# In the United States Court of Appeals for the Fourth Circuit

RUBY LAMBERT,
*Plaintiff-Appellant,*

v.

NAVY FEDERAL CREDIT UNION,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 1:19-cv-00103-LO-MSN (The Honorable Liam O'Grady)

## JOINT APPENDIX

D. BRADFORD HARDIN, JR.
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave. NW, Suite 800
Washington, DC 20006
(202) 973-4238
*bradfordhardin@dwt.com*

FREDERICK B. BURNSIDE
REBECCA J. FRANCIS
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
(206) 622-3150
*fredburnside@dwt.com*
*rebeccafrancis@dwt.com*

*Counsel for Defendant-Appellee*

MATTHEW W.H. WESSLER
GREGORY A. BECK
GUPTA WESSLER PLLC
1900 L Street NW, Suite 312
Washington, DC 20036
(202) 888-1741
*matt@guptawessler.com*

JEFFREY KALIEL
SOPHIA G. GOLD
KALIEL PLLC
1875 Connecticut Avenue NW, 10th Fl.
Washington, DC 20009
(202) 350-4783
*jkaliel@kalielpllc.com*

*Counsel for Plaintiff-Appellant*
*(additional counsel listed on next page)*

December 23, 2019

HASSAN A. ZAVAREEI
ANDREA GOLD
TYCKO & ZAVAREEI LLP
1828 L Street NW, Suite 1000
Washington, DC 20036
(202) 973-0900
*agold@tzlegal.com*

JONATHAN M. STEISFELD
DANIEL TROPIN
KOPELOWITZ OSTROW
  FERGUSON WEISELBERG GILBERT
1 West Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
(954) 525-4100
*streisfeld@kolawyers.com*

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

District court docket.................................................................................................1

Complaint (Dkt. 1) ..............................................................................................6

Exhibit A – Important Disclosures (Dkt. 1-1) ..............................................24

Exhibit B – Schedule of Fees and Charges (Dkt. 1-2) ................................35

Exhibit C – Online Banking Application and Consent (Dkt. 1-3)............39

Plaintiff's Opposition to Motion to Dismiss (Dkt. 28) ..............................52

Transcript (Dkt. 36)...........................................................................................85

Memorandum Opinion and Order (Dkt. 37)..............................................126

Notice of Appeal (Dkt. 38)............................................................................140

APPEAL,CLOSED,JURY

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:19-cv-00103-LO-MSN

Lambert v. Navy Federal Credit Union
Assigned to: District Judge Liam O'Grady
Referred to: Magistrate Judge Michael S. Nachmanoff
Case in other court: 4th Circuit, 19-01993
Cause: 28:1332 Diversity-Breach of Contract

Date Filed: 01/28/2019
Date Terminated: 08/14/2019
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Ruby Lambert**                          represented by   **Andrew Joseph Guzzo**
                                                           Kelly Guzzo PLC
                                                           3925 Chain Bridge Road
                                                           Suite 202
                                                           Fairfax, VA 22030
                                                           703-424-7576
                                                           Fax: 703-591-0167
                                                           Email: aguzzo@kellyguzzo.com
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Casey Shannon Nash**
                                                           Kelly Guzzo PLC
                                                           3925 Chain Bridge Road
                                                           Suite 202
                                                           Fairfax, VA 22030
                                                           703-424-7571
                                                           Fax: 703-591-0167
                                                           Email: casey@kellyguzzo.com
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Kristi Cahoon Kelly**
                                                           Kelly Guzzo PLC
                                                           3925 Chain Bridge Road
                                                           Suite 202
                                                           Fairfax, VA 22030
                                                           703-424-7570
                                                           Fax: 703-591-9285
                                                           Email: kkelly@kellyguzzo.com
                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**Navy Federal Credit Union**             represented by   **Don Bradford Hardin , Jr.**

JA 1

Davis Wright Tremaine LLP (DC)
1919 Pennsylvania Ave NW
Suite 800
Washington, DC 20006
202-973-4238
Fax: 202-973-4438
Email: bradfordhardin@dwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/28/2019 | 1 | Complaint ( Filing fee $ 400, receipt number 0422-6465204.), filed by Ruby Lambert. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Civil Cover Sheet)(Kelly, Kristi) (Attachment 4 replaced on 1/29/2019) (dvanm, ). (Entered: 01/28/2019) |
| 01/28/2019 | 2 | Proposed Summons by Ruby Lambert. (Kelly, Kristi) (Entered: 01/28/2019) |
| 01/28/2019 | | Initial Case Assignment to District Judge Liam O'Grady and Magistrate Judge Michael S. Nachmanoff. (dvanm, ) (Entered: 01/29/2019) |
| 01/29/2019 | | Notice of Correction re 1 Complaint exhibit #4 Civil Cover Sheet. The filing user has been notified that the civil cover sheet is an incorrectly saved PDF fillable form and has been removed. The filing user was directed to refile the document. (dvanm, ) (Entered: 01/29/2019) |
| 01/29/2019 | 3 | Summons Issued as to Navy Federal Credit Union. NOTICE TO ATTORNEY: Print out two electronically issued summons and one copy of the attachments for each defendant to be served with the complaint. (Attachments: # 1 Notice)(dvanm, ) (Entered: 01/29/2019) |
| 01/29/2019 | 4 | NOTICE of Appearance by Casey Shannon Nash on behalf of Ruby Lambert (Nash, Casey) (Entered: 01/29/2019) |
| 01/29/2019 | 5 | NOTICE of Appearance by Andrew Joseph Guzzo on behalf of Ruby Lambert (Guzzo, Andrew) (Entered: 01/29/2019) |
| 01/29/2019 | 6 | NOTICE by Ruby Lambert *(Notice Regarding Cover Sheet)* (Attachments: # 1 Exhibit 1 - Civil Cover Sheet)(Kelly, Kristi) (Entered: 01/29/2019) |
| 02/19/2019 | 7 | NOTICE of Appearance by Don Bradford Hardin, Jr on behalf of Navy Federal Credit Union (Hardin, Don) (Entered: 02/19/2019) |
| 02/19/2019 | 8 | Motion to appear Pro Hac Vice by Fred B. Burnside and Certification of Local Counsel Don Bradford Hardin Jr. Filing fee $ 75, receipt number 0422-6500210. by Navy Federal Credit Union. (Attachments: # 1 Courts of Admittance)(Hardin, Don) (Entered: 02/19/2019) |
| 02/19/2019 | 9 | Motion to appear Pro Hac Vice by Rebecca Francis and Certification of Local Counsel Don Bradford Hardin Jr. Filing fee $ 75, receipt number 0422-6500254. by Navy |

JA 2

| | | |
|---|---|---|
| | | Federal Credit Union. (Attachments: # 1 Court of Admittance)(Hardin, Don) (Entered: 02/19/2019) |
| 02/21/2019 | 10 | ORDER granting 8 Motion for Pro hac vice. Signed by District Judge Liam O'Grady on 2/21/2019. (dvanm, ) (Entered: 02/22/2019) |
| 02/21/2019 | 11 | ORDER granting 9 Motion for Pro hac vice. Signed by District Judge Liam O'Grady on 2/21/2019. (dvanm, ) (Entered: 02/22/2019) |
| 03/01/2019 | 12 | Motion to appear Pro Hac Vice by Jeffrey Ostrow and Certification of Local Counsel Kristi Cahoon Kelly Filing fee $ 75, receipt number 0422-6518628. by Ruby Lambert. (Kelly, Kristi) (Entered: 03/01/2019) |
| 03/01/2019 | 13 | Motion to appear Pro Hac Vice by Jonathan Streisfeld and Certification of Local Counsel Kristi Cahoon Kelly Filing fee $ 75, receipt number 0422-6518638. by Ruby Lambert. (Kelly, Kristi) (Entered: 03/01/2019) |
| 03/05/2019 | 14 | ORDER granting 12 Motion for Pro hac vice. Signed by District Judge Liam O'Grady on 3/5/2019. (dvanm, ) (Entered: 03/05/2019) |
| 03/05/2019 | 15 | ORDER granting 13 Motion for Pro hac vice. Signed by District Judge Liam O'Grady on 3/5/2019. (dvanm, ) (Entered: 03/05/2019) |
| 03/05/2019 | 16 | WAIVER OF SERVICE Returned Executed Navy Federal Credit Union waiver sent on 1/29/2019, answer due 4/1/2019. (dvanm, ) (Entered: 03/05/2019) |
| 03/06/2019 | 17 | NOTICE by Ruby Lambert *(Return of Unexecuted Summons)* (Nash, Casey) (Entered: 03/06/2019) |
| 04/01/2019 | 18 | Financial Interest Disclosure Statement (Local Rule 7.1) by Navy Federal Credit Union. (Hardin, Don) (Entered: 04/01/2019) |
| 04/01/2019 | 19 | MOTION to Dismiss for Failure to State a Claim by Navy Federal Credit Union. (Attachments: # 1 Proposed Order)(Hardin, Don) (Entered: 04/01/2019) |
| 04/01/2019 | 20 | Memorandum in Support re 19 MOTION to Dismiss for Failure to State a Claim filed by Navy Federal Credit Union. (Hardin, Don) (Entered: 04/01/2019) |
| 04/01/2019 | 21 | Notice of Hearing Date set for 04/26/2019 re 19 MOTION to Dismiss for Failure to State a Claim (Hardin, Don) (Entered: 04/01/2019) |
| 04/02/2019 | | Set Deadlines as to 19 MOTION to Dismiss for Failure to State a Claim . Motion Hearing set for 4/26/2019 at 10:00 AM in Alexandria Courtroom 1000 before District Judge Liam O'Grady. (clar, ) (Entered: 04/02/2019) |
| 04/03/2019 | 22 | Notice of Hearing Date re 19 MOTION to Dismiss for Failure to State a Claim (Hardin, Don) (Entered: 04/03/2019) |
| 04/04/2019 | | Reset Deadlines as to 19 MOTION to Dismiss for Failure to State a Claim . Motion Hearing set for 5/24/2019 at 10:00 AM in Alexandria Courtroom 1000 before District Judge Liam O'Grady. (clar, ) (Entered: 04/04/2019) |
| 04/04/2019 | 23 | Motion to appear Pro Hac Vice by Katherine Marie Aizpuru and Certification of Local |

JA 3

| | | Counsel Casey S. Nash Filing fee $ 75, receipt number 0422-6574316. by Ruby Lambert. (Nash, Casey) (Entered: 04/04/2019) |
|---|---|---|
| 04/04/2019 | 24 | Motion to appear Pro Hac Vice by Hassan Ali Zavareei and Certification of Local Counsel Casey S Nash Filing fee $ 75, receipt number 0422-6574335. by Ruby Lambert. (Nash, Casey) (Entered: 04/04/2019) |
| 04/04/2019 | 25 | Motion to appear Pro Hac Vice by Jeffrey Douglas Kaliel and Certification of Local Counsel Casey S Nash Filing fee $ 75, receipt number 0422-6574342. by Ruby Lambert. (Nash, Casey) (Entered: 04/04/2019) |
| 04/04/2019 | 26 | Motion to appear Pro Hac Vice by Sophia Goren Gold and Certification of Local Counsel Casey S Nash Filing fee $ 75, receipt number 0422-6574346. by Ruby Lambert. (Nash, Casey) (Entered: 04/04/2019) |
| 04/04/2019 | 27 | Motion to appear Pro Hac Vice by Andrea Rifka Gold and Certification of Local Counsel Casey S Nash Filing fee $ 75, receipt number 0422-6574351. by Ruby Lambert. (Nash, Casey) (Entered: 04/04/2019) |
| 04/15/2019 | 28 | Memorandum in Opposition re 19 MOTION to Dismiss for Failure to State a Claim filed by Ruby Lambert. (Kelly, Kristi) (Entered: 04/15/2019) |
| 04/16/2019 | 29 | ORDER granting 23 Motion for Pro hac vice. Signed by District Judge Liam O'Grady on 4/16/2019. (dvanm, ) (Entered: 04/17/2019) |
| 04/16/2019 | 30 | ORDER granting 24 Motion for Pro hac vice. Signed by District Judge Liam O'Grady on 4/16/2019. (dvanm, ) (Entered: 04/17/2019) |
| 04/16/2019 | 31 | ORDER granting 25 Motion for Pro hac vice. Signed by District Judge Liam O'Grady on 4/16/2019. (dvanm, ) (Entered: 04/17/2019) |
| 04/16/2019 | 32 | ORDER granting 26 Motion for Pro hac vice. Signed by District Judge Liam O'Grady on 4/16/2019. (dvanm, ) (Entered: 04/17/2019) |
| 04/16/2019 | 33 | ORDER granting 27 Motion for Pro hac vice. Signed by District Judge Liam O'Grady on 4/16/2019. (dvanm, ) (Entered: 04/17/2019) |
| 04/22/2019 | 34 | REPLY to Response to Motion re 19 MOTION to Dismiss for Failure to State a Claim filed by Navy Federal Credit Union. (Hardin, Don) (Entered: 04/22/2019) |
| 05/24/2019 | 35 | Minute Entry for proceedings held before District Judge Liam O'Grady:Motion Hearing held on 5/24/2019 re 19 MOTION to Dismiss for Failure to State a Claim filed by Navy Federal Credit Union. Counsel enter their appearances and present arguments. Court takes matter under advisement. (Court Reporter T. Harris.)(awac, ) (Entered: 05/24/2019) |
| 08/09/2019 | 36 | TRANSCRIPT of proceedings held on 5/24/2019, before Judge L. O'Grady, Court Reporter/Transcriber Tonia Harris, Telephone number 703-646-1438. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our** |

JA 4

| | | website at **www.vaed.uscourts.gov** Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 9/9/2019. Redacted Transcript Deadline set for 10/9/2019. Release of Transcript Restriction set for 11/7/2019.(harris, tonia) (Entered: 08/09/2019) |
|---|---|---|
| 08/14/2019 | [37](#) | MEMORANDUM OPINION and ORDER granting [19](#) Motion to Dismiss for Failure to State a Claim. Finding that amendment would be futile, Plaintiff's Complaint is hereby DISMISSED WITH PREJUDICE. Signed by District Judge Liam O'Grady on 8/14/2019. (rban, ) (Entered: 08/15/2019) |
| 09/11/2019 | [38](#) | NOTICE OF APPEAL as to [37](#) Order on Motion to Dismiss for Failure to State a Claim, by Ruby Lambert. Filing fee $ 505, receipt number 0422-6831443. (Kelly, Kristi) (Entered: 09/11/2019) |
| 09/11/2019 | [39](#) | Transmission of Notice of Appeal to US Court of Appeals re [38](#) Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (dvanm, ) (Entered: 09/11/2019) |
| 09/11/2019 | | Assembled INITIAL Electronic Record Transmitted to 4CCA re [38](#) Notice of Appeal (dvanm, ) (Entered: 09/11/2019) |
| 09/12/2019 | [40](#) | USCA Case Number 19-1993 4th Circuit, Case Manager A. Brownlee for [38](#) Notice of Appeal filed by Ruby Lambert. (rban, ) (Entered: 09/12/2019) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/01/2019 14:10:29 | | |
| **PACER Login:** | gregbeck:3965956:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-cv-00103-LO-MSN |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| RUBY LAMBERT, individually and on behalf of all others similarly situated, | Civil Action No. 1:19-cv-103 |
| Plaintiff, | |
| v. | |
| NAVY FEDERAL CREDIT UNION, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Ruby Lambert ("Ms. Lambert" or "Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint ("Complaint") against Defendant Navy Federal Credit Union ("NFCU" or the "Credit Union"), and based upon personal knowledge with respect to herself, and on information and belief and the investigation of counsel as to all other matters, in support thereof alleges as follows:

### INTRODUCTION

1. This case concerns NFCU's unlawful business practice of imposing multiple Non-Sufficient Funds Fees ("NSF Fees") on the same transaction.

2. Plaintiff brings this action on behalf of herself and all similarly situated consumers against NFCU, arising from a specific fee generation practice that violates the Credit Union's contracts and/or is deceptive.

3. Three NFCU documents permit the Credit Union to charge a single $29 NSF Fee when it determines a customer's account contains insufficient funds to pay a transaction and it rejects the charge. *See* Navy Federal Credit Union Important Disclosures ("Deposit Agreement"),

attached hereto as **Exhibit A**, Schedule of Fees and Charges attached hereto as **Exhibit B**, and Authorized User for Navy Federal Online Banking Application and Consent ("Online Banking Agreement") attached hereto as **Exhibit C** (collectively "Account Documents").

4.     Through the imposition of NSF Fees, NFCU makes tens of millions of dollars annually often at the expense of its most vulnerable customers.  In doing so, NFCU violates its Code of Ethics, which requires it to "act with the highest degree of integrity, which requires being honest and candid."  *See https://www.navyfederal.org/about/code-of-ethics.php* (last visited on January 23, 2019).

5.     Ms. Lambert does not dispute the Credit Union's right to reject a transaction and charge a *single* NSF Fee, but NFCU unlawfully maximizes its already profitable NSF Fees with deceptive practices that also violate the express terms of its contract.

6.     Specifically, NFCU unlawfully assesses *multiple* NSF Fees on a single Automated Clearing House (ACH) transaction or check.

7.     Unbeknownst to consumers, each time NFCU reprocesses an ACH transaction or check for payment after it was initially rejected for insufficient funds, NFCU chooses to treat it as a new and unique item or transaction that is subject to yet another NSF Fee. But NFCU's Account Documents never disclose that this counterintuitive and deceptive result could be possible and, in fact, suggest the opposite.

8.     NFCU's Account Documents indicate that only a *single* NSF Fee will be charged per "transaction" or "item," however, many times that item is reprocessed with no request from the customer to do so. An electronic item reprocessed after an initial return for insufficient funds, especially through no action by the customer, cannot and does not fairly become a new, unique item for fee assessment purposes.  This is particularly true here, where NFCU reprocesses the

items knowing there are insufficient funds, and thus does so solely to cause additional fees and increase the Credit Union's profits at the expense of its customers.

9.      NFCU breaches its contract when it charges more than one $29 NSF Fee on the same item, since the contract explicitly states—and reasonable consumers understand—that the same *item* can only incur a *single* NSF Fee.

10.      This practice not only violates NFCU's contracts, but is also unfair and deceptive under the consumer protection law of North Carolina (where Ms. Lambert is a citizen and resides)

11.      Plaintiff and other NFCU customers have been injured by NFCU's improper practice.      On behalf of herself and the Classes (defined below), Plaintiff seeks damages, restitution, and injunctive relief for NFCU's breach of contract and breach of the covenant of good faith and fair dealing and violation of the North Carolina consumer protection statute.

## PARTIES

12.      Ms. Lambert is a citizen of North Carolina who maintains an NFCU checking account.

13.      Defendant NFCU is a national credit union with its headquarters and principal place of business located in Vienna, Virginia.  Among other things, NFCU is engaged in the business of providing retail credit union services to consumers, including Plaintiff and members of the putative classes, throughout the United States.

## JURISDICTION AND VENUE

14.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the class (Ms. Lambert) is a citizen of a State different from the Defendant.  The number of members of the proposed Classes in

aggregate exceeds 100 accountholders.  28 U.S.C. § 1332(d)(5)(B).

15.     This Court has personal jurisdiction over the Defendant because Defendant's actions and omissions committed in or aimed at this District gave rise to the claims alleged in this Complaint.  Also, Defendant is headquartered and has its principal place of business in this District.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## SUBSTANTIVE ALLEGATIONS

17.     As alleged more fully herein, NFCU's Account Documents allow it to take certain steps when a Credit Union accountholder attempts a transaction, but does not have sufficient funds to cover it. Specifically, the Credit Union may (a) authorize the transaction and charge a *single* $20 overdraft fee ("OD Fee");[1] or (b) reject the transaction and charge a *single* $29 NSF Fee.

18.     In contrast to its Account Documents, however, NFCU regularly assesses two or more NSF Fees on the *same* item or transaction.

19.     This abusive practice is not universal in the financial services industry.  Indeed, major banks like Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one NSF Fee on the same item when it is reprocessed.  Instead, Chase charges one NSF Fee even if a transaction is resubmitted for payment multiple times.

20.     NFCU's Account Documents never disclose this practice. To the contrary, the Credit Union's Account Documents indicate it will only charge a single NSF Fee on an item or per transaction.

### A.  Ms. Lambert's Experience

21.     In support of her claims, Ms. Lambert offers an example of NSF Fees that should

---

[1] NFCU calls its OD Fee an "OOPS fee."

not have been assessed against her checking account. As alleged below, NFCU: (a) reprocessed a previously declined transaction; and (b) charged a fee upon reprocessing.

22.     On October 16, 2018, Plaintiff attempted a $96.66 insurance payment to Mutual of Omaha.

23.     NFCU rejected payment of that transaction due to insufficient funds in Ms. Lambert's account and charged her a $29 NSF Fee for doing so.  Ms. Lambert does not dispute the initial fee, as it is allowed by NFCU's Account Documents.

24.     Unbeknownst to Ms. Lambert and without her request to NFCU to retry the transaction, however, two days later, on October 18, 2018, NFCU processed the same transaction yet again, and again NFCU rejected the transaction due to insufficient funds and charged Plaintiff *another* $29 NSF Fee.

25.     *In sum, NFCU charged Plaintiff $58 in fees to attempt to process a single insurance payment.*

26.     Plaintiff understood the payment to be a single transaction as is laid out in NFCU's contract, capable at most of receiving a single NSF Fee (if NFCU returned it) or a single OD Fee (if NFCU paid it).

**B. The Imposition of Multiple NSF Fees on a Single Transaction Violates NFCU's Express Promises and Representations**

27.     The Deposit Agreement provides the general terms of Ms. Lambert's relationship with the Credit Union and therein NFCU makes explicit promises and representations regarding how transactions will be processed, as well as when NSF Fees and OD Fees may be assessed.

28.     The Deposit Agreement does not define the term "item" or "transaction," and never states the same "item" or "transaction" can cause multiple NSF Fees.

29.     Instead, the Deposit Agreement contains explicit terms indicating that NSF Fees

will only be assessed once per transaction or item—defined as a customer request for payment or transfer—when in fact NFCU regularly charges two or more NSF Fees per transaction or item even though a customer only requested the payment or transfer once.

30.     NFCU's Account Documents indicate that a singular NSF Fee can be assessed on checks, ACH debits, and electronic payments.

31.     NFCU's Account Documents state that it will charge $29 per item or transaction that is returned due to insufficient funds.

32.     While the term "check" and "ACH debit" are not expressly defined, their usage throughout the NFCU Deposit Agreement reveals that the terms must describe all iterations of a given instruction for transfer or payment from a checking or savings account.  For example, the Deposit Agreement states:

> An ACH debit might be made as a result of an authorization you gave a third party to automatically transfer funds from your account to pay your monthly insurance premium, utility bills, or car payment.

33.     According to two other provisions in the Deposit Agreement, a <u>single</u> fee will be assessed when a check or debit item is returned:

> Navy Federal is authorized to refuse checks that exceed funds available in the checking account. **A fee** will be assessed in the amount shown on Navy Federal's current Schedule of Fees and Charges **for each refused check**.
>
> […]
>
> Navy Federal may return debits to the checking account (e.g., an ACH payment) if the amount of the debit exceeds funds available in the checking account. **A fee** may be assessed in the amount shown on Navy Federal's current Schedule of Fees and Charges **for each returned debit item**.
>
> (Emphasis added.)

34.     While "debit item" is not defined, the same instruction for payment on an account cannot conceivably become a new "item" each time it is rejected for payment then reprocessed,

especially when—as here—Plaintiff took no action to resubmit it.

35.     Similarly, the Online Banking Agreement states that "a" (singular) NSF Fee "may"

be assessed on a returned payment:

### 3. Failed or Returned Transactions.

In using the Service, you are requesting us to make payments for you from your Payment Account. If we are unable to complete the withdrawal from your Payment Account for any reason (for example, *there are non-sufficient funds in your Payment Account to cover the transaction*, or the transaction would exceed the credit or overdraft protection limit of your Payment Account), the payment may not be made. In some instances, you will receive a return notice from us. In each such case, you agree that:

* you will reimburse us immediately upon demand for the transaction amount that has been returned to the Service;
* you will reimburse us immediately upon demand for any transaction amount paid by the Service;
* *we may charge you a non-sufficient funds (NSF) fee* in accordance with our Schedule of Fees and Charges available at **navyfederal.org**, even if the payment is not returned but is paid[.]

(Emphasis added.)

36.     The Deposit Agreement also states: "If we do not pay an overdraft, your transaction

will be declined and/or your check/ACH will be returned, unpaid."  This eliminates any right of

NFCU to reprocess the same transaction and charge multiple NSF Fees.

37.     There is zero indication anywhere in the Account Documents that the same "debit

item," "ACH debit," "check" or other withdrawal is eligible to incur multiple NSF Fees.

38.     A "transaction," like a check or ACH, is a request for payment by an accountholder.

It does not become a new "transaction" when it is later reprocessed by NFCU.

39.     Even if NFCU reprocesses an instruction for payment, it is still the same "item" or

"transaction."  The Credit Union's reprocessing is simply another attempt to effectuate Ms.

Lambert's original order or instruction.

40.     The disclosures identified above never discuss a circumstance where NFCU may

assess multiple NSF Fees for a single check or ACH transaction that was returned for insufficient

funds and later reprocessed one or more times and returned again.

41.     Because Ms. Lambert only made one authorization for payment for her ACH transaction, there is no new "item" or "transaction" when that transaction is rejected then automatically reprocessed for payment by NFCU.

42.     In sum, NFCU promises that at most one $29 NSF Fee will be assessed per electronic payment, check, ACH debit, or debit item, and these terms must mean all iterations of the same instruction for payment.  As such, NFCU breached the contract when it charged more than one NSF Fee per item.

43.     Reasonable consumers understand any given authorization for payment to be one, singular "debit item," "ACH debit" or other withdrawal, as those terms are used in NFCU's Account Documents.

44.     Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same transaction will be treated as the same "item," which the Credit Union will either authorize (resulting in an overdraft item) or reject (resulting in a returned item) when it decides there are insufficient funds in the account.  Nowhere does NFCU disclose that it will treat each reprocessing of a check or ACH payment as a separate item, subject to additional fees, nor do NFCU customers ever agree to such fees.

45.     Customers reasonably understand, based on the language of the Deposit Agreement and NFCU's other Account Documents, that the Credit Union's reprocessing of checks or ACH payments are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger NSF Fees.  In other words, it is always the same item or transaction.

46.     Banks and credit unions like NFCU that employ this abusive practice know how to plainly and clearly disclose it.  Indeed, other banks and credit unions that do engage in this abusive

practice disclose it expressly to their accountholders—something NFCU never did.

47.    For example, First Citizens Bank, a major institution in the Carolinas, engages in

the same abusive practice as NFCU, but at least expressly states:

> Because we may charge a service fee for an NSF item each time it is presented, **we may charge you more than one service fee for any given item**. All fees are charged during evening posting. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

(emphasis added).

48.    First Hawaiian Bank engages in the same abusive practices as NFCU, but at least

currently discloses it in its online banking agreement, in all capital letters, as follows:

> YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**.

(emphasis added).

49.    Klein Bank similarly states in its online banking agreement:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. We will charge an NSF/Overdraft Fee as provided in this section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.

50.    NFCU provides no such disclosure, and in so doing, deceives its accountholders.

**C. The Imposition of Multiple NSF Fees on a Single Transaction Breaches NFCU's Duty of Good Faith and Fair Dealing**

51.    Parties to a contract are required not only to adhere to the express conditions in the

contract, but also to act in good faith when they are invested with a discretionary power over the

other party. In such circumstances, the party with discretion is required to exercise that power and discretion in good faith. This creates an implied promise to act in accordance with the parties' reasonable expectations and means that the Credit Union is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the Credit Union has a duty to honor transaction requests in a way that is fair to Ms. Lambert and its other customers and is prohibited from exercising its discretion to pile on ever greater penalties on the depositor. Here—in the adhesion agreements NFCU foisted on Ms. Lambert and its other customers—NFCU has provided itself numerous discretionary powers affecting customers' credit union accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, the Credit Union abuses that discretion to take money out of consumers' account without their permission and contrary to their reasonable expectations that they will not be charged multiple fees for the same transaction.

52. As set forth in its Deposit Agreement, NFCU states "*A fee* may be assessed in the amount shown on Navy Federal's current Schedule of Fees and Charges *for each returned debit item*." (Emphasis supplied.) The Online Banking Agreement consistently states "*we may charge you a non-sufficient funds (NSF) fee* in accordance with our Schedule of Fees and Charges." (Emphasis added.) NFCU exercises its discretion in its own favor—and to the prejudice of Ms. Lambert and its other customers—when it reprocesses a transaction when it knows a customer's account lacks funds and then charges additional NSF Fees on a single item. Further, NFCU abuses the power it has over customers and their credit union accounts and acts contrary to their reasonable expectations under the Deposit Agreement. This is a breach of the Credit Union's implied covenant to engage in fair dealing and act in good faith.

53. Further, NFCU maintains complete discretion not to assess NSF Fees on

transactions at all. As alleged in the previous paragraph, the Credit Union "a fee may be assessed" or "we may charge you a non-sufficient funds (NSF) fee."  By exercising its discretion in its own favor—and to the prejudice of Ms. Lambert and other customers—by charging more than one NSF Fee on a single item, NFCU breaches the reasonable expectation of Ms. Lambert and other customers and in doing so violates the implied covenant to act in good faith.

54.     It was bad faith and totally outside Ms. Lambert's reasonable expectations for NFCU to use its discretion to assess $58 in fees for a single insurance payment.

55.     When NFCU charges multiple NSF Fees, the Credit Union uses its discretion to define the meaning of "debit item" and "ACH debit" in an unreasonable way that violates common sense and reasonable consumer expectations.  NFCU uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more NSF Fees.

56.     Moreover, NFCU provides itself discretion to refuse to reprocess transactions that are initially rejected.  It abuses that discretion to repeatedly reprocess transactions and to charge fees each time.

## CLASS ALLEGATIONS

57.     Ms. Lambert brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

58.     The proposed "Classes" are defined as:

**Nationwide Multiple NSF Fee Class**
All NFCU checking account holders in the United States who, during the applicable statute of limitations, were charged multiple NSF Fees on the same item (the "Class").

**North Carolina Multiple NSF Fee Class**
All NFCU checking account holders in North Carolina who, during the applicable statute of limitations, were charged multiple NSF Fees on the same item (the "North Carolina Subclass").

The classes are collectively referred to as the "Classes."

59.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

60.     Specifically excluded from the Classes are NFCU, its parents, subsidiaries, affiliates, officers and directors, any entity in which NFCU has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

61.     The members of the Classes are so numerous that joinder is impractical.  The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to NFCU's records.

62.     The claims of the representative plaintiff are typical of the claims of the Classes in that the representative plaintiff, like all members of the Classes, was charged multiple NSF Fees. The representative plaintiff, like all members of the Classes, has been damaged by NFCU's misconduct in that she has paid assessed unfair and unconscionable NSF Fees.  Furthermore, the factual basis of NFCU's misconduct is common to all members of the Classes, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.  Ms. Lambert has suffered the harm alleged and has no interests antagonistic to the interests of any other members of the Classes.

63.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members of the Classes.

64.     The questions of law and fact common to the Classes include:

A.      Whether NFCU charged multiple NSF Fees on a single transaction;

     B.     Whether NFCU breached its own contract by charging multiple NSF Fees on a single transaction;

     C.     Whether NFCU breached the covenant of good faith and fair dealing by charging multiple NSF Fees on a single transaction;

     D.     Whether NFCU violated North Carolina consumer protection law by charging multiple NSF Fees on a single transaction;

     E.     The proper method or methods by which to measure damages; and

     F.     The declaratory and injunctive relief to which the Classes are entitled.

65.     Ms. Lambert is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Ms. Lambert is an adequate representative and will fairly and adequately protect the interests of the Classes.

66.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual class member's claim is small relative to the complexity of the litigation, and due to the financial resources of NFCU, no class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Classes will continue to suffer losses and NFCU's misconduct will proceed without remedy.

67.     Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might

otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

68.     Plaintiff suffers a substantial risk of repeated injury in the future. Plaintiff, like all members of the Classes, is at risk of additional NSF Fees on repeated reprocessing of transactions. Plaintiff and the members of the Classes are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain NFCU from continuing to commit its unfair and illegal actions.

69.     NFCU has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing
#### (On Behalf of the Classes)

70.     Plaintiff incorporates by reference each of the allegations set forth in the preceding paragraphs.

71.     Plaintiff and NFCU have contracted for credit union account deposit and checking services, as embodied in NFCU's Deposit Agreement and related documentation.

72.     NFCU's account documents explicitly state that, when a customer lacks sufficient funds to cover a transaction, the Credit Union may either: (a) authorize the transaction and charge a single OD Fee; or (b) reject the transaction and charge a single NSF fee. NFCU regularly violates its contractual promises by charging multiple NSF Fees on a single transaction.

73.     Therefore, NFCU breached the terms of its contract with consumers by charging multiple NSF Fees on the same transaction.

74.    Under Virginia law, made applicable to all accountholders in the Deposit Agreement, every contract carries with it an implied covenant of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  The covenant requires faithfulness to an agreed common purpose and consistency with the justified expectations of the other party to a contract. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

75.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify contract terms, and interference with or failure to cooperate in the other party's performance.

76.    NFCU has breached the covenant of good faith and fair dealing in the contract through its multiple NSF Fee policy and practice as alleged herein.  Specifically, NFCU harms consumers by exercising its contractual discretion in bad faith, even though that discretion is only vested in NFCU, in a way which no reasonable consumer would anticipate.  NFCU abuses that discretion to take money out of customers' accounts without their permission and contrary to their reasonable expectations that they will not be charged multiple NSF Fees for the same transaction. Specifically, NFCU regularly: (a) reprocesses previously declined transactions, even when NFCU knows a customer's account lacks sufficient funds; and (b) charges NSF Fees upon reprocessing of previously declined transactions.

77.     Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the Deposit Agreement.

78.     Plaintiff and members of the Classes have sustained damages as a result of NFCU's breaches of contract and breaches of the covenant of good faith and fair dealing.

## SECOND CLAIM FOR RELIEF
## Violation of North Carolina Unfair and Deceptive Trade Practices Act
### (On Behalf of the North Carolina Subclass)

79.     Plaintiff incorporates by reference each of the allegations set forth in the preceding paragraphs.

80.     As described herein, NFCU's unconscionable and unfair actions regarding the assessment of NSF Fees constitute unfair competition and unfair and deceptive trade practices as defined by the laws of the United States of America and the State of North Carolina, including but not limited to N.C.G.S. § 75.1-1 et seq.

81.     NFCU engaged in unfair and deceptive acts and practices relating to the imposition of NSF fees in violation of N.C. Gen. Stat. §§ 75-1.1 et seq.

82.     As alleged herein, charging multiple NSF Fees on a single transactions is both unfair and deceptive, as it offends public policy, and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and it deceives customers who do not expect the charges.

83.     NFCU's acts and practices were in and affected commerce as defined by Chapter 75 of the North Carolina General Statutes.

84.     NFCU's acts and practices proximately caused injury to Plaintiff and the North Carolina Subclass, and they are entitled to, *inter alia*, damages and declaratory relief.

85.     Because of the unfair and deceptive acts and practices of NFCU, Plaintiff and the North Carolina Subclass seek an award of treble damages and attorneys' fees pursuant to N.C.

Gen. Stat. §§ 75-16, 75.16.1.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.      Declaring NFCU's NSF Fee policies and practices to be wrongful, unfair and unconscionable;

2.      Restitution of all relevant fees paid to NFCU by Plaintiff and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

3.      Disgorgement of the ill-gotten gains derived by NFCU from its misconduct;

4.      Actual damages in an amount according to proof;

5.      Statutory treble damages as permitted by law;

6.      Punitive and exemplary damages;

7.      Pre-judgment interest at the maximum rate permitted by applicable law;

8.      Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

9.      Such other relief as this Court deems just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

Dated:  January 24, 2019                              Respectfully submitted,


                                                     /s/_____

                                                     Kristi C. Kelly, Esq., VSB #72791
                                                     Andrew J. Guzzo, Esq., VSB #82170

Casey S. Nash, Esq., VSB #84261
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Fax: (703) 591-0167
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com
Email:  casey@kellyandcrandall.com

Jeffrey D. Kaliel (pro hac vice to be filed)
Sophia G. Gold (pro hac vice to be filed)
**KALIEL PLLC**
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C.  20009
(202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com

Hassan A. Zavareei (pro hac vice to be filed)
Andrea Gold (pro hac vice to be filed)
**TYCKO & ZAVAREEI LLP**
1828 L Street, NW, Suite 1000
Washington, DC 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
hzavareei@tzlegal.com
agold@tzlegal.com

Jeff Ostrow (pro hac vice to be filed)
Jonathan M. Streisfeld (pro hac vice to be filed)
**KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT**
One W. Las Olas Blvd.
Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
ostrow@kolawyers.com
streisfeld@kolawyers.com

*Attorneys for Plaintiff and the Putative Classes*

# Exhibit A



**NAVY FEDERAL CREDIT UNION**

# IMPORTANT DISCLOSURES



navyfederal.org
1-888-842-6328

**Federally insured by NCUA.**
© 2018 Navy Federal NFCU 606 (7-18)

# Table of Contents

Membership/Savings/Checking Disclosure Statement...........................................1

Funds Availability Schedule..................................................................7

Electronic Funds Transfer Agreement and Disclosure...........................................9

What Does Navy Federal Do With Your Personal Information?..............................14

Your Affiliate Marketing Choices.............................................................16

# Membership/Savings/Checking Disclosure Statement

## Membership

Upon verification of eligibility following submission of a completed membership application and acceptance for membership by the membership officer, and upon purchase of at least one share ($5), a Membership Savings Account will be established in your name, indicating that you are a member-owner of Navy Federal Credit Union (Navy Federal). Membership at Navy Federal comes with certain ongoing responsibilities. By signing your original membership application, you and your joint owner(s), if any, agree to abide by the properly disclosed terms and conditions of all accounts or services that you may receive at Navy Federal. You also agree to keep Navy Federal informed of your current mailing address. The terms and conditions of these accounts and services are subject to change without notice to you, unless prior notification is required by law.

A balance of at least one share ($5) is required to establish and maintain membership. The balance in your Membership Savings Account must not be reduced below the value of one share ($5) at any given time. If your Membership Savings Account maintains a balance of less than a share ($5) for 180 consecutive days, the Membership Savings Account may be closed, thereby terminating your membership. To protect your member-owner status, we may limit access to your initial share ($5). You will be considered an active Member in Navy Federal as long as you have a Membership Savings Account balance of $50 or more; have a Membership Savings Account balance of $5 or more and a checking account, a Money Market Savings Account (MMSA), a certificate, an Individual Retirement Account, a credit card account, an additional savings account, or a current consumer loan or mortgage account; or have a Membership Savings Account balance of $5 or more and are a Member under the age of 24. If you do not meet one of the above criteria, you will be considered an inactive Member and may be subject to a quarterly Inactive Member Fee in the amount listed on Navy Federal's current *Schedule of Fees and Charges*. The fee will be assessed until you meet one of the criteria listed above or the Membership Savings Account is closed, thereby terminating your membership. Once this happens, you must be in Navy Federal's field of membership to reopen the account.

A savings account may not be used for commercial or business purposes.

## Restriction of Services

Navy Federal may restrict or suspend access by a Member to any or all products or services, except the basic rights of a Member to vote in annual and special meetings and maintain a share account, if a Member engages in conduct that is abusive to the credit union and its membership. This conduct includes, but is not limited to: actions that abuse the products or services of the credit union; abusive or threatening behavior; and suspicious, fraudulent, illegal, dishonest, or deceptive activities. Restrictions or suspensions of accounts, products, and/or services will be reasonably related to the nature of the Member's conduct. This policy will also apply to joint owners and authorized users of accounts, products, and services. When a Member is delinquent on a loan or has caused Navy Federal a loss, Navy Federal may deny that Member's subsequent application for any new product or service that would allow the Member to obtain further credit from Navy Federal or cause Navy Federal a further loss. Pursuant to Navy Federal's bylaws and the Federal Credit Union Act, Members may be expelled at a special meeting called for the purpose of expelling those Members.

### Contacting You Via Your Cell Phone Number or Email Address

You must provide us a phone number and an email address to discuss your accounts with us. If you provide a cell phone number, Navy Federal has your permission to contact you at that number about all your Navy Federal accounts, including account servicing and collection purposes. We may contact you for non-marketing purposes in any way, including automated calls, text messages, and/or prerecorded or artificial voice messages. You agree to promptly notify us if your contact information changes. Message and data rates may apply. Visit **navyfederal.org** for more information.

If you provide an email address, Navy Federal has your permission to send you email messages using an automatic emailing system for commercial or transactional purposes.

Navy Federal may at any time request the following from you in relation to your Mobile or Online Banking activities: electronic banking credentials, implementation of alternative risk control mechanisms, or may contact authorities when suspicious account activity or Member security-related events occur.

| Services Offered | SMS No. | Purpose of Service | Frequency of Messages |
|---|---|---|---|
| Security Alerts | 73077 | Free to End User notifications to alert you about possible risk of fraud, identify theft, and/or account security | Message frequency varies |
| Credit Card Fraud Alerts | 33748 | Free to End User notifications to alert you about possible risk of credit card fraud | Message frequency varies |
| Account Transaction Alerts | 40554 | Notifications related to account transactions, including, but not limited to, account balance alerts or deposit confirmation alerts | Message frequency varies |
| Account Servicing and Collection Alerts | 37531 | Notifications to contact you for account servicing and collection purposes, including payment reminders | Message frequency varies |
| SMS Text Banking Alerts | 46328 | Receive account information via a text message. For example, low balance alerts, view account transaction history, or transfer money between accounts. | Message frequency varies |
| On-Demand Alerts | 73949 | Receive information you have requested via a one-time text message on your mobile phone | One-time per request |
| One-Time Passcode Alerts | 668439 | Free to End User text message to receive your passcode via a one-time text message on your mobile phone | One-time per request |

If you have questions about mobile or text messages related to the Services listed above, you may send a text message with the word "HELP" to the applicable SMS Short Code or call us toll-free at 1-888-868-8123. To stop receiving text messages for any of the above Services on your phone, text "STOP" to the applicable SMS Short Code. Wireless service providers and wireless carriers are not liable for delayed or undelivered messages.

## Required IRS and Bank Secrecy Act (BSA) Information

Federal law requires each individual becoming a Member to certify under penalty of perjury that the Taxpayer Identification Number (TIN) furnished to Navy Federal is the individual's correct number and the individual is not subject to backup withholding. For an individual, your TIN is usually your Social Security Number. The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required for backup withholding. Failure to provide a valid TIN and to complete and sign a membership application certifying your Social Security Number for this purpose could result in backup withholding being applied to all your interest earnings (dividends) at Navy Federal. If you are not a U.S. citizen or U.S. resident alien, you must complete a Form W-8BEN verifying non-resident alien status.

In addition, in compliance with the Currency and Foreign Transactions Act, also known as the Bank Secrecy Act (BSA), the U.S. government now requires that we ask you to supply certain information about your employment and other sources of income.

## Dividends

Dividends are a division and distribution of earnings among Members, after all expenses have been paid and the required amount has been set aside for reserves. Dividend rates are declared prospectively by the Board of Directors in the month preceding the dividend period. These prospective dividend rates may change at the determination of the Board. Navy Federal also provides the Annual Percentage Yield (APY) for each dividend rate declared by the Board. Payment of all dividends is dependent on the availability of earnings at the end of the period. Dividends at Navy Federal are earned on deposits, including non-cash deposits, from day-of-deposit to day-of-withdrawal (eDeposits on checking, savings, and MMSA accounts are earned from the day of acceptance of the eDeposit), and are computed using the daily balance method by applying the daily periodic rate to the full amount in the account at the end of the day. Dividends for the savings and checking accounts, where applicable, are credited the last day of the period they are earned and are compounded monthly. The dividend period is monthly—for example, the beginning date of the first dividend period of the calendar year is Jan. 1, and the ending date of such dividend period is Jan. 31. All other dividend periods follow this same pattern of dates.

## Current Rates and Fees

Current rates may be obtained online at navyfederal.org or by calling Navy Federal toll-free in the U.S. at 1-888-842-6328. For toll-free numbers when overseas, visit navyfederal.org. Use 1-703-255-8837 for collect international calls. Fees and charges that may be assessed are disclosed on Navy Federal's current Schedule of Fees and Charges.

## Share Insurance Coverage

Your shares at Navy Federal are federally insured. Share insurance coverage is provided by the National Credit Union Administration (NCUA), an independent government agency that charters, regulates, and insures federal credit unions. Your shares are backed by our solid financial standing. The insurance protects Members against loss if a federal credit union fails. Individual accounts are insured for up to $250,000 for combined balances in your savings, checking, share certificates, and MMSAs. Joint accounts are insured for up to $250,000 for each joint owner on the account. The most share insurance coverage any Member can have as a result of joint ownership is $250,000, regardless of the number of joint accounts he or she co-owns.

The combined balances in your Traditional, Simplified Employee Pension (SEP), and Roth IRA plans are insured separately from your other Navy Federal accounts for up to $250,000. Educational Savings Accounts (ESAs) are insured separately from your other Navy Federal accounts for up to $250,000.

Payable on Death (POD) accounts are insured separately from your other Navy Federal accounts. Each owner is insured for up to $250,000 per beneficiary. Deposit Trust Accounts are insured separately from your other Navy Federal accounts. Each grantor is insured for up to $250,000 per beneficiary. For more information about NCUA share insurance, please see the Insurance on Your Savings brochure (NFCU 1116e).

## Joint Ownership

If you designate a joint owner on any depository account(s), it is co-owned equally by you and the joint owner. Joint ownership means that the shares and accumulated dividends may be withdrawn or transferred by you or the joint owner, or pledged as collateral against a loan by you or the joint owner (if a Member) at any time. Navy Federal is not liable for carrying out any of these requested actions. A joint owner cannot be removed from an account without his/her written permission. Like the owner, a joint owner may close the account.

## Survivorship

The "survivorship" designation on the Membership Savings Account applies to all other joint accounts with the same joint owner, unless specifically designated otherwise for a particular account on a separate application. If "Joint Account–With Survivorship" is designated, on the death of an owner of the account, the deceased owner's shares in the account pass to the surviving owner of the account. If "Joint Account–No Survivorship" is designated, on the death of an owner of the account, the deceased owner's shares in the account pass as a part of the deceased owner's estate.

## Zero Balance Accounts

Checking accounts, savings accounts other than a Membership Savings Account, and MMSAs may close after 180 consecutive days at a zero balance. Share Certificates and Individual Retirement Arrangement (IRA) Certificates will generally close within 30 days if the balance is zero. IRA Savings Accounts and IRA MMSAs may close after 90 consecutive days at a zero balance.

## Savings Transfers and Withdrawals

You may transfer and/or withdraw funds from your savings account as often as you want under the following conditions: in person, by mail, by Automated Teller Machine (ATM), to pay your Navy Federal loan, to have funds mailed directly to you, or as distributions of your direct deposit. Otherwise, federal regulations limit the number of certain types of transfers and/or withdrawals that you can make from the savings account to six per month. The types of transfers and withdrawals that are limited are those requested by fax, telephone (including the Automated Telephone Service (ATS)), internet, mobile, pre-authorized transfers, or transfers automatically generated from savings to cover checking overdrafts or MMSA checks. Navy Federal shall have the right, at any time, to require you to give, in writing, not more than 60 days' notice of intention to withdraw or transfer the whole or any part of the funds in your savings account.

## Order of Transactions

Navy Federal posts items presented on your account in the following order: all money coming in (credits, deposits, etc.); ATM withdrawals; debit card transactions, also called Point of Sale (POS); Automated Clearing House (ACH) debits; and checks written. When more than one transaction is processed from a group of transactions, the items will be posted in the order of lowest to highest amount within that group of transactions.

## Checking Account

We may deny opening a checking account if you have had any previous checking accounts closed for unsatisfactory reasons. A personal checking account may not be used for commercial or business purposes. Shares in the checking account may not be pledged as collateral on any loan. All non-cash share purchases or payments made to the checking account will be credited subject to final payment of the deposited item(s). Navy Federal encourages you to use blue or black ink when writing checks.

It is agreed that checks may be used to withdraw funds from this checking account. By requesting a checking account, you authorize Navy Federal to pay checks signed by you or the joint owner (if any) of this account and to charge the payments against the checking account. You shall discharge Navy Federal from any liability for carrying out any requested actions. The right or authority of Navy Federal under this agreement shall not be changed or terminated by you except by written notice to Navy Federal, which shall not affect transactions previously made. Each negotiated check will be charged to the checking account as of the date of receipt by Navy Federal. Navy Federal will not be responsible for checks that are postdated if they are paid before the date of the instrument. Navy Federal is under no obligation to pay or refuse payment of a check on which the date is more than six months old. Navy Federal is authorized to refuse checks that exceed funds available in the checking account. A fee will be assessed in the amount shown on Navy Federal's current *Schedule of Fees and Charges* for each refused check. Checks deposited in other financial institutions may be sent to us electronically. Except for negligence, Navy Federal is not liable for any action that it takes regarding the payment or non-payment of a check.

The owner and joint owner (if any) may request that payment of a check be stopped by providing notification to Navy Federal. A fee will be assessed in the amount shown on Navy Federal's current *Schedule of Fees and Charges* for each stop-payment request. When we process a stop-payment request, you will hold Navy Federal harmless from all claims and demands resulting from the refusal to honor the check. This means that reimbursement for all damages, costs, and expenses incurred or later assigned because of the refusal to honor the check will be your responsibility. The owner and joint owner (if any) may request copies of paid checks. A fee may be assessed as provided on Navy Federal's current *Schedule of Fees and Charges* for each check copy.

Navy Federal may return debits to the checking account (e.g., an ACH payment) if the amount of the debit exceeds funds available in the checking account. A fee may be assessed in the amount shown on Navy Federal's current *Schedule of Fees and Charges* for each returned debit item. Navy Federal may, at its option, pay a Navy Federal Debit Card transaction that exceeds the balance in the checking account by transferring the amount of the resulting overdraft from your savings account. You will be held responsible for the amount of any Navy Federal Debit Card transaction that cannot be paid out of your checking account or line of credit, or through the Optional Overdraft Protection

Service (OOPS). A Navy Federal membership account generally includes one or more savings subaccounts and one or more checking subaccounts. Periodically, we may transfer funds between a checking subaccount and a savings subaccount for account management purposes. This savings subaccount will be subject to federal regulation transfer limitations, as are shares in any Navy Federal savings account. Should there be a sixth transfer of funds in a month, all remaining funds will be transferred to the checking subaccount for the remainder of the month.

## Overdraft Savings Transfers

If your checking account does not have sufficient funds to cover a check or ACH transaction, Navy Federal may, at no charge to you, transfer funds from your linked savings account (your Membership Savings Account), provided it has sufficient funds available to cover the full amount of the overdraft transaction. If you wish to designate another savings account for such transfers, you may call Navy Federal or visit a Navy Federal branch. However, only one savings account per checking account can be set up as a linked savings account for overdraft transfers, and an MMSA is not eligible to be a linked savings account. If your checking account goes into an overdrawn status and funds are available in the linked savings account, we will transfer all or some of the funds from the linked savings account to the overdrawn checking account to reduce or eliminate the overdrawn amount, as permitted by law. Overdraft Savings Transfers are subject to the federally regulated transfer/withdrawal limit of six per month, which is described in the paragraph, "Savings Transfers and Withdrawals."

## Optional Overdraft Protection Service

Optional Overdraft Protection Service (OOPS) is a service that allows us to pay checks, POS Debit Card transactions, ATM withdrawals, and ACH transactions presented against your checking account when you do not have enough money available in your account to cover the transaction(s). You must be at least 18 years of age and a Member for 90 days to qualify for the service. You also must have no delinquencies or legal orders against your Navy Federal accounts in order to qualify. Members may not have both Checking Line of Credit and OOPS on the same account. Members may enroll up to two primary checking accounts in OOPS.

Standard Practices and Fees:

a. We will charge a fee of $20 each time we pay an overdraft.

b. You will not be charged a fee on transactions of $5 or less.

c. You will not be charged a fee if the amount you are overdrawn after all transactions have

cleared or posted after the end of the business day is less than $15.

d. You can only be assessed three overdraft fees per day per account.

OOPS is limited and only available up to $500. Your account may become overdrawn in excess of the $500 limit due to fees. Up to $50 in fees may be added to the limit. The $500 limit includes the amount of overdrawn items, OOPS fees, and any other transactions that result in overdrawing your account, such as returned deposits and other fees described in our *Schedule of Fees and Charges* (NFCU 2043ep).

Enrolling in OOPS does not guarantee that we will pay overdrafts. Navy Federal pays overdrafts at our discretion. If we do not pay an overdraft, your transaction will be declined and/or your check/ACH will be returned, unpaid. Navy Federal Credit Union reserves the right to revoke OOPS privileges, permanently or temporarily, at any time and to deny the payment of any transactions without prior notification.

If your checking account does not have sufficient funds to cover a check or ACH transaction, we will first attempt to pay the overdraft at no charge through Overdraft Savings Transfers from your linked savings account (your Membership Savings Account), provided it has sufficient funds available, before using OOPS. If we do not cover your overdraft through Overdraft Savings Transfers and you do not have a Checking Line of Credit, we may cover your overdraft through OOPS, if you are enrolled in OOPS. To determine whether a transaction may cause an overdraft, it is important to understand that your checking account has two kinds of balances: the Available Balance and the Current Balance.

a. Available Balance indicates the amount of funds available for withdrawal or use at that moment. The Available Balance includes pending transactions that have been authorized but may not yet have been processed (posted), such as debit card POS transactions, online transfers, ATM transactions, or pending deposits, but does not include items such as scheduled Bill Pay transactions, deposits with holds on them, and checks that you have written but that have not yet cleared your account.

b. Current Balance is calculated after all transactions have posted to your account after the end of the business day (Eastern Time). We first process (post) all money coming in to your account (credits, deposits, etc.), subject to holds placed on certain transactions (see our Funds Availability Schedule on page 7). After those are processed, we process (post) all money coming out of your account (debits, withdrawals, etc.) in a pre-determined order. The following frequently-used debit transactions are processed in groups in this order: 1) Branch

withdrawals; 2) ATM withdrawals; 3) Debit card or POS transactions that merchants have presented to us for payment; 4) Transfers from one Navy Federal account to another; 5) ACH; and 6) Checks. When more than one transaction from a group is processed on the same day, the items will be processed in the order of lowest to highest amount within that group of transactions.

Assessment of overdraft fees is determined based on the account's Current Balance after the close of each business day, and not based on the Available Balance at the time a transaction is authorized. If the account balance, including new credits/deposits, is greater than or equal to the total of new debits/expenditures after all items have posted after the end of a business day (Eastern Time), there will be no overdraft fees assessed. If the account balance is less than the total of new debits/expenditures after all items have posted on a business day, you will be charged up to three overdraft fees if we cover the overdraft transactions under OOPS.

When you use your Navy Federal Debit Card to make a purchase, the transaction is authorized based on your Available Balance plus any Checking Protection option (OOPS or Checking Line of Credit) you have enrolled in at the time of the purchase. Once a transaction is authorized, a temporary hold is placed on your account for the amount of the purchase; you will see this hold reflected in your Available Balance. This hold does not affect or otherwise adjust your Current Balance. This hold will be removed when the transaction posts to your account or after three business days, whichever comes first. Although the hold may be removed after three business days, the merchant has up to 180 calendar days to present the transaction for posting. In some cases, the hold may exceed or be less than the amount of the transaction; for example, for some purchases made at gas stations, restaurants, or hotels, or for car rentals. Funds subject to a hold are not necessarily the same funds that are ultimately used to pay for a transaction. When the hold is removed, the funds will be added to the Available Balance in your account. If your account is overdrawn after the held funds are returned to the Available Balance and the transaction posts, an OOPS fee may be assessed. Please note, however, that even though a transaction has been authorized, it still might result in an overdraft if you initiate other transactions that are processed before it. So, do not consider a transaction authorization as a guarantee there will be sufficient funds in your account to cover the transaction when it posts. See Navy Federal Credit Union Debit Card Disclosure (NFCU 210AB) for more information.

OOPS is not a loan or a line of credit and must be repaid promptly. Should the account remain overdrawn beyond 30 days of the initial

transaction posting, OOPS privileges will be revoked temporarily and the service frozen. For example, if you overdraft $100 on the first of the month and $200 on the 20th, then a total of $300 is due on or before the 30th. The account must have a positive balance for a minimum of one business day to allow the deposited funds to clear and reset the 30-day repayment cycle. If Day 30 of the repayment cycle falls on a weekend or holiday, the account must have a positive balance as of the previous business day to be eligible for OOPS reinstatement. Should the account remain overdrawn beyond 45 days, OOPS privileges will be revoked permanently. The failure to deposit funds to bring the account to a positive balance may result in the overdrawn balance being charged off as a loss to Navy Federal. Such action could result in the checking account being closed and restriction of your membership privileges.

The full terms and conditions for OOPS are detailed in the Navy Federal Form 657–*Optional Overdraft Protection Service Disclosures*, which is included in these disclosures by reference and which can be found at **https://www.navyfederal. org/pdf/applications-forms/NFCU_657.pdf**. Navy Federal recommends that you read this disclosure form prior to opting in to OOPS. By opting in to OOPS, you agree to all the terms and conditions in the Form 657–*Optional Overdraft Protection Service Disclosures*.

You have the right to revoke your consent by opting out of OOPS at any time through **navyfederal.org** or by phone, toll-free in the U.S., by calling 1-888-842-6328. For toll-free numbers when overseas, visit **navyfederal.org**. Use 1-703-255-8837 for collect international calls. If you prefer, you may also opt out at any branch location, by faxing a request to 1-703-206-4244, or by mailing the request to: P.O. Box 3000, Merrifield, VA 22119-3000.

### Dormant Checking Account

A Dormant Checking Account fee in the amount shown on Navy Federal's *Schedule of Fees and Charges* may be assessed if you have not engaged in checking account activity in 365 days, you carry a combined balance of less than $50 in your checking and membership savings accounts, and you have no other Navy Federal products during that time **(Note:** This fee will not be assessed for Members under the age of 24). You agree that we may close your checking account if it reaches a zero balance as a result.

### Change in Terms and Right of Assignment

Navy Federal reserves the right to change or terminate this agreement. The terms of this account may change upon 30 days' notice. The right or authority of Navy Federal under this agreement shall not be changed or terminated

by you except by written notice, which shall not affect transactions previously made. Navy Federal has the right of assignment of this agreement.

### Verification and Correction of Transactions

All transactions are subject to final verification by Navy Federal. Navy Federal may reverse or adjust any transaction, credit, or debit that Navy Federal believes was erroneously made to your account at any time without prior notice being provided to you, except as may be required by regulation or federal law. In addition, you agree that if any deposit or other credit is made to you that Navy Federal determines should not have been made to you, Navy Federal may reverse the credit without prior notice to you.

### Consumer Reports

The owner and joint owner, if any, authorize Navy Federal to obtain a consumer credit report in connection with the application, update, or renewal of any membership, share, or loan account for which either of them applies. The owner and joint owner, if any, authorize and understand that Navy Federal may obtain such reports at any time after either of them establishes membership or opens an account with Navy Federal. The owner and joint owner, if any, authorize Navy Federal to use these consumer credit reports to consider either of them for other products and services with Navy Federal. The owner and joint owner, if any, also authorize Navy Federal to obtain consumer reports for the purposes of evaluating either of their membership applications and reviewing any Navy Federal accounts either of them opens. The owner and joint owner, if any, understand these reports may be used in decisions to deny account applications, close accounts, and/or restrict accounts or services.

### Overdrawn Accounts

The owner and joint owner, if any, agree to be jointly and severally liable for negative balances on any accounts in which either owner has an ownership interest, including any overdrafts, regardless of the cause, and agree to immediately deposit sufficient funds to cover the negative amount of the overdraft.

### Contractual Lien

The owner and joint owner, if any, authorize Navy Federal to transfer funds from any accounts in which either of them has an ownership interest to correct a negative or overdrawn amount on any account on which either's name appears. This authorization applies to all funds voluntarily deposited into Navy Federal accounts, including Social Security funds, as permitted by law. The owner and joint owner, if any, agree to reimburse Navy Federal for all costs of collection, including reasonable attorney's fees and court costs.

### Statutory Lien/Security Interest

The owner and joint owner, if any, acknowledge and pledge to Navy Federal a statutory lien in either of their shares and dividends on deposit in all joint and individual accounts and any monies held by Navy Federal now and in the future, to the extent of any loan made and any charges payable. The statutory lien does not apply to shares in any IRA.

The owner and joint owner, if any, acknowledge and pledge to Navy Federal a security interest in the collateral securing loan(s) that either of them has with Navy Federal now and in the future, including any type of change or increase, and any proceeds from the sale of such collateral and of insurance thereon, not to exceed the unpaid balance of the loan. This security interest in collateral securing other loans does not apply to any loan(s) on the primary residence of either the owner or joint owner, if any.

If approved for a Navy Federal (NFCU) Credit Card, use of the card demonstrates my/ our consent to all its terms and conditions, including the Security Interest Specific for Credit Cards provision, which reads: I/We acknowledge and pledge, specifically as a condition of my/our use of the credit card, that I/we have voluntarily granted NFCU a security interest in all of my/our individual and joint share accounts at NFCU. If my/ our credit card loan becomes delinquent, this security interest may be used without further notice to pay all or part of such delinquency. This security interest does not apply to shares in an Individual Retirement Account (IRA).

### Request for Information

When necessary for business purposes, the owner and the joint owner, if any, authorize any person to furnish upon request by Navy Federal any information concerning either or both of their financial affairs.

### Governing Laws

Navy Federal accounts are maintained and governed in accordance with federal law and the laws of the Commonwealth of Virginia, as amended. Property may be transferred to the appropriate state if there has been no activity on any of your accounts within the time period specified by state law.

## Funds Availability Schedule

### Your Ability to Withdraw Funds at Navy Federal Credit Union

This Funds Availability Schedule (Schedule) applies to deposits made into a checking or savings account made at a branch, automated teller machine (ATM), or by mail. This Schedule does not apply to deposits made remotely through mobile or scan deposit services.

Except as described later in this Schedule, our general procedure is to make funds available from your deposits on or before the first business day after the day we receive your deposit. At that time, you can withdraw the funds in cash and we will use the funds to pay checks or other items. For example, if you deposit a check on Monday, you may not be able to access the funds from that deposit, to include paying other checks, until Tuesday or possibly later. See the availability timelines below for details about when you can use the funds from different types of deposits. Longer delays (of up to 14 business days) may apply to checks deposited in branches and ATMs outside of the continental United States and Hawaii. Additionally, we may place a longer hold, and credit will not be received on non-U.S. items until the collection process is completed.

### Determining When a Deposit Is Received

As used in this Schedule, a business day is Monday through Friday, except federal holidays (Business Day).

If you make a deposit with a Member Service Representative (MSR) at one of our branches on a Business Day before 2:00 pm, local time, we will consider that day to be the day we received your deposit. If you make a deposit at a Navy Federal ATM on a Business Day before that ATM's cutoff time, we will consider that day to be the day we received your deposit. However, if you make a deposit on a day that is not a Business Day, or make a deposit after the cutoff time, we will consider the deposit to have been received on the next Business Day.

- For deposits at Navy Federal ATMs, the cutoff time is 12:00 noon, Eastern Time. For ATMs with an earlier cutoff, a message on the ATM will notify you of the earlier cutoff.

- All deposits made by mail will be considered received by Navy Federal on the Business Day we receive the deposit at our office in Vienna, VA.

### Same-Day Availability

Funds from electronic direct deposits to your account will be available on the day we receive the deposit.

JA 29

## Next-Day Availability

Funds from the following deposits are available on (or before) the first Business Day after the day we are considered to have received your deposit:

- U.S. Treasury checks that are payable to you
- Electronic payments, such as wire transfers, and Automated Clearing House (ACH) credits
- Checks drawn on any bank, amount less than $200

If you make a deposit in person to a MSR at a branch, funds from the following deposits are also available on the first Business Day after the day we are considered to have received your deposit:

- State and local government checks that are payable to you
- Cashier's, certified, and teller's checks that are payable to you
- Federal Reserve Bank checks, Federal Home Loan Bank checks, and postal money orders, if these items are payable to you
- Cash

If you do not make your deposit in person to a MSR at a branch, the funds may not be made available until the second Business Day after the day we are considered to have received your deposit. Available funds may be withdrawn in cash or used to pay checks or other items.

## Checks $200 and Over

The first $200 per Business Day of the total amount of deposited checks will be made available on or before the first Business Day after the day we are considered to have received your deposit. The remaining funds will be available on the second Business Day after the day we are considered to have received your deposit.

For example, if you deposit a check of $1,000 on a Monday, $200 of the deposit is available on or before Tuesday. The remaining $800 is available on or before Wednesday.

**Navy Federal ATMs:** The first $200 per Business Day of cash or checks deposited at a Navy Federal ATM prior to the posted cutoff time will be available immediately for cash withdrawals only; it is not available to pay checks and/or other transactions until the remaining funds are made available. The remaining funds will be available by the second Business Day after the day we are considered to have received your deposit.

**Deposits at Nonproprietary ATMs (Vcom® ATMs):** Funds from any deposits made at ATMs we do not own or operate may not be available until the fifth Business Day after the day you make the deposit.

## Longer Delays May Apply

Funds you deposit by check may be delayed for a longer period if:

- we believe a check you deposit will not be paid;
- you deposit checks totaling more than $5,000 on any one day;
- you re-deposit a check that has been returned unpaid;
- you have overdrawn your account repeatedly in the last six months; or
- there is an emergency, such as natural disaster or failure of communications equipment.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. If we delay availability for one of these reasons, funds will generally be available no later than the seventh Business Day after the day we are considered to have received your deposit.

If your check deposit is made with one of our MSRs and we decide at that time to delay your ability to withdraw funds, we will tell you then. If we decide to delay availability of your funds after you complete your deposit, we will mail you a deposit hold notice by the first Business Day after we decide to take that action.

Except in California, New York, and Connecticut, deposits into a savings account may be held up to five Business Days.

## Special Rules for New Accounts

If you are a new member, the following special rules may apply during the first 30 days your account is open:

- Funds from electronic direct deposits will be available on the day we receive the deposit.
- Funds from deposits of the first $5,000 of a day's total deposits of cashier's, certified, teller's, and federal, state, and local government checks will be available on the first Business Day after the day we are considered to have received your deposit if the deposit meets certain conditions. For example, the checks must be made payable to you. The excess over $5,000 will be available on the seventh Business Day after the day we are considered to have received your deposit. If you do not deposit these checks (other than U.S. Treasury checks) in person to one of our MSRs at a branch, the first $5,000 will not be made available until the second Business Day after the day we are considered to have received your deposit.

- Funds from all other check deposits will be available no later than the seventh Business Day after the day we are considered to have received your deposit.

## Check Cashing

If we cash a check for you that is drawn on another financial institution, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds will be available on the day they would have been available as though you had deposited the check.

## Availability and Notice for Electronic Entries

In the case of credit entries subject to Article 4A of the Uniform Commercial Code, Navy Federal hereby provides notice that such entries may be transmitted through the Automated Clearing House (ACH) Network pursuant to the ACH Rules governed by the National Automated Clearing House Association (NACHA). Your rights and obligations concerning these entries shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia. Credit provided by Navy Federal as the Receiving Depository Financial Institution (RDFI) to you for these entries is provisional until we have received final settlement through a Federal Reserve Bank. If we do not receive such payment for the entry, we are entitled to a refund from you in the amount of the credit to your account, and the payor of the entry will not be considered to have paid the amount of the credit to you. Navy Federal has not agreed to provide you with notice if we have received a credit entry subject to Article 4A of the Uniform Commercial Code.

## Rights Reserved

Navy Federal reserves the right to:

- accept or reject any check presented;
- revoke any settlement with respect to a check accepted by us, and to charge back to your account the amount of the check based on the return of the check or a receipt of notice of non-payment of the check, or claim a refund for such credit; and
- require that the space reserved for endorsement by Navy Federal on the back of any check accepted for deposit be free and clear of any prior markings or endorsements.

## Payment of Dividends

Dividends are paid on all deposits to your savings and checking accounts, where applicable, as of the Business Day we are considered to have received the deposits, including non-cash deposits (e.g., checks).

## Electronic Funds Transfer Agreement and Disclosure

### Types of Transfers, Limitations, and Fees

We can accept transfers to your checking or savings accounts and make transfers from your checking or savings accounts electronically. Such transfers are often received or sent in the form of ACH debits and credits. For example, an ACH credit to your account might be in the form of an electronic deposit of your pay, stock dividends, or tax refund. An ACH debit might be made as a result of an authorization you gave a third party to automatically transfer funds from your account to pay your monthly insurance premium, utility bills, or car payment. You may also authorize third parties to use information from one of your checks or MMSA checks to initiate a one-time ACH debit from your checking account or MMSA.

Using Navy Federal's ATS, you may make transfers between your Navy Federal savings, MMSA, and checking accounts, including accounts on which you are a joint owner. You may make transfers from your savings accounts, checking accounts, and MMSAs to your savings Individual Retirement Accounts (IRAs), MMSA IRAs, share certificates, or IRA share certificates. You may also transfer funds from your savings, checking, and MMSA accounts to make Navy Federal loan, checking line of credit, and credit card payments. By calling Navy Federal at the telephone numbers listed at the end of this agreement and disclosure, you may initiate a one-time ACH funds transfer to an account at another financial institution. By completing the Automatic Funds Transfer Authorization via the Automated Clearing House (ACH) form and mailing or faxing it to Navy Federal or delivering it to a branch, you may set up a recurring transfer to an account at another financial institution.

Please see Navy Federal's *Mobile Banking, Online Banking, and Bill Pay Disclosure* for the types of transfers that can be initiated through Mobile and Online Banking, and for limitations on those transfers.

Please see Navy Federal's *Debit Card Disclosure* for transfers that can be initiated using a Navy Federal Debit Card.

You may verify the posting of your transfers by calling us at the telephone numbers listed at the end of this agreement and disclosure, or by accessing your account information through ATS or Navy Federal Online Banking.

When you originate an ACH transfer at another financial institution, please note that your Navy Federal savings account may only receive ACH credits. Checking accounts may receive

JA 30

ACH credits and debits. MMSAs may receive ACH credits and debits in accordance with the limitations set forth in the MMSA agreement.

When you originate an ACH transfer at another financial institution, Navy Federal places no limitations on the dollar amount of received ACH transfers, and Navy Federal does not charge fees for received transfers.

You may only originate ACH transfers at Navy Federal from your checking account. For transfers originated at Navy Federal, there is no limit on the *number* of funds transfers you can make from your checking account per day. However, there are minimum and maximum *total dollar* transfer limits associated with transferring funds to/from another financial institution via the ACH, when the transfer is originated from Navy Federal.

Transfers from a Navy Federal checking account to a checking account at another financial institution may be requested for a minimum of $5.00 to a maximum of $5,000.00 per business day. However, the total aggregate amount of all checking transfers within any five-business-day period cannot exceed $15,000.

Transfers to Navy Federal loans from a checking account at another financial institution may be requested for a minimum of $5.00 to a maximum of $10,000 per business day. However, the total aggregate amount of all loan payments within any five-business-day period cannot exceed $30,000.

Transfers to Navy Federal mortgage loans from a checking account at another financial institution may be requested for a minimum of $5.00 to a maximum of $30,000 per business day. However, the total aggregate amount, which includes your regular payment, additional escrow, principal, and late fees, of all mortgage payments within any five-business-day period cannot exceed $30,000.

Aggregate amounts apply to all accounts that you own individually or that you have joint ownership of, and are based on the effective transfer date(s). For security reasons, Navy Federal may impose further limitations on the dollar amounts of transfers initiated at Navy Federal.

## Periodic Statements

You will receive a statement monthly unless your account(s) has/have not engaged in savings or checking account activity (no transactions) within 365 days. When there is no activity within 365 days, Navy Federal may choose to provide a statement on an annual basis.

## Business Days

Our business days are Monday through Friday, excluding federal holidays.

## Your Liability for Unauthorized Electronic Funds Transfers

**Notify us AT ONCE if you believe:**

- your account may have been accessed without your authority;
- your card, code, or password has been lost or stolen;
- someone has transferred or may transfer money from your account without your permission; or
- an electronic funds transfer has been made without your permission using information from your check or your MMSA check.

The best way to minimize your possible loss is to telephone or, if you have Online Banking, contact us through our eMessaging system at **navyfederal.org**, although you may advise us in person or in writing. See the telephone numbers and address listed at the end of this agreement and disclosure. If you do not notify us, you could lose all the money in your account (plus your maximum line of credit amount).

If you tell us within two (2) business days after you discover your password or other means to access your account has been lost or stolen, your liability is no more than $50.00 should someone access your account without your permission. If you do not tell us within two (2) business days after you discover such loss or theft, and we can prove that we could have prevented the unauthorized use of your password or other means to access your account if you had told us, you could be liable for as much as $500.00.

**Also, if your statement shows transfers that you did not make or authorize, tell us AT ONCE.** If you do not tell us within sixty (60) days after the statement was delivered to you of any unauthorized or fraudulent use of your account, you may not get back any of the money you lost after the sixty (60) days if we can prove that we could have stopped someone from taking the money if you had told us in time. If a good reason (such as a long trip or a hospital stay) prevented you from telling us, we may in our sole discretion extend the time periods.

## In Case of Errors or Questions About Your Electronic Transfers

If you think your statement or receipt is wrong, or if you need more information about a transaction listed on your statement or receipt, contact us as soon as possible at the telephone numbers and address listed at the end of this agreement and disclosure.

We must hear from you no later than sixty (60) days after the FIRST statement on which the problem or error appeared. When you contact us:

- tell us your name and account number;
- describe the error or the transaction you are unsure about and clearly explain why you believe it is an error or why you need more information; and
- tell us the dollar amount and date of the suspected error.

These are our procedures for resolving errors:

- If you tell us orally, we may require that you send your complaint in writing within ten (10) business days after your oral notification.
- We will determine whether an error occurred within ten (10) business days (twenty (20) business days for new accounts) after you notify us of the error and will correct any error promptly. However, if we require more time to confirm the nature of your complaint or question, we reserve the right to take up to forty-five (45) days to complete our investigation. For errors involving new accounts, point-of-sale, or foreign-initiated transactions, we may take up to ninety (90) days to investigate your complaint or question. If we decide to do this, we will provisionally credit your account within ten (10) business days (twenty (20) business days for new accounts) for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. A provisional credit is a temporary credit adjustment made to your account during the time it takes us to complete our investigation.
- If we ask you to submit your complaint or question in writing and we do not receive it within ten (10) business days, we may remove the provisional credit from your account.
- If it is determined that there was no error, we will reverse any provisional credits within one (1) business day of finishing our investigation and send you a written explanation within three (3) business days. If there are insufficient funds in your account to cover the amount of the provisional credit, the account will be overdrawn, and you will be responsible for payment. You may ask for copies of documents used in our investigation.

## Stop Payment Procedure

Navy Federal cannot cancel an agreement that you have with a third party or revoke the authorization that you have provided a third party for recurring automatic transfers from your accounts. To cancel your agreement with a third party and revoke your authorization for recurring automatic transfers, you must contact the third party with whom you have an agreement. When you request a stop-payment on a one-time preauthorized transfer, Navy Federal will stop payment on that one transfer and not on any subsequent transfers you may have authorized the third party to make. When you request a stop-payment on a series of recurring preauthorized transfers to a third party, Navy Federal will stop payment on that series of transfers, not on any subsequent series of recurring transfers you may authorize the third party to make. If you wish to stop payment on any preauthorized transfers other than the specific one (or series) on which you initially stopped payment, you will need to make a new stop-payment request. We must receive your stop-payment request three (3) business days or more before the transfer is scheduled to be made. You may contact us by calling or writing us using the telephone numbers or address listed at the end of this agreement and disclosure. You will be charged for each stop-payment request in accordance with Navy Federal's *Schedule of Fees and Charges*. When we process a stop-payment request, you will hold Navy Federal harmless from all claims and demands resulting from the refusal to honor the preauthorized transfer. This means that reimbursement for all damages, costs, and expenses incurred or later assigned because of the refusal to honor the preauthorized transfer will be your responsibility. If you order us to stop one of these transfers three (3) business days or more before the transfer is scheduled, and we do not do so, we will be liable for your losses or damages.

## Notice of Varying Amounts

If your recurring transfers vary in amount, the third party debiting your account will tell you ten (10) days before each payment, in addition to when the debit will be made and how much it will be.

## Navy Federal's Liability

If Navy Federal does not complete a transfer to or from your account on time, in the correct amount, or to the correct recipient according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will NOT be liable, for instance if:

1) through no fault of ours, you do not have enough money in your account, available funds through your OOPS, or available credit in your Checking Line of Credit to make the transfer.

2) the funds in your account are subject to legal process, such as garnishment or attachment, or if the account is subject to a pledge or security agreement.

3) circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions that we have taken.

4) there are additional exceptions specified under other agreements that you have with us.

## Account Information Disclosures

We will disclose information to third parties about your account or the transactions you make:

1) if we are unable to complete an electronic fund transfer because of insufficient funds.

2) when it is necessary for completing transfers.

3) to verify the existence or conditions of your account for a third party, such as a consumer reporting agency or merchant.

4) to comply with government agency or court orders.

5) if you give us your written permission.

6) in accordance with our privacy policy.

## Contact Numbers and Addresses

Whenever possible, please contact us by telephone or at Navy Federal Online Banking to report unauthorized transfers or request stop payments. Contacting us by these methods is the quickest way for us to comply with your requests.

### Telephone Us

Call 1-888-842-6328 toll-free in the U.S. For toll-free numbers when overseas, visit **navyfederal.org**. Use 1-703-255-8837 for collect international calls.

### Online

If you are signed up for Navy Federal Online Banking, you may send us an electronic message through our eMessaging system at **navyfederal.org**.

### Write Us

Navy Federal Credit Union
Account Servicing Section
P.O. Box 3000
Merrifield, VA  22119-3001



Rev. 6/17

| FACTS | WHAT DOES NAVY FEDERAL DO WITH YOUR PERSONAL INFORMATION? |
|---|---|

| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
|---|---|

| What? | The types of personal information that we collect and share depend on the product or service that you have with us. This information can include:<br>• your Social Security Number and income<br>• account balances and payment history<br>• account transactions and checking account information<br>When you are *no longer* our Member, we continue to share your information as described in this notice. |
|---|---|

| How? | All financial companies need to share members' personal information to run their everyday businesses. In the section below, we list the reasons financial companies can share their members' personal information, whether Navy Federal chooses to share, and whether you can limit this sharing. |
|---|---|

| Reasons we can share your personal information | Does Navy Federal share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes–such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes–to offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | Yes | No |
| For our affiliates' everyday business purposes– information about your transactions and experiences | Yes | No |
| For our affiliates' everyday business purposes– information about your creditworthiness | No | We don't share |
| For nonaffiliates to market to you | No | We don't share |

| Questions? | Call toll-free 1-888-842-6328 or go to **navyfederal.org.** |
|---|---|

© 2017 Navy Federal NFCU 198 (6-17)

| Who we are | |
|---|---|
| Who is providing this notice? | Navy Federal Credit Union; Navy Federal Financial Group, LLC; Navy Federal Brokerage Services, LLC |

| What we do | |
|---|---|
| How does Navy Federal protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings.<br>Navy Federal regularly tests and assesses its information security measures, systematically trains employees, and adopts upgrades and enhancements as necessary to protect your information. |
| How does Navy Federal collect my personal information? | We collect your personal information, for example, when you:<br>• open an account or deposit money<br>• pay your bills or apply for a loan<br>• use your credit or debit card<br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| Why can't I limit all sharing? | Federal law gives you the right to limit only:<br>• sharing for affiliates' everyday business purposes— information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. |

| Definitions | |
|---|---|
| Affiliates | Companies related by common ownership or control. They can be financial and non-financial companies.<br>• *Our affiliates include companies with a Navy Federal name: financial companies such as Navy Federal Credit Union; Navy Federal Financial Group, LLC; Navy Federal Brokerage Services, LLC; or Navy Federal Title Services, LLC.* |
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and non-financial companies.<br>• *Navy Federal does not share with nonaffiliates so they can market to you.* |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>• *Our joint marketing partners include investment, insurance, and other financial services companies.* |

## Your Affiliate Marketing Choices

For personal information (such as your name, address, or certain account-related information) shared among affiliates, you may opt out of direct marketing of products and services by those affiliates with whom you do not have a prior business relationship. You may do this by calling the toll-free number of the appropriate Navy Federal company provided. An opt-out by a joint account holder will be treated as applying to all associated joint account holders. Your choice to limit marketing offers from our affiliates will apply until you notify us to modify your preference. **Note:** If you have already requested this, there is no need to do so again.

### Contact the Navy Federal Family

If you have questions or if you need to correct information that we have on file, please contact us at:

**Navy Federal Credit Union**

P.O. Box 3000
Merrifield, VA 22119-3000
Toll-free in the U.S. 1-888-842-6328
For toll-free numbers when overseas,
visit **navyfederal.org**.
Collect internationally 1-703-255-8837

**Navy Federal Financial Group**
**Navy Federal Brokerage Services**

820 Follin Lane SE
Vienna, VA 22180
1-877-221-8108
Fax: 703-206-1510

**Navy Federal Title Services**

21631 Ridgetop Circle
Suite #265
Sterling, VA 20166
571-267-2120
Toll-free 1-855-404-9549

### Notes

# Exhibit B



1-888-842-6328

For toll-free numbers when overseas, visit navyfederal.org.

Collect internationally
1-703-255-8837

TDD for the hearing impaired
1-888-869-5863

Online at navyfederal.org

Or visit a branch

## Checks, Checkbook Covers and Accessories
Pricing varies depending on style and quantity selected. Visit us online at **navyfederal.org** to see our product line and pricing.

## Checking Accounts
### e-Checking
> Monthly service fee ................ $5.00
(waived with Direct Deposit or 20 or more Visa® Debit Card transactions during the statement period)

### Flagship Checking
> Monthly service fee ............... $10.00
(if average daily balance is less than $1,500.00 during the statement period)

## Miscellaneous Checking, Checking Protection and Money Market Savings Account Fees
> Non-sufficient funds fee for checks and ACH Debit ........................ $29.00

> Optional Overdraft Protection Service transaction ....................... $20.00

> Stop payment for a single item ..... $20.00
For a series of items .............. $25.00

> Copy of, or information from, a paid or deposited item
One request per month ........ No charge
More than one (per copy) ........... $1.00

> Repeated checkbook balancing assistance (per 1/2 hour) ...................... $5.00

> Payment of a Checking Line of Credit check that exceeds the approved credit limit ........................ $10.00

> Money Market Savings Account excessive transactions (per item) ............. $10.00

> Bill Pay "Rush Delivery" (per transaction) ...................................... $5.00

## Checking or Savings
> Returned checks, deposited or cashed ......................... $15.00

> Cashier's checks, more than two checks per day (per check) .................... $5.00

> Inactive Member fee assessed on savings accounts of members age 24 and over with less than $50.00, no activity in 12 months and no other Navy Federal products (per quarter) ....................... $3.00

> Dormant Checking Account fee assessed on checking accounts of members age 24 and over with a combined savings and checking balance less than $50.00, no activity in 12 months and no other Navy Federal products (per quarter) ....................... $3.00

> Account number re-assignments (more than once in the same calendar year) ..... $25.00

## Adjustment to a CO-OP ATM
### Check Deposit
> For deposits made at CO-OP Network® ATMs, the ATM owner will impose a fee per item if an adjustment is processed due to one of the following discrepancies in the deposit: the currency appears to be counterfeit; the currency is foreign; the deposit contents do not equal the deposit amount in U.S. dollars as entered into the ATM; an item is unsigned by the maker; an item is dated more than six months prior to the date of deposit; the numerical and written amounts do not agree; the deposit is over $1,000.00 and contains an obvious alteration .............. $2.00

## Returned CO-OP ATM Check Deposit
> For each adjustment initiated for deposit items processed and subsequently returned by the financial institution, the ATM owner will impose a fee per item at the time the adjustment is processed ........... $6.00


## Money Transfers

> Bank wire transfer
Incoming ...................... No charge
Outgoing—Domestic ................ $14.00
Outgoing—International ............ $25.00

> Domestic and international cash
transfer (maximum per order is
$10,000.00) ........................ $14.50

> Western Union Quick Collect® ....... $12.95

## Navy Federal Debit Card and CUCARD®

> Replacement card .............. No charge

> Fees for expedited delivery
Card and system-generated PIN ..... $17.45
Card and self-selected PIN .......... $11.50
Replacement card .................. $11.50
PIN only ......................... $5.95

## GO Prepaid Card

> Visa/PLUS® System ATM domestic and
foreign cash withdrawal and balance inquiry
...................... $1.00 per transaction

> Lost/stolen or replacement fee ...... $5.00

> Express delivery fee ............... $5.00

## Visa Buxx Card

> Inactive fee (after six consecutive months
with no transactions, the card will be charged
until the balance is depleted or the cardholder
makes another transaction)
.......................... $1.00 per month

> Visa/PLUS System ATM domestic and
foreign cash withdrawal and balance inquiry
...................... $1.00 per transaction

> Lost/stolen or replacement fee ...... $5.00

> Express delivery fee ............... $5.00

## Visa Gift Card

> After 12 consecutive months of no activity,
the card will be charged $5.00 per month
until the balance is depleted or the cardholder
makes another purchase

> Lost/stolen or replacement fee ...... $5.00

> Express delivery fee ................. $5.00

## Miscellaneous Account Services

> Address research/unclaimed shares fee
(per quarter) .................. No charge

## Notary Public Service

> Navy Federal-related document ... No charge

> Non-Navy Federal document
First two per week .............. No charge

Each additional document, not to exceed the
local jurisdiction fee maximum ...... $5.00 per

Notary Public Service is applicable in all jurisdictions
except California and Louisiana. In California, Notary
Public Service is limited to Navy Federal-related documents
only. Navy Federal does not offer Notary Public Service in
Louisiana. Members in Louisiana need to seek the advice
of an attorney. Due to the potential legal ramifications,
Navy Federal does not notarize wills. Wills should be
notarized by an attorney authorized to do so.

JA 37



## Current ATM and Point-of-Sale (POS) Fees
### Fees are subject to change.

| TRANSACTION TYPE | NAVY FEDERAL ATM | CO-OP NETWORK ATM | VISA/PLUS SYSTEM ATM | INTERLINK*/MAESTRO* |
|---|---|---|---|---|
| Cash withdrawal | None | None | $1.00 | Not Applicable |
| Transfer | None | None | $1.00 | Not Applicable |
| Inquiry | None | None | $1.00 | Not Applicable |
| Purchase cash back | Not Applicable | | | Some merchants may impose a cash back fee. |
| Deposit | None | None | Not Applicable | Not Applicable |
| Rejected transactions Result from account-related problems such as non-sufficient funds, request exceeds limit, etc. | None | None | $1.00 | Not Applicable |
| Invalid PIN attempts | None | None | $1.00 | Not Applicable |
| Point-of-sale purchases | Not Applicable | | | Some merchants in some states may impose a surcharge. |

*Reminders:*

> Please ensure that you have sufficient funds in your account to cover the withdrawal and the fee.

> All checks and cash deposits to non-Navy Federal ATMs are subject to a five-business-day hold beginning the date the check is posted.

> Deposits can be made at Navy Federal-owned ATMs and CO-OP Network ATMs.

> Loan payments can only be made at Navy Federal-owned ATMs.

> You cannot transfer funds to another member's account, including family members, via the ATM.

> Some financial institutions, for example in the Visa/PLUS System network, may charge you a convenience fee for using their ATMs.

### Navy Federal Debit Card/GO Prepaid Card/CUCARD/Visa Buxx Card

| International Transactions—ATM and POS | |
|---|---|
| *Single Currency* Transactions made in foreign/international countries and in U.S. dollars. | 0.8% of the transaction |
| *Multi-Currency* Transactions made in foreign/international countries and in a foreign currency. | 1% of the transaction |



Federally insured by NCUA. © 2016 Navy Federal NFCU 2043ep (7-16)

# Exhibit C



## AUTHORIZED USER FOR NAVY FEDERAL ONLINE BANKING APPLICATION AND CONSENT

navyfederal.org • 1-888-842-6328

**Federally insured by NCUA.**

© 2018 Navy Federal NFCU 652 (10-18)



ARMY
MARINE CORPS
NAVY
AIR FORCE
COAST GUARD
VETERANS

# Mobile Banking, Online Banking, and Bill Pay Terms and Conditions

## TABLE OF CONTENTS

A. General Mobile Banking, Online Banking, and Bill Pay Terms and Conditions

B. Mobile Banking Terms and Conditions

C. Bill Pay Terms and Conditions

D. Authorized User Application and Consent

## A. General Mobile Banking, Online Banking, and Bill Pay Terms and Conditions

**These General Mobile Banking, Online Banking, and Bill Pay Terms and Conditions apply equally to Mobile Banking, Online Banking, and Bill Pay except where the context indicates otherwise. For additional terms and conditions specific to Mobile Banking or Bill Pay, see below in the appropriate section.**

This section provides information and the general terms and conditions for use of Navy Federal's Mobile Banking, Online Banking, and Bill Pay Services. You will find definitions of terms used throughout the Agreement, and provisions that provide you necessary information related to contacting you by mobile device, by email, and electronically; the electronic transactions permitted; your liability for unauthorized transactions; contact information for unauthorized transactions or if you have a question or error that needs to be resolved; protecting your password, access, devices, and means to carry out electronic transactions; and your remedies and limitations on liability.

### 1. General Mobile Banking, Online Banking, and Bill Pay Definitions

**"Affiliates"** are companies related by common ownership or control.

**"Agreement"** means the terms and conditions that pertain to the particular Service in which this defined term is used, or to this entire Mobile Banking, Online Banking, and Bill Pay Terms and Conditions disclosure, where the context does not indicate a particular Service.

**"Business Days"** are Monday through Friday, except federal holidays.

**"Mobile Banking"** means any activity conducted by you on Navy Federal's mobile app, including Bill Pay, and any future Services used by you on Navy Federal's mobile app.

**"Navy Federal," "we," "us,"** or **"our"** refers to Navy Federal Credit Union and its affiliates and Service Providers.

**"Online Banking"** means any activity conducted by you on Navy Federal Credit Union's website, navyfederal.org, including Bill Pay transactions and any future Services used by you on Navy Federal's website.

**"Service(s)"** means any activity or functionality offered by Navy Federal or its Service Providers through Mobile or Online Banking, including Bill Pay.

**"Service Providers"** means companies that we have engaged to render some or all of the Services to you on our behalf.

**"You," "your," "I,"** or **"yourself"** refers to the Member, authorized user, or joint account holder using the Services.

### 2. Access to All Existing and Future Accounts

With Mobile and Online Banking, you will have access to all existing and future accounts on which you are the owner or joint owner. However, if you are a joint owner and you wish to access account statements, the primary owner must designate you as an authorized user for Online Banking, with permission to access statements. Authorized users have access to the primary owner's Online Banking, subject to the conditions in the paragraph "Authorized User" below.

### 3. Authorized User

You may elect to authorize Online Banking access only for any number of authorized users, in addition to yourself. A separate application and agreement must be signed for each authorized user. If you desire an authorized user to have access to your account via Online Banking, you must sign the Mobile Banking, Online Banking, and Bill Pay Application and Agreement as the Member, and the other person must sign the application as the authorized user. At the time you add an authorized user, the authorized user will by default have access to all existing and future accounts held in your name, except those where you are designated as the joint owner, co-signer (guarantor), or co-borrower.

Your authorized user will have authority to perform the following functions through Online Banking:

- Make transfers to and from your account
- Enroll in or access your Bill Pay Service
- View your eStatements, suppress your paper statements, and request a statement copy
- Enroll in Scan Deposits and use the Scan Deposits Service
- Check the status of a pending loan application
- Update your personal information
- Sign up for email alerts
- Send us an eMessage
- View your account details and account summary
- View checks online, order checks, or make a stop payment request
- Change your checking account type

You can manage your authorized user's privileges via the "Settings" link in Online Banking. This will allow you to provide access for your authorized user(s) to certain accounts and Services as you deem necessary.

Note that, while your authorized user may access your lines of credit, you remain solely responsible for repayment if any credit is extended. Authorizing Online Banking for an authorized user will make you financially liable for all unauthorized access, losses, or misuse of your accounts until reported to Navy Federal.

### 4. Verification of Identification

To help fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account, including joint owners and authorized users. When you open an account or become an authorized user, we will ask you for your name, address, date of birth, and other information that will allow us to identify you.

### 5. Eligibility of Minors

Mobile and Online Banking is offered to adults and to minors fourteen (14) years or older. By using Mobile and Online Banking, you represent that you meet these requirements and that you agree to be bound by this Agreement.

### 6. Your Account Ownership and Contact Information

You represent that you are the legal owner or authorized user of the account and other financial information, which may be accessed via Mobile or Online Banking.

You represent and agree that all information you provide us in connection with Mobile or Online Banking is accurate, current, and complete, and that you have the right to provide such information to us for the purpose of operating Mobile or Online Banking Services. You agree not to misrepresent your identity or your account information.

You agree to keep your account information confidential, up to date, and accurate.

It is your sole responsibility to ensure that your contact information with Navy Federal is current and accurate. You may change your contact information by editing your profile via the Navy Federal mobile app or Online Banking. You may also call Navy Federal at 1-888-842-6328 or write us at Navy Federal Credit Union (EFT), P.O. Box 3001, Merrifield, VA 22119-3001.

### 7. Contacting You Via Your Cell Phone Number or Email Address

You must provide us a phone number and an email address to discuss your accounts with us. If you provide a cell phone number, Navy Federal has your permission to contact you at that number about all your Navy Federal accounts, including account servicing and collection purposes. We may contact you for non-marketing purposes in any way, including automated calls, text messages, and/or prerecorded or artificial voice messages. You agree to promptly notify us if your contact information changes. Message and data rates may apply. Visit **navyfederal.org** for more information.

If you provide an email address, Navy Federal has your permission to send you email messages using an automatic emailing system for commercial or transactional purposes.

Navy Federal may at any time request the following from you in relation to your Mobile or Online Banking activities: electronic banking credentials, implementation of alternative risk control mechanisms, or may contact authorities when suspicious account activity or Member security-related events occur.

| Services | SMS Short Code | Description of Service | Frequency of Messages |
|---|---|---|---|
| Security Alerts | 73077 | Free to End User notifications to alert you about possible risk of fraud, identity theft, and/or account security | Message frequency varies |
| Credit Card Fraud Alerts | 33748 | Free to End User notifications to alert you about possible risk of credit card fraud | Message frequency varies |
| Account Transaction Alerts | 40554 | Notifications related to account transactions, including, but not limited to, account balance alerts or deposit confirmation alerts | Message frequency varies |
| Account Servicing and Collection Alerts | 37531 | Notifications to contact you for account servicing and collection purposes, including payment reminders | Message frequency varies |
| SMS Text Banking Alerts | 46328 | Receive account information via a text message. For example, low balance alerts, view account transaction history, or transfer money between accounts. | Message frequency varies |
| On-Demand Alerts | 73949 | Receive information you have requested via a one-time text message on your mobile phone | One-time per request |
| One-Time Passcode Alerts | 668439 | Free to End User text message to receive your passcode via a one-time text message on your mobile phone | One-time per request |

If you have questions about mobile or text messages related to the Services listed above, send a text message with the word "HELP" to the applicable SMS Short Code or call us toll-free at 1-888-868-8123. To stop receiving text messages for any of the above Services on your phone, text "STOP" to the applicable SMS Short Code. Wireless service providers and wireless carriers are not liable for delayed or undelivered messages.

### 8. Types of Available Transfers Using Mobile and Online Banking

Transfers using Navy Federal Mobile and Online Banking may be made in accordance with the rules of the relevant accounts.

You may make transfers between all owned savings accounts, checking accounts, and Money Market Savings Accounts (MMSAs).

You may make transfers from your savings accounts, checking accounts, and MMSAs to your savings Individual Retirement Accounts (IRAs), MMSA IRAs, share certificates, or IRA share certificates.

You may make transfers from a specific savings IRA and MMSA IRA to another IRA of the same type.

You may transfer funds from your savings accounts, checking accounts, and MMSAs to make Navy Federal loan and credit card payments.

You may make cash advances from your Navy Federal Credit Card or Home Equity Line of Credit (HELOC) to your savings accounts, checking accounts, or MMSAs.

You may transfer funds from your savings accounts, checking accounts, and MMSAs to another Member's savings account, checking account, and MMSA or to make a payment on another Member's consumer loan if you have established a Member-to-Member transfer capability for those accounts.

You may transfer funds from your checking account at Navy Federal to a checking account at another financial institution via the Automated Clearing House (ACH) when the transfer is originated from Navy Federal.

You may make transfers from your checking account at another financial institution to make a payment on a Navy Federal loan when the transfer is originated from Navy Federal.

You may make bill payments directly from your checking accounts or MMSAs in the amounts and on the days you requested, using our Bill Pay Service.

You may withdraw $5 to $2,500 from your savings accounts to be mailed by check to your savings account address of record on the next Business Day.

We may add new transfer capabilities or features to our Mobile and Online Banking, which will be subject to the terms governing the relevant accounts.

### 9. Transfer Limitations

There is no limit on the number of transfers from your savings account or your MMSA if they are made in person, by automatic teller machine (ATM), or by mail, or if they are made to make payments on Navy Federal loans, to have funds mailed directly to you, or as a distribution of your direct deposit. Otherwise, federal regulations limit the number of certain types of transfers and/or withdrawals you can make from your savings account and your MMSA to six (6) per calendar month. The types of transfers that are limited are those requested by fax, telephone, internet, mobile, pre-authorized transfers, or transfers automatically generated from savings to cover checking overdrafts or MMSA checks.

Except for the Federal regulations limits described above, there is no limit on the number of transfers that can be performed per day.

3

4

There are minimum and maximum total dollar transfer limits associated with transferring funds to/from another financial institution via the ACH when the transfer is originated from Navy Federal.

Transfers from a Navy Federal checking account to a checking account at another financial institution may be requested for a minimum of $5.00 to a maximum of $5,000 per Business Day. However, the total aggregate amount of all checking transfers within any five-Business-Day period cannot exceed $15,000.

Transfers to Navy Federal loans from a checking account at another financial institution may be requested for a minimum of $5.00 to a maximum of $10,000 per Business Day. However, the total aggregate amount of all loan payments within any five-Business-Day period cannot exceed $30,000.

Transfers to Navy Federal mortgage loans from a checking account at another financial institution may be requested for a minimum of $5.00 to a maximum of $30,000 per Business Day. However, the total aggregate amount, which includes your regular payment, additional escrow, principal, and late fees, of all mortgage payments within any five-Business-Day period cannot exceed $30,000.

Aggregate amounts apply to all accounts that you own individually or that you have joint ownership of, and are based on the effective transfer date(s). If you attempt to schedule a transfer or payment that would exceed these limits, an online message will let you know the effective transfer date(s) that have exceeded these limits.

These transfer limits can also be found within Online Banking by clicking on the "Help" function, and then on "External Transfers" under the "Categories" column.

For security reasons, Navy Federal may impose further limitations on the dollar amounts of transfers initiated at Navy Federal.

### 10. Your Liability for Unauthorized Electronic Funds Transfers

**Notify us AT ONCE if you believe:**

- your account may have been accessed without your authority;
- your card, code, or password has been lost or stolen;
- someone has transferred or may transfer money from your account without your permission; or
- an electronic funds transfer has been made without your permission using information from your check or your MMSA check.

The best way to minimize your possible loss is to telephone or contact us through our eMessage system at **navyfederal.org**, although you may advise us in person or in writing. If you do not notify us, you could lose all the money in your account (plus your maximum line of credit amount).

If you tell us within two (2) Business Days after you discover your password or other means to access your account has been lost or stolen, your liability is no more than $50.00 should someone access your account without your permission. If you do not tell us within two (2) Business Days after you discover such loss or theft, and we can prove that we could have prevented the unauthorized use of your password or other means to access your account if you had told us, you could be liable for as much as $500.00.

**Also, if your statement shows transfers that you did not make or authorize, tell us AT ONCE.** If you do not tell us within sixty (60) days after the statement was delivered to you of any unauthorized or fraudulent use of your account, you may not get back any of the money you lost after the sixty (60) days if we can prove that we could have stopped someone from taking the money if you had told us in time. If a good reason (such as a long trip or a hospital stay) prevented you from telling us, we may in our sole discretion extend the time periods.

**Telephone Numbers and Address to notify us of unauthorized account access or activity, lost or stolen credentials, or an unauthorized Bill Pay transaction:**

- Call 24 hours a day toll-free: 1-888-868-8123
- If in metro Washington, DC or outside the United States, call 703-255-8699
- Write us at: Navy Federal Credit Union (EFT), P.O. Box 3001, Merrifield, VA 22119-3001
- Send us an electronic message through our eMessaging system at **navyfederal.org**

### 11. In Case of Errors or Questions About Your Electronic Transfers

If you think your statement or receipt is wrong, or if you need more information about a transaction listed on your statement or receipt, contact us as soon as possible:

- Call us 24 hours a day at our toll-free number: 1-888-842-6328
- If overseas, visit **navyfederal.org** or use 1-703-255-8837 for collect international calls
- Write us at: Navy Federal Credit Union (EFT), P.O. Box 3001, Merrifield, VA 22119-3001

We must hear from you no later than sixty (60) days after the FIRST statement on which the problem or error appeared. When you contact us:

- tell us your name and account number;
- describe the error or the transaction you are unsure about and clearly explain why you believe it is an error or why you need more information; and
- tell us the dollar amount and date of the suspected error.

These are our procedures for resolving errors:

- If you tell us orally, we may require that you send your complaint in writing within ten (10) Business Days after your oral notification.
- We will determine whether an error occurred within ten (10) Business Days (twenty (20) Business Days for new accounts) after you notify us of the error and will correct any error promptly. However, if we require more time to confirm the nature of your complaint or question, we reserve the right to take up to forty-five (45) days to complete our investigation. For errors involving new accounts, point-of-sale, or foreign-initiated transactions, we may take up to ninety (90) days to investigate your complaint or question. If we decide to do this, we will provisionally credit your account within ten (10) Business Days (twenty (20) Business Days for new accounts) for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. A provisional credit is a temporary credit adjustment made to your account during the time it takes us to complete our investigation.
- If we ask you to submit your complaint or question in writing and we do not receive it within ten (10) Business Days, we may remove the provisional credit from your account.
- If it is determined that there was no error, we will reverse any provisional credits within one (1) Business Day of finishing our investigation, and send you a written explanation within three (3) Business Days. If there are insufficient funds in your account to cover the amount of the provisional credit, the account will be overdrawn, and you will be responsible for payment. You may ask for copies of documents used in our investigation.

### 12. Protecting Your Password and Ensuring the Security of Your Device

By applying for Mobile and Online Banking, you agree to accept responsibility for safeguarding and protecting your Password, Reset Question and Answer, Challenge Questions and Answers, or any other credentials used to access Mobile or Online Banking. If you believe your password or other credentials have been lost or stolen, or that someone may attempt to use your Mobile or Online Banking Service without your consent or has transferred money without your permission, notify us at once at the address or telephone numbers listed in paragraph 10, "Your Liability for Unauthorized Electronic Funds Transfers," above.

5

6

You agree not to give or make available your password or credentials to any unauthorized individuals, and you agree to be responsible for all actions taken by anyone to whom you have provided such credentials or allowed to use your Mobile or Online Banking Service, including any Bill Pay transactions.

In order to help prevent unauthorized transactions on Mobile and Online Banking, you also agree to ensure the security of the personal computer (PC) you own and/or use to access Online Banking, and of any mobile device you use to access Mobile Banking. By securing the PC you own and/or use, we specifically mean installing antivirus software, a firewall, and spyware detection software on your PC, and keeping this security software current, or verifying that the above security software has been installed and is current.

You also agree that Navy Federal may revoke Mobile or Online Banking if unauthorized Mobile or Online Banking occurs as a result of your negligence in safeguarding the Password, Reset Question and Answer, and Challenge Questions and Answers, or as a result of your negligence in ensuring the security of the PC you own and/or use to access the Navy Federal Online Banking Service, as described above, or of the mobile device used to access Mobile Banking.

### 13. Periodic Statements

Unless you have opted in to receiving your statements electronically, you will receive a paper monthly account statement (unless there are no electronic funds transfers in a particular month, in which case you will receive a statement at least quarterly). Additionally, you can view all your account transaction activity through Mobile and Online Banking.

### 14. Transaction Fees

Navy Federal does not charge for transfers initiated or account information viewed via Navy Federal Mobile or Online Banking, or for the Bill Pay Services, except for the optional "Rush Delivery" fee for expedited Bill Pay. However, message and data rates may apply. Visit **navyfederal.org** for more information. Please see the *Schedule of Fees and Charges* at **navyfederal.org** for fees charged for other transactions and optional services. Navy Federal reserves the right to charge for Mobile or Online Banking, including Bill Pay. You will be given at least twenty-one (21) days advance notice before Navy Federal implements any new fees for Mobile or Online Banking or Bill Pay.

### 15. Our Liability for Failure to Make Transfers

Navy Federal will use reasonable efforts to complete all your transfers properly. If Navy Federal does not complete a transfer to or from your account on time, in the correct amount, or to the correct recipient in accordance with your payment instructions, according to our Agreement with you, we will be liable for your losses or damages.

However, there are some exceptions. We will NOT be liable, for instance, if:

  a.) through no fault of ours, you do not have sufficient funds in your account (for Bill Pay, this is your Payment Account–see the Bill Pay section below in this Agreement), available funds through your Optional Overdraft Protection Service (OOPS), or available credit in your Checking Line of Credit (CLOC) to make the transfer. Per federal regulation, pre-authorized telephone, internet, mobile, or automatic transfers from savings to cover checking overdrafts cannot exceed six (6) in number per calendar month; in such case for Bill Pay, the Bill Pay Service Guarantee shall be void;

  b.) the funds in your account are subject to legal process, such as garnishment or attachment;

  c.) the account is subject to a pledge or security agreement;

  d.) despite reasonable precautions that we have taken, circumstances beyond our control (such as fire, power failure, flood, or failure of paying agency to deliver direct deposit payment data) prevent the transfer; in such case for Bill Pay, the Bill Pay Service Guarantee shall be void;

  e.) for Bill Pay, the Service is not working properly and you know or have been advised by us about the malfunction before you execute the transaction or the Payment Instruction; in such case for Bill Pay, the Bill Pay Service Guarantee shall be void;

  f.) for Bill Pay, you have not provided the Service with the correct Payment Account information, or the correct name, address, phone number, or account information for the Biller; in such case, the Bill Pay Service Guarantee shall be void;

  g.) Bill Pay Rush Delivery payments are submitted without complete or accurate information and are therefore rejected or do not post on time. You will be charged the associated fee for each Rush Delivery payment order you submit, regardless of whether it was properly submitted;

For Bill Pay, provided none of the foregoing exceptions are applicable, if the Service causes an incorrect amount of funds to be removed from your Payment Account or causes funds from your Payment Account to be directed to a Biller that does not comply with your Payment instruction, the Service shall be responsible for returning the improperly transferred funds to your Payment Account, directing to the proper Biller any previously misdirected transactions, and, if applicable, any late payment-related charges.

### 16. Disclosure of Account Information to Third Parties

It is our general policy to treat your account information as confidential. However, we will disclose information to third parties about your account or the transactions you make ONLY in the following situations:

  a.) Where it is necessary for completing transactions;

  b.) Where it is necessary for activating additional services;

  c.) In order to verify the existence or condition of your account to a third party, such as a credit bureau or Biller;

  d.) To a consumer reporting agency for research purposes only;

  e.) In order to comply with a governmental agency or court orders;

  f.) If you give us your written permission;

  g.) If we return checks on your account drawn on non-sufficient funds or if we are unable to complete an electronic transfer because of non-sufficient funds; or

  h.) In accordance with Navy Federal's Privacy Policy, which you can find on **navyfederal.org**.

### 17. Governing Law and Forum for Disputes

This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without regard to its conflicts of laws provisions, provided, however, that any dispute solely between you and the Service Provider shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to its conflicts of laws provisions. To the extent that the terms of this Agreement conflict with applicable state or federal law, such state or federal law shall replace such conflicting terms only to the extent required by law. Unless expressly stated otherwise, all other terms of this Agreement shall remain in full force and effect. Unless our Important Disclosures Booklet states otherwise, you agree that any claim or dispute you may have against us must be resolved by a court located in the county in which you reside. You agree to submit to the personal jurisdiction of such courts for the purpose of litigating all claims or disputes. The United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

THE FOREGOING SHALL CONSTITUTE THE SERVICE'S ENTIRE LIABILITY AND YOUR EXCLUSIVE REMEDY. IN NO EVENT SHALL THE SERVICE BE LIABLE FOR ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR EXEMPLARY DAMAGES, INCLUDING LOST PROFITS (EVEN IF ADVISED OF THE POSSIBILITY THEREOF) ARISING IN ANY WAY OUT OF THE INSTALLATION, USE, OR MAINTENANCE OF THE EQUIPMENT, SOFTWARE, AND/OR SERVICE.

### 18. Unauthorized Use

Access to and use of the Navy Federal Mobile and Online Banking Service(s) is subject to all applicable federal, state, and local laws and regulations. Unauthorized use of the Navy Federal Mobile and Online Banking Service(s) or information accessed via the Navy Federal Mobile and Online Banking Service(s) is strictly prohibited.

### 19. Links and Frames

Links to other sites may be provided on the portion of the Site through which the Service is offered for your convenience. By providing these links, we are not endorsing, sponsoring, or recommending such sites or the materials disseminated by or services provided by them, and are not responsible for the materials, services, or other situations at or related to or from any other site, and make no representations concerning the content of sites listed in any of the Service web pages. Consequently, we cannot be held responsible for the accuracy, relevancy, copyright compliance, legality, or decency of material contained in sites listed in any search results or otherwise linked to the Site. For example, if you "click" on a banner advertisement or a search result, your "click" may take you off the Site. This may include links from advertisers, sponsors, and content partners that may use our logo(s) as part of a co-branding agreement. These other sites may send their own cookies to users, collect data, solicit personal information, or contain information that you may find inappropriate or offensive. In addition, advertisers on the Site may send cookies to users that we do not control. You may link to the home page of our Site. However, you may not link to other pages of our Site without our express written permission. You also may not "frame" material on our Site without our express written permission. We reserve the right to disable links from any third-party sites to the Site.

### 20. Complete Agreement, Severability, Headings, Survival, and Inconsistencies

In the event of a dispute regarding this Agreement and the Services offered through Mobile and Online Banking, you agree to resolve the dispute by looking to this Agreement. You agree that this Agreement is the complete and exclusive statement of the agreement between us, sets forth the entire understanding between us and you with respect to the Services and the portion of Navy Federal's website, the Site, or mobile app through which the Services are offered, and supersedes any proposal or prior agreement, oral or written, and any other communications between us. If there is a conflict between the terms of this Agreement and something stated by an employee, contractor, or Service Provider of ours, the terms of the Agreement will prevail. The headings of paragraphs hereof are for convenience only and shall not control or affect the meaning or construction of any of the provisions of this Agreement. If any provision of this Agreement is held to be invalid or unenforceable, such provision shall be struck and the remaining provisions shall be enforced. Any terms that by their nature should survive, will survive the termination of this Agreement. In the event of any inconsistency between prior Agreements applicable to the Navy Federal Mobile and Online Banking Service and this Agreement, this Agreement shall apply and control. Undefined terms herein shall have the meaning assigned to them in the Important Disclosures Booklet. This Agreement supplements the Important Disclosures Booklet. In the event of an inconsistency between the Important Disclosures Booklet and this Agreement, this Agreement shall govern.

### 21. No Waiver

We shall not be deemed to have waived any rights or remedies hereunder, unless such waiver is in writing and signed by one of our authorized representatives. No delay or omission on our part in exercising any rights or remedies shall operate as a waiver of such rights or remedies or any other rights or remedies. A waiver on any one occasion shall not be construed as a bar or waiver of any rights or remedies on future occasions.

### 22. Assignment

You may not transfer or assign any rights or obligations you have under this Agreement to any party, person, or entity without our prior written consent, which we may withhold in our sole discretion. We reserve the right to transfer or assign this Agreement or any right or obligation under this Agreement at any time to any party. We may also assign or delegate certain of our rights and responsibilities under this Agreement to independent contractors or other third parties.

### 23. Amendments

We may amend this Agreement and any applicable fees and charges for the Services at any time by posting a revised version on our website, **navyfederal.org**, or, where required by law, providing notice to you. The revised version will be effective at the time it is posted unless a delayed effective date is expressly stated in the revision. Any

use of the Services after a notice of change or after the posting of a revised version of this Agreement on **navyfederal.org** will constitute your agreement to such changes and revised versions. Further, we may, from time to time, revise, update, upgrade, or enhance the Services and/or related applications or material, which may render all such prior versions obsolete. Consequently, we reserve the right to terminate this Agreement as to all such prior versions of the Services, and/or related applications and material, and limit access to only the Services' more recent revisions, updates, upgrades, or enhancements.

### 24. Service Cancellation, Termination, or Suspension

If you wish to cancel the Service, you may contact us as set forth in paragraph 10, "Your Liability for Unauthorized Electronic Funds Transfers," under "General Mobile Banking, Online Banking, and Bill Pay Terms and Conditions" above. Any payment(s) that has/have begun processing before the requested cancellation date will be processed by us. All Scheduled Payments (including recurring payments) will not be processed once the Service is canceled.

You agree that we may terminate or suspend your use of the Service(s) at any time and for any reason or no reason. Any payment(s) that we have already processed before the termination or suspension date will be completed by us. All Scheduled Payments (including recurring payments) will not be processed once the Service(s) is/are terminated or suspended.

Neither termination nor suspension shall affect your liability or obligations under this Agreement.

Navy Federal reserves the right to revoke or refuse Mobile or Online Banking Services. We may cancel your Mobile or Online Banking Services at any time with or without written notice to you. For example (and not excluding other examples), if you do not provide us with your current mailing address and email address, we may cancel your services until you provide us with your current addresses.

### 25. Remedies

If we have reason to believe that you have engaged in any of the prohibited or unauthorized activities described in this Agreement or have otherwise breached your obligations under this Agreement, we may terminate, suspend, or limit your access to or use of the Site, the Navy Federal website, and/or the Service(s); notify law enforcement, regulatory authorities, impacted third parties, and others as we deem appropriate; refuse to provide our Service(s) to you in the future; and/or take legal action against you. In addition, we, in our sole discretion, reserve the right to terminate this Agreement, access to the Site, Navy Federal website, and/or use of the Service(s) for any reason or no reason and at any time. The remedies contained in this paragraph are cumulative and are in addition to the other rights and remedies available to us under this Agreement, by law or otherwise.

### 26. Indemnification

You agree to defend, indemnify, and hold harmless us and our Affiliates and Service Providers and their Affiliates and the employees and contractors of each of these, from any loss, damage, claim, or demand (including attorneys' fees) made or incurred by any third party due to or arising out of your breach of this Agreement, your use of Navy Federal's mobile app or website, and/or the Services offered through Mobile or Online Banking.

### 27. Release

You release us and our Affiliates and Service Providers and the employees and contractors of each of these, from any and all claims, demands, and damages (actual and consequential) of every kind and nature arising out of or in any way connected with any dispute that may arise between you or one or more other users of the Site, Navy Federal website, or the Service(s). In addition, you waive California Civil Code §1542, which states that a general release does not extend to claims that the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if not known by him or her, must have materially affected his or her settlement with the debtor.

**28. Relationship to Other Agreements**

You agree that when you use Mobile and Online Banking Services, you will remain subject to the terms and conditions of all existing agreements with our affiliates and us. You acknowledge that certain wireless service providers and/or wireless carriers may assess fees, limitations, and/or restrictions that might impact your use of Mobile or Online Banking (for example, your mobile service carrier or provider may impose data usage or text charges for your use of or interaction with Mobile Banking, including downloading the software, receiving or sending Mobile Banking text messages, or other use of your wireless device when using the software or other products and services provided by Mobile Banking). You expressly agree that you are responsible for all such fees, limitations, and restrictions.

**29. Exclusions of Warranties**

THE NAVY FEDERAL WEBSITE, THE SITE AND SERVICE(S), AND RELATED DOCUMENTATION ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. IN PARTICULAR, WE DO NOT GUARANTEE CONTINUOUS, UNINTERRUPTED, OR SECURE ACCESS TO ANY PART OF OUR SERVICE(S), AND OPERATION OF THE NAVY FEDERAL WEBSITE AND THE SITE MAY BE INTERFERED WITH BY NUMEROUS FACTORS OUTSIDE OF OUR CONTROL. SOME STATES DO NOT ALLOW THE DISCLAIMER OF CERTAIN IMPLIED WARRANTIES, SO THE FOREGOING DISCLAIMERS MAY NOT APPLY TO YOU. THIS PARAGRAPH GIVES YOU SPECIFIC LEGAL RIGHTS, AND YOU MAY ALSO HAVE OTHER LEGAL RIGHTS THAT VARY FROM STATE TO STATE.

**30. Limitation of Liability**

THE FOREGOING SHALL CONSTITUTE YOUR EXCLUSIVE REMEDIES AND THE ENTIRE LIABILITY OF US AND OUR AFFILIATES AND SERVICE PROVIDERS AND THE EMPLOYEES AND CONTRACTORS OF EACH OF THESE, FOR THE SERVICE(S) AND THE PORTION OF THE NAVY FEDERAL WEBSITE OR SITE THROUGH WHICH THE SERVICE(S) IS/ARE OFFERED. YOU ACKNOWLEDGE AND AGREE THAT FROM TIME TO TIME, THE SERVICE(S) MAY BE DELAYED, INTERRUPTED, OR DISRUPTED PERIODICALLY FOR AN INDETERMINATE AMOUNT OF TIME DUE TO CIRCUMSTANCES BEYOND OUR REASONABLE CONTROL, INCLUDING, BUT NOT LIMITED TO, ANY INTERRUPTION, DISRUPTION, OR FAILURE IN THE PROVISION OF THE SERVICE(S), WHETHER CAUSED BY STRIKES, POWER FAILURES, EQUIPMENT MALFUNCTIONS, INTERNET DISRUPTION, OR OTHER REASONS. IN NO EVENT SHALL WE OR OUR AFFILIATES OR SERVICE PROVIDERS, OR THE EMPLOYEES OR CONTRACTORS OF ANY OF THESE, BE LIABLE FOR ANY CLAIM ARISING FROM OR RELATED TO THE SERVICE(S) CAUSED BY OR ARISING OUT OF ANY SUCH DELAY, INTERRUPTION, DISRUPTION, OR SIMILAR FAILURE. IN NO EVENT SHALL WE OR OUR AFFILIATES OR SERVICE PROVIDERS, OR THE EMPLOYEES OR CONTRACTORS OF ANY OF THESE, BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR EXEMPLARY DAMAGES, INCLUDING LOSS OF GOODWILL OR LOST PROFITS (EVEN IF ADVISED OF THE POSSIBILITY THEREOF) ARISING IN ANY WAY OUT OF THE INSTALLATION, USE, OR MAINTENANCE OF THE SERVICE(S) OR THE PORTION OF NAVY FEDERAL'S WEBSITE OR THE SITE THROUGH WHICH THE SERVICE(S) IS/ ARE OFFERED, EVEN IF SUCH DAMAGES WERE REASONABLY FORESEEABLE AND NOTICE WAS GIVEN REGARDING THEM. IN NO EVENT SHALL WE OR OUR AFFILIATES OR SERVICE PROVIDERS, OR THE EMPLOYEES OR CONTRACTORS OF ANY OF THESE, BE LIABLE FOR ANY CLAIM ARISING FROM OR RELATED TO THE SERVICE(S) OR THE PORTION OF THE NAVY FEDERAL WEBSITE OR SITE THROUGH WHICH THE SERVICE(S) IS/ARE OFFERED THAT YOU DO NOT STATE IN WRITING IN A COMPLAINT FILED IN A COURT PROCEEDING AS DESCRIBED IN PARAGRAPH 17 ABOVE WITHIN TWO (2) YEARS OF THE DATE THAT THE EVENT GIVING RISE TO THE CLAIM OCCURRED. THESE LIMITATIONS WILL APPLY TO ALL CAUSES OF ACTION, WHETHER ARISING FROM BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR ANY OTHER LEGAL THEORY. OUR AGGREGATE LIABILITY, AND THE AGGREGATE LIABILITY OF OUR AFFILIATES AND SERVICE

PROVIDERS, AND THE EMPLOYEES AND CONTRACTORS OF EACH OF THESE, TO YOU AND ANY THIRD PARTY FOR ANY AND ALL CLAIMS OR OBLIGATIONS RELATING TO THIS AGREEMENT SHALL BE LIMITED TO DIRECT OUT-OF-POCKET DAMAGES UP TO A MAXIMUM OF $500 (FIVE HUNDRED DOLLARS). SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU.

**B. Mobile Banking Terms and Conditions**

> This section provides information and the general terms and conditions for use of Navy Federal's Mobile Banking Services. You will find definitions of terms used for Mobile Banking, and a description of this service as well as describing what you can do using your mobile device.

**1. Mobile Banking Definitions**

**"Eligible Accounts"** means accounts that Navy Federal includes in the Mobile Banking display, and that are permitted to be viewed by you on a Mobile Device. Some Mobile Banking users, such as joint owners, are prevented from viewing certain accounts belonging to the primary owner.

**"Mobile Device"** means a cell phone or electronic handheld device.

**"Text Banking"** means using your Mobile Device to view your Navy Federal accounts and making transactions with the text message functionality.

**2. Description of Navy Federal Mobile Banking**

Navy Federal Mobile Banking refers generally to any service allowing an existing Navy Federal Member or joint account holder to access and view Eligible Accounts from a Mobile Device.

**3. What Does Navy Federal Mobile Banking Include?**

- Navy Federal Mobile Banking includes Text Banking and access through the Navy Federal app. Mobile Banking allows you to view balances, track recent account activity for your Eligible Accounts, make funds transfers from your Mobile Device, and receive alerts for which you have subscribed, as well as other account actions as permitted and offered by us, including those actions in paragraph 8 in the section "General Mobile Banking, Online Banking, and Bill Pay Terms and Conditions."

- Text Banking requires a text-enabled Mobile Device. You do not need Internet access on your Mobile Device to use Text Banking. Text Banking allows you to view your account balance, review recent account history, and transfer funds between your accounts using the text message functionality on your Mobile Device.

- Touch ID™ and Fingerprint Sign-In Authentication are optional authentication methods offered by Navy Federal to sign into Navy Federal Mobile Banking. You can turn these features on or off by checking or un-checking the "Enable Touch ID" or "Enable Fingerprint Sign-In" check box on the Settings screen. Fingerprints are stored on your device only. Navy Federal never sees your fingerprint information and does not store this fingerprint information. Your User ID and password will be encrypted and stored in your device's Apple® iOS Keychain. You acknowledge that by enabling Touch ID or Fingerprint Sign-In, anyone who has a fingerprint stored on your device will have access to your personal and payment account information on Navy Federal Mobile Banking. Navy Federal reserves the right to suspend or disable this feature at any time. Touch ID and Fingerprint Sign-In can only be associated with one Navy Federal Mobile Banking User ID at a time on a device. If you believe someone has gained unauthorized access to your account or your password has been stolen, call 24 hours a day toll-free: 1-888-868-8123. If in metro Washington, DC or outside the United States, call 703-255-8699 or write: Navy Federal Credit Union, P.O. Box 3001, Merrifield, VA 22119-3001.

- From time to time, Navy Federal may develop additional Mobile Banking Services. As such Services are developed, you will have the opportunity to

11

12

add them to your Navy Federal Mobile Banking Service, provided you have compatible wireless hardware and software.

Touch ID™ is a trademark of Apple, Inc.

# C. Bill Pay Terms and Conditions

> This section provides information and additional terms and conditions for use of Navy Federal's Bill Pay Services. You will find definitions of terms used for Bill Pay and provisions that provide you necessary information related to failed, returned, or refused transactions; prohibited payments; information authorization; scheduling payments; guarantee of the service and exceptions to payments; cancellation and stop payments; electronic bill payments; payment authorization and initiation of payment instructions; and receiving payments.

## Definitions

**"Biller"** is the person or entity to which you wish a bill payment to be directed or is the person or entity from which you receive electronic bills (E-Bills), as the case may be.

**"Billing Account"** is your primary checking account from which any Service fees, excluding the optional Rush Delivery fee, will automatically be debited.

**"Customer Care"** represents the customer service provided by the Service Provider to Navy Federal's Bill Pay subscribers on Navy Federal's behalf.

**"Due Date"** is the date reflected on your Biller statement for which the payment is due. It is not the late date or grace period.

**"Payment Account"** is the checking account from which bill payments will be debited. If you use the optional Rush Delivery service, the Rush Delivery fee will automatically be debited from this account.

**"Payment Instruction"** is the information provided by you to the Service for a bill payment to be made to the Biller (such as, but not limited to, Biller name, Biller account number, and Scheduled Payment Date).

**"Rush Delivery"** is an optional service available with participating Billers that allows you to initiate payment for immediate processing for an additional fee.

**"Scheduled Payment"** is a payment that has been scheduled through the Service but has not begun processing.

**"Scheduled Payment Date"** is the day you want your Biller to receive your bill payment and is also the day your Payment Account will be debited, unless the Scheduled Payment Date falls on a non-Business Day, in which case it will be considered to be the previous Business Day. Payments with the optional Rush Delivery service will begin processing immediately.

**"Service"** means, in this Bill Pay Terms and Conditions section, Navy Federal's Bill Pay Service, offered through our Service Provider(s).

**"Site"** means the portion of Navy Federal's website, **navyfederal.org**, or mobile app through which the Bill Pay Service is offered.

## 1. Service Providers

We are offering you the Service through one or more Service Providers that we have engaged to render some or all of the Service to you on our behalf. The Service Provider will be processing Bill Pay payments and answering questions directly related to such member-initiated Bill Pay payments. Notwithstanding that we have engaged such a Service Provider to render some or all of the Service to you, we are the sole party liable to you for any payments or transfers conducted using the Bill Pay Service. You agree that we have the right under this Agreement to delegate to Service Providers all the rights and performance obligations that we have under this Agreement, and that the Service Providers will be third-party beneficiaries of this Agreement and will be entitled to all the rights and protections that this Agreement provides to us. Navy Federal, in our sole discretion, reserves the right to change Bill Pay Service Providers.

The Service Providers are independent contractors for all purposes, except that they act as your agent with respect to the custody of your funds for the Service. The Service Providers do not have control of, or liability for, any products or services that are paid for with the Service. The Service Providers also do not guarantee the identity of any user of the Service (including, but not limited to, Receivers to whom you send payments).

## 2. United States Address

To be enrolled in the Service, you must have a United States mailing address, a FPO or APO address, or an address in one of the following U.S. territories and/or possessions: American Samoa, Guam, Marshall Islands, Micronesia, N. Mariana Island, Palau, Puerto Rico, or the Virgin Islands.

## 3. Failed or Returned Transactions

In using the Service, you are requesting us to make payments for you from your Payment Account. If we are unable to complete the withdrawal from your Payment Account for any reason (for example, there are non-sufficient funds in your Payment Account to cover the transaction, or the transaction would exceed the credit or overdraft protection limit of your Payment Account), the payment may not be made. In some instances, you will receive a return notice from us. In each such case, you agree that:

- you will reimburse us immediately upon demand for the transaction amount that has been returned to the Service;
- you will reimburse us immediately upon demand for any transaction amount paid by the Service;
- we may charge you a non-sufficient funds (NSF) fee in accordance with our *Schedule of Fees and Charges* available at **navyfederal.org**, even if the payment is not returned but is paid;
- you will reimburse us for any fees we incur in attempting to collect the transaction amount from you that was paid by the Service;
- to recover the transaction amount paid by the Service, we may withdraw the transaction amount from any share accounts on which you are a primary or joint owner;
- to recover the transaction amount paid by the Service, we may draw on the available balance on any line of credit accounts (e.g., CLOC) on which you are a primary or joint owner;
- we may impose a late charge equal to 1.5% monthly interest or the legal maximum, whichever rate is lower, for any amounts not reimbursed to us within fifteen (15) days of the initial demand; and
- we are authorized to report the facts concerning the failed or returned transaction to any consumer credit reporting agency.

## 4. Prohibited Payments

The following types of payments are prohibited through the Service, and we have the right but not the obligation to monitor for, block, cancel, and/or reverse such payments:

a.) Payments to or from persons or entities located in prohibited territories (including any territory outside of the United States or its territories);

b.) Payments that violate any law, statute, ordinance, or regulation;

c.) Payments that violate the Acceptable Use terms in paragraph 6 below;

d.) Payments related to: (1) tobacco products, (2) prescription drugs and devices; (3) narcotics, steroids, controlled substances, or other products that present a risk to consumer safety; (4) drug paraphernalia; (5) ammunition, firearms, or firearm parts or related accessories; (6) weapons or knives regulated under applicable law; (7) goods or services that encourage, promote, facilitate, or instruct others to engage in illegal activity; (8) goods or services that are sexually oriented; (9) goods or services that promote hate, violence, racial intolerance, or the financial exploitation of a crime; (10) goods or services that defame, abuse, harass, or threaten others; (11) goods or services that include any language or images that are bigoted, hateful, racially offensive, vulgar, obscene, indecent, or discourteous; (12) goods or services that advertise or sell to, or solicit others; or (13) goods or services that infringe or violate any copyright, trademark, right of publicity or privacy, or any other proprietary right under the laws of any jurisdiction;

13

14

JA 47

e.) Payments related to gambling, gaming, and/or any other activity with an entry fee and a prize, including, but not limited to, casino games, sports betting, horse or greyhound racing, lottery tickets, other ventures that facilitate gambling, games of skill (whether or not it is legally defined as a lottery), and sweepstakes;

f.) Payments relating to transactions that (1) support pyramid or Ponzi schemes, matrix programs, other "get rich quick" schemes, or multi-level marketing programs, (2) are associated with purchases of real property, annuities or lottery contracts, lay-away systems, off-shore banking, or transactions to finance or refinance debts funded by a credit card, (3) are for the sale of items before the seller has control or possession of the item, (4) constitute money-laundering or terrorist financing, (5) are associated with the following "money service business" activities: the sale of traveler's checks or money orders, currency dealers or exchanges, or check cashing, or (6) provide credit repair or debt settlement services;

g.) Tax payments and court-ordered payments.

In addition to the above-referenced prohibited payments, we may also block and/or reverse payments that involve donations or payments to an unauthorized charity or non-profit organization, unless we have performed appropriate due diligence on and investigation of such charity or non-profit organization and have determined its legitimacy, in our sole discretion. In no event shall we or our Service Providers be liable for any claims or damages resulting from your scheduling of prohibited payments. We have no obligation to research or resolve any claim resulting from a prohibited payment. All research and resolution for any misapplied, misposted, or misdirected prohibited payments will be your sole responsibility and not ours. We encourage you to provide notice to us by the methods described in paragraph 7 of this "Bill Pay Terms and Conditions" section of any violations of this paragraph or the Agreement generally.

### 5. Acceptable Use
You agree that you are independently responsible for complying with all applicable laws in all your activities related to your use of the Service(s), regardless of the purpose of the use, and for all communications you send through the Service(s). We and our Service Providers have the right but not the obligation to monitor and remove communications content that we find in our sole discretion to be objectionable in any way. In addition, you are prohibited from using the Service(s) for communications or activities that: (a) violate any law, statute, ordinance, or regulation; (b) promote hate, violence, racial intolerance, or the financial exploitation of a crime; (c) defame, abuse, harass, or threaten others; (d) include any language or images that are bigoted, hateful, racially offensive, vulgar, obscene, indecent, or discourteous; (e) infringe or violate any copyright, trademark, right of publicity or privacy, or any other proprietary right under the laws of any jurisdiction; (f) impose an unreasonable or disproportionately large load on our infrastructure; (g) facilitate any viruses, Trojan horses, worms, or other computer programming routines that may damage, detrimentally interfere with, surreptitiously intercept, or expropriate any system, data, or information; (h) constitute use of any robot, spider, other automatic device, or manual process to monitor or copy the Service or the portion of the Site through which the Service is offered without our prior written permission; (i) constitute use of any device, software, or routine to bypass technology protecting the Site or Service(s), or interfere or attempt to interfere, with the Site or Service(s); or (j) may cause us or our Service Providers to lose any of the services from our Internet Service Providers, payment processors, or other vendors. We encourage you to provide notice to us by the methods described in paragraph 7 of this "Bill Pay Terms and Conditions" section of any violations of this paragraph or the Agreement generally.

### 6. Questions Regarding the Service
If you have questions about the Service or your transactions, you may contact us via one of the following:

- Telephone us toll-free at 1-888-560-8031 or dial direct at 1-614-564-3878 during the Service Provider's hours
- Contact us by using the Service's eMessaging feature
- Write us at: Navy Federal Credit Union, Attn: Account Servicing, P.O. Box 182477, Columbus, OH 43218-2477

15

### 7. Notices to Us Regarding the Service
Notices to us concerning the Service must be sent by postal mail to:

Navy Federal Credit Union
Attn: Account Servicing
P.O. Box 182477
Columbus, OH 43218-2477

We may also be reached toll-free at 1-888-560-8031 or dial direct at 1-614-564-3878 for questions and other purposes concerning the Service. We will act on your telephone calls as described in paragraph 11, "In Case of Errors or Questions About Your Electronic Transfers," in the "General Mobile Banking, Online Banking, and Bill Pay, Terms and Conditions" section above, but otherwise such telephone calls will not constitute legal notices under this Agreement.

### 8. Notices to You
You agree that we may provide notice to you by sending it to you through the Navy Federal Online eMessage system, by sending you an in-product message within the Site, by emailing it to an email address that you have provided us, by mailing it to any postal address that you have provided us, or by sending it as a text message to any mobile phone number that you have provided us. For example, you may receive certain notices (such as notices of processed Payment Instructions, alerts for validation, and notices of receipt of payments) as text messages on your mobile phone. All notices by any of these methods shall be deemed received by you no later than twenty-four (24) hours after they are sent or posted, except for notice by postal mail, which shall be deemed received by you no later than three (3) Business Days after it is mailed.

### 9. Privacy of Others
If you receive information about another person through the Service, you agree to keep the information confidential and only use it in connection with the Service.

### 10. Receipts and Transaction History
You may view your Bill Pay transaction history by logging into the Service and looking at your transaction history. You agree to review your transactions by this method instead of receiving receipts by mail.

### 11. Mobile Phone Users
Your phone service provider is not the provider of the Service. Users of the Service will receive text messages relating to their Payment Instructions and other notices from time to time if a mobile phone number is provided. Data and messaging charges from your telecommunications provider may apply, and you are responsible for any such charges. In the event your enrolled mobile device is lost or stolen, you agree to update your enrollment information and make the appropriate changes to disable the use of such device. You understand that there are risks associated with using a mobile device, and that in the event of theft or loss, your confidential information could be compromised.

### 12. Information Authorization
Your enrollment in the Service may not be fulfilled if we or the Service cannot verify your identity or other necessary information. In order to verify ownership of the Payment Account(s) and/or Billing Account, the Service may issue offsetting debits and credits to the Payment Account(s) and/or Billing Account, and require confirmation of such from you. Through your enrollment in the Service, you agree that we or the Service reserve the right to request a review of your credit rating at our or its own expense through an authorized bureau. In addition, and in accordance with our Privacy Policy, you agree that we reserve the right to obtain personal information about you, including without limitation, financial information and transaction history regarding your Payment Account or Eligible Transaction Account. In addition, you agree that the Service reserves the right to obtain financial information regarding your account from a Biller or your financial institution (for example, to resolve payment posting problems or for verification). You further understand and agree that we reserve the right to use personal information about you for our and our Service Providers' everyday business purposes, such as to maintain your ability to access the Service, to authenticate you when you log in, to send you information

16

about the Service, to perform fraud screening, to verify your identity, to determine your transaction limits, to perform collections, to comply with laws, regulations, court orders, and lawful instructions from government agencies, to protect the personal safety of subscribers or the public, to defend claims, to resolve disputes, to troubleshoot problems, to enforce this Agreement, to protect our rights and property, and to customize, measure, and improve the Service and the content and layout of the Navy Federal website and the Site. Additionally, we and our Service Providers may use your information for risk management purposes and may use, store, and disclose your information acquired in connection with this Agreement as permitted by law, including (without limitation) any use to effect, administer, or enforce a transaction or to protect against or prevent actual or potential fraud, unauthorized transactions, claims, or other liability. We and our Service Providers shall have the right to retain such data even after termination or expiration of this Agreement for risk management, regulatory compliance, audit compliance, and audit reasons, and as permitted by applicable law for everyday business purposes. In addition, we and our Service Providers may use, store, and disclose such information acquired in connection with the Service in statistical form for pattern recognition, modeling, enhancement and improvement, and system analysis, and to analyze the performance of the Service.

### 13. Charges or Fees

The Bill Pay service is provided to you at no cost. Charges for other transactions and optional services (e.g., non-sufficient funds, stop payment, or overdraft fees), as well as the fee associated with the optional Rush Delivery service, are specified in Navy Federal's *Schedule of Fees and Charges*, which can be found at **navyfederal.org**.

You agree to pay such fees and charges, and authorize the Service to charge your designated Billing Account for these amounts and any additional charges that may be incurred by you. Any fees associated with your share or loan accounts will continue to apply. You are responsible for any and all telephone access fees or internet service fees that may be assessed by your telephone utility and/or internet service provider.

### 14. Banking Changes

You can update your choice of Payment Account within the Service, but any changes to your Billing Account must be made by calling Navy Federal at 1-888-842-6328. All changes made are effective immediately for scheduled and future payments paid from the updated Payment Account information. The Service is not responsible for any payment processing errors or fees incurred if you do not provide accurate Payment Account information, contact information, or payment instructions.

### 15. Bill Payment Scheduling

The earliest possible Scheduled Payment Date for each Biller (typically four (4) or fewer Business Days from the current date) will be designated within the application when you are scheduling the payment. Therefore, the application will not permit you to select a Scheduled Payment Date earlier than the earliest possible Scheduled Payment Date designated for each Biller. When scheduling payments, you must select a Scheduled Payment Date that is no later than the actual Due Date reflected on your Biller statement, unless the Due Date falls on a non-Business Day. If the actual Due Date falls on a non-Business Day, you must select a Scheduled Payment Date that is at least one (1) Business Day before the actual Due Date. Scheduled Payment Dates should be prior to any late date or grace period.

Please note: While you can make payments to your Navy Federal loan accounts using the Service, you can also make payments using the transfer payment option on the Navy Federal Online Banking service at no charge.

Rush Delivery: In order for a Rush Delivery payment to be processed the same day, it must be initiated on a Business Day and prior to the Biller's cutoff time. Cutoff times vary by Biller. If Rush Delivery is not available for an intended Biller, if you have missed the Biller's cutoff time for that day, or if you attempt to submit a Rush Delivery payment on a non-Business Day, it will not be presented as an option to you.

### 16. The Service Guarantee

Due to circumstances beyond the control of the Service, particularly delays in handling and posting payments by Billers or financial institutions, some transactions may take longer to be credited to your account. The Service will bear responsibility for any late payment-related charges up to $50.00 should a payment post after its Due Date, as long as the payment was scheduled in accordance with the guidelines described under "Bill Payment Scheduling" in this Agreement.

### 17. Exception Payments

Tax payments and court-ordered payments may be scheduled through the Service; however, such payments are discouraged and are scheduled at your own risk. In no event shall the Service be liable for any claims or damages resulting from your scheduling of these types of payments. The Service Guarantee as it applies to any late payment-related charges is void when these types of payments are scheduled and/or processed by the Service. The Service has no obligation to research or resolve any claim resulting from an exception payment. All research and resolution for any misapplied or misdirected payments will be the sole responsibility of you and not of the Service.

### 18. Payment Authorization and Payment Remittance

By providing the Service with names and account information of Billers to whom you wish to direct payments, you authorize the Service to follow the Payment Instructions that it receives through the payment system. In order to process payments more efficiently and effectively, the Service may edit or alter payment data or data formats in accordance with Biller directives.

When the Service receives a Payment Instruction, you authorize the Service to debit your Payment Account and remit funds on your behalf so that the funds arrive as close as reasonably possible to the Scheduled Payment Date designated by you. You also authorize the Service to credit your Payment Account for payments returned to the Service by the United States Postal Service or Biller, or payments remitted to you on behalf of another authorized user of the Service.

If you choose the optional "Rush Delivery" service, you authorize the Service to debit your Payment Account the same day, with the additional fee charged for Rush Delivery. Please refer to the *Schedule of Fees and Charges* at **navyfederal.org**.

### 19. Payment Methods

The Service reserves the right to select the method in which to remit funds on your behalf to your Biller. These payment methods may include, but may not be limited to, an electronic payment, an electronic-to-check payment, or a laser draft payment (funds remitted to the Biller are deducted from your Payment Account when the laser draft is presented to your financial institution for payment).

### 20. Payment Cancellation Requests

You may cancel or edit any Scheduled Payment, including recurring payments, but excluding "Rush Delivery" payment orders, by following the directions within the application. There is no charge for canceling or editing a Scheduled Payment. Once the Service has begun processing a payment, it cannot be canceled or edited. Therefore, a stop payment request must be submitted.

The "Rush Delivery" service results in immediate processing of your payment, and cannot be modified or canceled once submitted.

### 21. Stop Payment Requests

The Service's ability to process a stop payment request will depend on the payment method and whether or not a check has cleared. The Service may also not have a reasonable opportunity to act on any stop payment request after a payment has been processed. If you desire to stop any payment that has already been processed, you must contact Bill Pay Customer Care, offered through our Service Provider. Although the Service will make every effort to accommodate your request, the Service will have no liability for failing to do so. The Service may also require you to present your request in writing within fourteen (14) days. Please refer to the *Schedule of Fees and Charges*, which can be found on the Navy Federal website (**navyfederal.org**).

A stop payment request cannot be submitted for "Rush Delivery."

17

18

## 22. Electronic Bill (E-Bill) Delivery and Presentment

This feature is for the presentment of electronic bills (E-Bills) only, and it is your sole responsibility to contact your Billers directly if you do not receive your statements. In addition, if you elect to activate one of the Service's electronic bill options, you also agree to the following:

a.) Information provided to the Biller—The Service is unable to update or change your personal information such as, but not limited to, name, address, phone numbers, and email addresses with the electronic Biller. Any changes will need to be made by contacting the Biller directly. Additionally, it is your responsibility to maintain all usernames and passwords for all electronic Biller sites. You also agree not to use someone else's information to gain unauthorized access to another person's bill. The Service may, at the request of the Biller, provide to the Biller your email address, service address, or other data specifically requested by the Biller at the time of activating the electronic bill for that Biller, for the purposes of the Biller informing you about Service and/or bill information.

b.) Activation—Upon activation of the electronic bill feature, the Service may notify the Biller of your request to receive electronic billing information. The presentment of your first electronic bill may vary from Biller to Biller and may take up to sixty (60) days, depending on the billing cycle of each Biller. Additionally, the ability to receive a paper copy of your statement(s) is at the sole discretion of the Biller. While your electronic bill feature is being activated, it is your responsibility to keep your accounts current. Each electronic Biller reserves the right to accept or deny your request to receive electronic bills.

c.) Authorization to obtain bill data—Your activation of the electronic bill feature for a Biller shall be deemed by us to be your authorization for us to obtain bill data from the Biller on your behalf. For some Billers, you will be asked to provide us with your username and password for that Biller. By providing us with such information, you authorize us to use the information to obtain your bill data.

d.) Notification—The Service will use its best efforts to present all your electronic bills promptly. In addition to notification within the Service, the Service may send an email notification to the email address listed for your account. It is your sole responsibility to ensure that this information is accurate. In the event you do not receive notification, it is your responsibility to periodically log in to the Service and check on the delivery of new electronic bills. The time for notification may vary from Biller to Biller. You are responsible for ensuring timely payment of all bills.

e.) Cancellation of electronic bill notification—The electronic Biller reserves the right to cancel the presentment of electronic bills at any time. You may cancel electronic bill presentment at any time. The timeframe for cancellation of your electronic bill presentment may vary from Biller to Biller. It may take up to sixty (60) days, depending on the billing cycle of each Biller. The Service will notify your electronic Biller(s) as to the change in status of your account, and it is your sole responsibility to make arrangements for an alternative form of bill delivery. The Service will not be responsible for presenting any electronic bills that are already in process at the time of cancellation.

f.) Non-delivery of electronic bill(s)—You agree to hold the Service harmless should the Biller fail to deliver your statement(s). You are responsible for ensuring timely payment of all bills. Copies of previously delivered bills must be requested from the Biller directly.

g.) Accuracy and dispute of electronic bill—The Service is not responsible for the accuracy of your electronic bill(s). The Service is only responsible for presenting the information we receive from the Biller. Any discrepancies or disputes regarding the accuracy of your electronic bill summary or detail must be addressed with the Biller directly.

This Agreement does not alter your liability or obligations that currently exist between you and your Billers.

## 23. Biller Limitation

The Service reserves the right to refuse to pay any Biller to whom you may direct a payment. The Service will notify you promptly if it decides to refuse to pay a Biller designated by you. This notification is not required if you attempt to make a prohibited payment or an exception payment under this Agreement.

## 24. Returned Payments

In using the Service, you understand that Billers and/or the United States Postal Service may return payments to the Service for various reasons such as, but not limited to: Biller's forwarding address expired; Biller account number is not valid; Biller is unable to locate account; or Biller account is paid in full. The Service will use its best efforts to research and correct the returned payment and return it to your Biller, or void the payment and credit your Payment Account. You may receive notification from the Service.

19

20

# Navy Federal Online Banking Application and Agreement

## Section 1 (Member complete.)

| Name: First | MI | Last | Suffix | Social Security No. | Access No. |
|---|---|---|---|---|---|
| Date of Birth (MM/DD/YY) | Home Phone | Work Phone | | Email Address | Date of Birth (MM/DD/YY) |

## Section 2 (Authorized User complete.)

| Authorized User Name: First | MI | Last | Suffix | Authorized User Social Security No. | Date of Birth (MM/DD/YY) |
|---|---|---|---|---|---|
| Address: Street | | City | State | Zip Code | Phone No. (Home) | Phone No. (Work) |
| Authorized User Email Address | | | | | |

© 2018 Navy Federal NFCU 69/2 (10-18)

**For Office Use Only**

| Processed By | Date (MM/DD/YY) |
|---|---|

## D. Authorized User Application and Consent

I, as the primary member, designate

as my Authorized User for Online Banking, and/or Bill Pay. I understand and agree that this will give my Authorized User access to my account(s) pursuant to the Mobile Banking, Online Banking, and Bill Pay Terms and Conditions ("Agreement"), including the ability to enroll in or access my Bill Pay service, and to suppress statements. I understand that I can specify or modify my Authorized User's privileges in my Online Banking settings, and can provide access to certain accounts and services as I deem necessary.

Member/Owner Name (Please print)

Member/Owner Signature                    Date (MM/DD/YY)

I, as the primary member's Authorized User for Online Banking, and/or Bill Pay, hereby agree to the terms and conditions as set forth in the Mobile Banking, Online Banking, and Bill Pay Terms and Conditions ("Agreement"). I understand that this service will provide me online access to the primary member's accounts, except those accounts where the primary member is designated as a joint owner, co-applicant, or co-signer (guarantor). I acknowledge that the primary owner can specify and modify my privileges under this service, and can provide access to certain accounts and services as he/she deems necessary. I acknowledge the receipt of, have read, understand, and agree to the Agreement. I further understand and agree that I accept responsibility for safeguarding and protecting my password(s) and other credentials and my access device(s) used to access Online Banking in order to prevent unauthorized access and transactions on the account(s). I further understand and agree that Navy Federal may revoke my Online Banking access if unauthorized access or transactions occur as the apparent result of my negligence in safeguarding my access credentials and/or my access device(s).

Authorized User Name (Please print)

Authorized User Signature                    Date (MM/DD/YY)

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| RUBY LAMBERT, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. 1:19-cv-00103-LO-MSN |
| v. | Hon. Liam O'Grady |
| NAVY FEDERAL CREDIT UNION, | |
| Defendant. | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT NAVY FEDERAL CREDIT UNION'S
<u>MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)</u>**

## I.      INTRODUCTION

Navy Federal Credit Union ("NFCU") has adopted a fee policy that is counter to its own disclosures and is eschewed by other leading American credit unions and banks: the assessment of multiple "insufficient funds fees" ("NSF Fees") on the same electronic payment or refused check that is reprocessed over and over again.  Specifically, the Deposit Agreement permits "[a] fee" (singular) for a "refused check" or "returned debit item"—phrases which are not defined in the Agreement and must mean all iterations of the same payment request.  Complaint ("Compl.") ¶ 33, Dkt. 1. But instead of abiding by NFCU's words, NFCU routinely assesses *multiple* NSF fees on "each" "returned debit item" or "refused check" returned for insufficient funds. *Id.* ¶ 1.

The assessment of multiple $29 NSF Fees[1] by NFCU on the same, small dollar electronic or check transactions is devastating to low-income consumers already struggling to stay afloat— many of whom, in the case of NFCU, are entry-level servicemembers serving their country. Indeed, many other leading American credit unions and banks do not assess multiple NSF Fees on the same electronic payment—and of those that do, many *expressly* inform their accountholders they can incur more than one NSF Fee on the same item. NFCU never did.  The reason other major banks provide this warning is that ordinary accountholders would have no reasonable expectation that the same single payment request could incur numerous NSF Fees. When an institution like NFCU charges an NSF Fee *again and again* on the same attempted transaction (for example, Ms. Lambert's attempted insurance payment), the effect is unfair, unconscionable, and unexpected.

---

[1] NSF Fees, which are assessed when an institution *rejects* an attempted debit, are distinct from overdraft fees ("OD Fees"), which are assessed when an institution *authorizes* a transaction even though there are insufficient account funds. When an institution pays an overdraft, it advances funds and arguably provides a valuable service in return for the OD Fee it assesses. When, on the other hand, an institution *rejects* an electronic payment, its service provides no direct benefit; the NSF Fee is essentially pure revenue.

- 1 -

Unlike other leading American financial institutions who have chosen not to engage in such a punitive practice—or at least to truthfully and accurately disclose their practices—NFCU has chosen to breach its contractual agreements with its customers and deceive them as to its fee practices.

In its Motion to Dismiss, Dkts. 19-20, NFCU attempts to complicate this case unnecessarily by invoking the National Automated Clearing House Operating Rules and Guidelines ("NACHA Rules"), indulging in lengthy descriptions of Automated Clearing House ("ACH") transactions and the parties thereto, and making irrelevant arguments about whether NFCU is authorized or required to re-process failed transactions. But these tangents distract from the very simple issues in this case. After telling its customers it would charge "a" single NSF Fee for a "returned debit item," NFCU routinely charges multiple NSF Fees on such an item. NFCU, not the NACHA Rules nor any other entity, imposed those fees. In assessing duplicative NSF Fees, NFCU breached its contracts with customers, and violated the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") as to its North Carolina customers.

None of NFCU's arguments for why, in its view, Ms. Lambert's claims should be dismissed are persuasive. First, NFCU argues preemption by the Federal Credit Union Act ("FCUA"), the Truth in Savings Act ("TISA"), and their implementing regulations, but the express preemption provisions do not apply. And, in any event, breach of contract claims and consumer protection claims based on affirmative misrepresentations, like NFCU's, are not preempted.

Next, NFCU asserts that Ms. Lambert has not stated a claim for breach of contract. This argument fails, since the key contract term for NSF Fee assessment, "returned debit item", cannot mean what NFCU says it means.  At the very least, the term's ambiguity precludes dismissal.

Finally, NFCU seeks dismissal of Ms. Lambert's UDTPA claims because, in its view, a

choice-of-law provision in the Deposit Agreement imposes Virginia law; its conduct was not unfair or deceptive; and Ms. Lambert's claim is for a simple breach of contract. But NFCU is wrong.

Because NFCU's Motion is unsupported, the Court should deny it— just as a court in the Western District of North Carolina did recently in a case against Bank of America based on the same practices and similarly inadequate disclosures. *See Morris et al. v. Bank of America, N.A.*, No. 3:18-cv-157-RJC-DSC (W.D.N.C.)[2]; and just as a court recently did in another case against NFCU involving the disputed meaning of an ambiguous phrase. *Lloyd et al v. Navy Federal Credit Union*, Case No. 17-cv-2980-BAS-RBB, 2018 WL 1757609 (S.D. Cal. Apr. 12, 2018).

## II.     SUMMARY OF ALLEGATIONS

NFCU's Account Agreements[3] permit NFCU to make one of two decisions when its accountholder attempts a transaction without sufficient funds to cover it: (a) authorize the transaction and charge a *single* $20 overdraft fee ("OD Fee") or (b) reject the transaction and charge a *single* NSF fee. Compl. ¶ 17. But in violation of its Account Agreements, NCFU regularly assesses two or more NSF Fees on the *same* transaction. *Id.* ¶ 18.

NFCU's Deposit Agreement provides the general terms of its relationship with its customers. *Id.* ¶ 27. In it, NFCU makes explicit promises and representations about the circumstances under which it will ass NSF Fees and OD Fees. *Id.* Specifically, the Deposit Agreement states that NSF Fees will only be assessed once per payment request:

---

[2] A Report and Recommendation ("R&R") denied the Bank's motion to dismiss breach of contract, implied covenant of good faith and fair dealing, and North Carolina, Georgia and Oklahoma consumer protection law claims. 2019 U.S. Dist. LEXIS 56652 (W.D.N.C. Jan. 7, 2019). Defendant did not object to the ruling with respect to the contract claims.  Judge Conrad then upheld the R&R with respect to Plaintiffs' breach of contract and North Carolina and California consumer protection law claims.  2019 U.S. Dist. LEXIS 53617 (W.D.N.C. Mar. 29, 2019).
[3] "Account Agreements" as used herein refers to the Deposit Agreement, Compl. Ex. A, the Schedule of Fees and Charges, Compl. Ex. B, and the Online Banking Agreement, Compl. Ex. C.

> Navy Federal is authorized to refuse checks that exceed funds available in the checking account. **A fee** will be assessed in the amount shown on Navy Federal's current Schedule of Fees and Charges for **each refused check.**
>
> . . .
>
> Navy Federal may return debits to the checking account (e.g., an ACH Payment) if the amount of the debit exceeds funds available in the checking account. **A fee** may be assessed in the amount shown on Navy Federal's current Schedule of Fees and Charges **for each returned debit item.**

*Id.* ¶ 33; Deposit Agreement at 4 (emphasis added). It also states, "If we do not pay an overdraft, your transaction will be declined and/or your check/ACH will be returned, unpaid." Compl. ¶ 36.

Even if NFCU reprocesses an instruction for payment, the underlying payment request is still the same "item" or transaction. NFCU's Account Agreements do not define "refused check" or "returned debit item," but the way those terms are used throughout the Deposit Agreement demonstrates such terms must describe all iterations of a given instruction for transfer or payment from an account, even if the same transaction is retried. Reasonable consumers understand any given authorization for payment to be one, singular, debit item or check, as those terms are used in NFCU's Account Agreements. Compl. ¶ 43. Taken together, these representations and omissions convey to customers that all submissions for payment of a particular transaction will be treated as one item that NFCU will either authorize (resulting in an overdraft) or reject (resulting in a returned item), for which NFCU may asses *a* fee. *Id.* ¶ 44. NFCU's Account Agreements do not state that it has permission to assess multiple NSF Fees for a single check or debit item that was later reprocessed and returned again. *Id.* ¶ 40.

In breach of the representations it makes to its customers, and without their permission or agreement, NFCU assesses a *new* fee every time it reprocesses the same "item," even though its Account Agreements do not give it permission to assess duplicative NSF Fees. That is what happened to Ms. Lambert. *See* Compl. ¶¶ 22-26.

- 4 -

### III.    LEGAL STANDARD

In reviewing whether the defendant has carried its burden to show that a complaint must be dismissed for failing to state a claim on which relief can be granted, the Court "must draw all reasonable inferences" in favor of the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). The Court must also "assume all facts plead by" the plaintiff are true. *Trulock v. Freeh*, 275 F.3d 391, 399 (4th Cir. 2001). Only if a complaint does not contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face should it be dismissed. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)).

### IV.    ARGUMENT

#### A.    Ms. Lambert's Claims Are Not Preempted.

NFCU incorrectly seeks to evade Ms. Lambert's contract and consumer protection claims by asserting that FCUA and TISA regulations preempt them. To the contrary, credit unions must uphold their contractual obligations, and are subject to laws barring misrepresentation, fraud, and unconscionability—just like any other business. Neither the FCUA regulations nor the TISA regulations exempt federal credit unions from all generally applicable state laws that incidentally affect the imposition of such fees. As the Ninth Circuit has recognized in the context of the National Bank Act ("NBA"), such "an expansive interpretation—with no limiting principle— 'would swallow all laws.'" *Gutierrez v. Wells Fargo Bank*, 704 F.3d 712, 727 (9th Cir. 2012) (quoting *Aguayo v. U.S. Bank*, 653 F.3d 912, 925 (9th Cir. 2011)). *See also Decohen v. Capital One, N.A.*, 703 F.3d 216, 222 (4th Cir. 2012) ("Despite the broad scope of the [National Bank Act] . . . national banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA." (quoting

*Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10 (2007))).[4]

Neither express nor conflict preemption, the two types NFCU incorrectly argues apply, bars Ms. Lambert's claims. *See English v. Gen. Electric Co.*, 496 U.S. 72, 78-79 (1990); *Epps*, 675 F.3d at 322. Express preemption exists where Congress defines the extent to which federal law preempts state law. *English*, 496 U.S. at 78-79. Conflict preemption exists when federal law directly conflicts with state law by either (1) making compliance with both impossible, or (2) where state law frustrates the purpose of federal law. *Id.* NFCU bears the burden of establishing preemption. *E.g.*, *Burrell v. Bayer Corp.*, 918 F.3d 372, 382 n.3 (4th Cir. 2019).

Ms. Lambert's claims do not conflict with federal law because they are not expressly preempted by FCUA or TISA regulations, and the claims do not impermissibly interfere with the manner in which NFCU exercises its powers as a federally-chartered credit union. In fact, the regulations NFCU cites expressly provide that state laws are preempted only if they are inconsistent with federal law and regulation. As described below, none of Ms. Lambert's claims are inconsistent with federal law, and thus, there is no preemption.

## 1.     Express Preemption

NFCU's arguments based on express preemption all fail because none of the express preemption provisions in the FCUA and TISA regulations apply. Turning first to the FCUA regulations, 12 C.F.R. § 701.35(b) requires that a federal credit union "shall accurately represent the terms and conditions of its share, share draft, and share certificate accounts in all advertising, disclosures, or agreements, whether written or oral." 12 C.F.R. § 701.35(c) states that a federal

---

[4] Cases under the NBA are analogous because, like the FCUA and TISA, the NBA does not expressly preempt state law, but its implementing regulations do contain express preemption provisions. *See Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 323 (4th Cir. 2012).

credit union may determine "the types of fees or charges" it imposes "consistent with . . . its contractual obligations." First, Ms. Lambert is not challenging the "types of fees" that NFCU charges; rather, she is challenging the number of times that NFCU may assess its NSF Fee given its representations in its Account Agreements. And in any event, NFCU's authority to determine "types of fees" charged is not unbounded; it must be exercised "consistent with" the federal credit union's "contractual obligations." *Id.* Here, Ms. Lambert asserts that NFCU's Account Agreements do not "accurately represent" the terms of its accounts because they misrepresent NFCU's practice of routinely assessing multiple NSF Fees on the same item or transaction. She also asserts that NFCU assessed NSF Fees in breach of its "contractual obligations." These claims are in no way inconsistent with the requirements of 12 C.F.R. § 701.35 and are therefore not preempted.

NFCU's arguments based on the TISA regulations fare no better. The TISA regulations, whose purpose is "to enable credit union members and potential members to make informed decisions about accounts at credit unions," preempt only state laws that "are inconsistent with" their requirements. 12 C.F.R. § 707.1(a), (d). State laws are "inconsistent" if they require "a credit union to make disclosures or take actions that contradict the requirements of the federal law"; if they require "the use of the same term to represent a different amount or a different meaning than the federal law"; require "the use of a term different from that required in the federal law to describe the same item"; or "permit[] a method of calculating dividends or interest on an account different from that required in the federal law." *See* 12 C.F.R. Pt. 707 app'x C § 707.1(d) (official staff interpretation). Section 707.4(b)(4) specifies that federal credit union account disclosures "shall include" "[t]he amount of any fee that may be imposed in connection with the account (or an explanation of how the fee will be determined) and *the conditions under which the fee may be*

- 7 -

*imposed.*" *Id.* (emphasis added).

Here, Ms. Lambert's position is simply that, having agreed to contractual terms, NFCU should abide by them; and that NFCU should not be permitted to misrepresent its fee practices in its Account Agreements. Her claims are completely consistent with a regulation requiring NFCU to accurately disclose "the conditions under which the fee may be imposed." Her claims are in no way "inconsistent with" TISA regulations.

### 2.    Conflict Preemption

NFCU's arguments based on conflict preemption also fail. NFCU identifies no conflict. Instead, NFCU distorts Ms. Lambert's claims to manufacture a non-existent conflict, insisting her claims are based purely on omissions, but in fact, her claims allege NFCU's failure to abide by its contract and affirmative misrepresentations about its practices. Despite NFCU's contrary contention (Mot. at 14), NFCU repeatedly and falsely told its consumers it would assess "a fee" (singular) per rejected transaction or returned debit item, Compl. ¶¶ 33-40, 44, 52-55; *supra* Pt. II, breaching its promises, as well as an affirmatively misrepresenting its practice.[5] Because Ms. Lambert's claims derive from NFCU's failure to fulfill its contractual obligations as well as its affirmative misrepresentations, there is no conflict preemption. Indeed, numerous courts have held that such claims do no more than incidentally impact the defendant's banking activities and are therefore not preempted. *See, e.g.*, *Gutierrez*, 704 F.3d at 726-28 (claims based on affirmative misstatements not preempted); *King v. Carolina First Bank*, 26 F. Supp. 3d 510, 514-516 (D.S.C. 2014) (breach of contract claims not preempted). At heart, this case is about NFCU's failure to

---

[5] And the exemplar disclosures alleged in the Complaint do not ask the Court to *require* NFCU to model its disclosures off of those made by other banks, but rather to demonstrate that it is possible to accurately describe fee practices like NFCU's.

conform its practices to the affirmative promises it made in its Account Agreements. And as multiple courts have held, claims deriving from financial institutions' failure to conform its practices to its contractual promises, or from their misrepresentations, are not preempted.

        **a.**    **Requiring a Federal Credit Union to Abide By Its Contracts Does Not Conflict with Federal Law and Thus Ms. Lambert's Breach of Contract Claims are Not Preempted.**

Courts have repeatedly held that contract disputes, like Ms. Lambert's breach of contract claim, are not preempted by federal law and regulations governing financial institutions. This makes sense: since credit unions, like national banks, are not free "to ignore general contract or tort law," requiring credit unions, like national banks, to abide by their customer contracts could at most incidentally impact their ability to conduct business. *See In re HSBC Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 46 (E.D.N.Y. 2014) (quoting *In re Checking Acct. Overdraft Litig.*, 694 F. Supp. 2d 1302, 1313 (S.D. Fla. 2010)). Thus, claims seeking to "recover for past conduct that was inconsistent with [the defendant's] contractual obligations" only "incidentally affect" a financial institution's federal powers and do not "prevent or significantly interfere with its ability to engage in the business of banking." *King*, 26 F. Supp. 3d at 517.

In *King*, the court rejected the bank's preemption argument that claims it posted debits and credits to customer accounts and assessed overdraft fees in a manner inconsistent with the bank's account documents interfered with the bank's discretion to choose a posting order for debits and credits. The *King* court relied heavily on *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1313, in which the court also rejected a preemption challenge to a breach-of-contract claim because federal regulations do not authorize banks to ignore general contract or tort law. The court reached an identical conclusion in *Hanjy v. Arvest Bank*, 94 F. Supp. 3d 1012 (E.D. Ark. 2015), another high-to-low posting order case, where the court correctly distinguished claims seeking "to

hold Arvest to the terms of its contracts with plaintiffs and the putative class members," which were *not preempted*, from claims purporting "to challenge Arvest's authority or ability to charge overdraft fees under the applicable federal or state regulatory schemes," which the plaintiffs had not raised. *Id.* at 1025. *See also In re TD Bank, N.A.*, 150 F. Supp. 3d at 610 (breach of contract claims not preempted); *Old Nat. Bank v. Kelly*, 31 N.E.3d 522, 528-31 (Ind. Ct. App. 2015) (same).

Courts have also rejected preemption of bank breach of contract claims in other similar contexts. For example, in *Smallwood v. Sovereign Bank, F.S.B.*, No. 3:11-cv-87, 2012 WL 243744 (N.D.W.Va. Jan. 25, 2012), plaintiffs asserted a savings and loan bank breached a home loan modification contract, and alleged a violation of a West Virginia consumer protection law based on that alleged breach. The court rejected the argument that the claim was preempted by the Home Owners Loan Act ("HOLA") and 12 C.F.R. § 560.2, which provides that federal savings associations may extend credit "without regard to state laws purporting to regulate or otherwise affect their credit activities." *Smallwood*, 2012 WL 273744, at *4-5. The court reasoned that the claim was not preempted "*[i]nsofar as such a claim is based in contract*, and that *abiding by that contract would not more than incidentally affect lending operations.*" *Id.* at *10 (emphasis added). The court "recognize[d] that states cannot regulate the terms of the loan agreements entered into by federal savings banks," but correctly noted that "even a federal savings bank must abide by its agreements. When it does not, it would be surprising for a federal regulation to forbid a homeowner's state to give the homeowner a defense based on breach of contract." *Id.* at *10 n.4 (quoting *In re Ocwen Loan Servicing, LLC Mortg. Servicing Litig.*, 491 F.3d 638 (7th Cir. 2007). *See also Wittenberg v. First Independent Mortg. Co.*, No. 3:10-cv-58, 2011 WL 1357483, at *20 (N.D.W.Va. April 11, 2011) ("This Court finds no reason not to . . . hold a national bank to its agreements by way of a breach of contract claim."); *Faulkner v. Onewest Bank*, No. 3:10-cv-12,

2010 WL 2472275, at *9 (N.D.W.Va. June 16, 2010) (rejecting HOLA preemption on a breach of contract claim).

Ms. Lambert does not challenge NFCU's general right to assess NSF Fees under the applicable federal regulations; rather, she seeks to hold NFCU to the plain contractual language it imposed, which confers only the right to charge "a" fee per "item." *See, e.g.*, *Hanjy*, 94 F. Supp. 3d at 1025; *King*, 26 F. Supp. 3d at 517. Adopting NFCU's argument would render meaningless account contracts with federal credit unions, permitting credit unions to ignore their own promises any time they unilaterally determine that doing so would impair profitability. Surely Congress's intent in enacting the FCUA and TISA, and NCUA's intent in enacting regulations, was not to immunize credit unions from breach of contract claims. The motion should be denied.

> **b.      Requiring a Federal Credit Union to Refrain from Making Affirmative Misstatements Does Not Conflict with Federal Law and thus Ms. Lambert's Consumer Protection Claims are  Not Preempted.**

Consumer protection claims based on affirmative misrepresentations, like those alleged here, are likewise not preempted. Here, *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712 (9th Cir. 2012), addressing NBA preemption, is instructive. In *Gutierrez*, the Ninth Circuit made clear that state claims based on a bank's misrepresentations of its actual practices are *not* preempted. *Gutierrez*, 704 F.3d at 726-28. The plaintiffs alleged that Wells Fargo Bank violated California law by unfairly imposing overdraft fees using a high-to-low posting order to increase the frequency of overdraft fees, by misleading clients as to the bank's actual posting order. The *Gutierrez* court found that state laws could not dictate the posting order or require particular disclosures to customers, but state law *could* regulate Wells Fargo not making fraudulent or misleading statements about its posting practices.  NFCU's citations to *Gutierrez* ignore the lower court's key ruling, affirmed by the Ninth Circuit: not even a national bank (subject to the NBA's express

- 11 -

preemption provision) is free to disregard the basic duties to avoid fraud, deception, and other basic common law duties. "California's prohibition of misleading statements does not significantly interfere with the bank's ability to offer checking account services, choose a posting method, or calculate fees." *Id.* at 727 (citations omitted). Because Ms. Lambert's claims NFCU misrepresented its NSF fee practices, and because she alleges she was harmed as a result of NFCU's misleading statements regarding its fee practices, her state law claims based on its misrepresentations are not preempted.

Judge Cain reached the same result as *Gutierrez* in *Murr v. Capital One Bank (USA), N.A.*, 28 F. Supp. 3d 575 (E.D. Va. 2014), in which a bank sought to evade its contractual obligations and state law prohibitions on fraudulent and misleading statements. There, the national bank offered the plaintiff an opportunity it represented would save money on credit card purchases; in practice, it did not offer any savings opportunity. *See id.* The court rejected preemption "in light of defendant's description of the benefits of the offer." *See id.* at 584; *see also id.* at 583 ("The NBA does not, however, preempt state law insofar as the latter only creates liability for intentional and affirmative misrepresentations."). The court rejected defendant's argument that the claims should be dismissed because "plaintiff has at various turns spoken largely in terms of omissions." *Id.* at 584. Instead, because the plaintiff, like Ms. Lambert here, "rest[ed] her case on a theory of misrepresentation that is not subject to preemption," the motion to dismiss failed. This Court should follow Judge Cain's reasoned analysis in *Murr*.

*Whittington v. Mobiloil Federal Credit Union*, 2017 WL 6988193 (E.D. Tex. 2017), cited by NFCU, does not alter this conclusion. In *Whittington*, the plaintiff asserted claims under the Texas Deceptive Trade Practices Act ("DTPA") and several common law theories based on two claims: (1) that the defendant "failed to disclose 'material facts'" in its account agreements; and

- 12 -

(2) that its policies and practices were unconscionable. *See id.* at \*1. The court, relying on *Gutierrez*, found preemption to the extent the claims were not based on affirmative misrepresentations. However, in analyzing the common law fraud claims, the court made clear that "direct misrepresentation" claims are not preempted. *Id.* at \*11. Here, Ms. Lambert's claims under the North Carolina UDTPA derive from NFCU's direct misrepresentations in its Account Agreements: that it would charge "a" (single) fee, and then charged multiple fees. Thus, *Whittington* supports her UDTPA claim. NFCU attempts to forestall this outcome by referencing the allegation in *Whittington* that the defendant assessed overdraft fees when the account was not actually withdrawn is irrelevant since it presents a different fee practice. The important legal conclusion of *Whittington*, like *Gutierrez* and *Murr*, is that claims based on misrepresentations— like Ms. Lambert's—are *not* preempted.[6]

### B.   NFCU Breached the Express Terms of Its Contract.

Ms. Lambert incurred a total of $58 in NSF Fees as a result of a failed insurance payment: first, NFCU charged an NSF Fee on October 16, 2018. Then, Ms. Lambert incurred another $29 NSF Fee on the same item when NFCU reprocessed it, again rejected it, and again charged a fee on it.  As discussed below, the contract bars this conduct.

The double (or triple) NSF Fee practice used by NFCU is not universal in the banking industry. Many major banks like JP Morgan Chase—the largest consumer bank in the country— do not engage in the practice of charging more than one NSF Fee on the same item when a bank

---

[6] The NCUA opinion letters NFCU cites in footnote 13 of its Motion likewise do not compel a different conclusion. Each concerns a statute purporting to prohibit a federal credit union from charging particular fees under any circumstances. None immunizes federal credit unions for making affirmative misrepresentations to customers from state laws, or that a federal credit union may unilaterally renege on a contract with a customer without regard for state contract law. Accordingly, they are inapposite.

processes it for payment multiple times, and charge a maximum of one fee per item. Compl. ¶ 19. Institutions like NFCU that do employ this multiple fee practice know how to plainly and clearly disclose it expressly to their accountholders—and NFCU chose not to. For example, First Citizens Bank, a major institution and NFCU competitor, engages in the same abusive practice as NFCU, but at least expressly states in its deposit agreement that **"[b]ecause we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item**" (emphasis added). *Id.* ¶ 47. First Hawaiian Bank likewise states: "YOU AGREE THAT **MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**" (emphasis added). *Id.* ¶ 48. NFCU provides no such disclosure of its harmful practice.

To the contrary, NFCU's account agreement bars the assessment of more than one NSF Fee on the same "item."

Specifically, NFCU repeatedly promises that NSF Fees will be assessed at one per item or check, each time using the singular phrase "a fee" to promise that a *single* fee will be charged "for each refused check" and "each returned debit item":

> A fee will be assessed in the amount shown on NFCU's current Schedule of Fees and Charges for each refused check.

*Id.* ¶ 33.

> Navy Federal may return debits to the checking account (e.g. an ACH payment) if the amount of the debit exceeds funds available in the checking account.  A fee may be assessed in the amount shown on Navy Federal's current Schedule of Fees and Charges for each returned debit item.

*Id.*

These promises of a single fee for a "debit item" or "refused check" should end the inquiry

- 14 -

and invalidate NFCU's assertion that each time a previously rejected electronic payment or check is re-processed—even though the consumer does nothing to facilitate this re-submission—it becomes a *new*, unique transaction worthy of *new* and multiple NSF Fees. NFCU's Account Agreements never says this. Rather, for a "each refused check" or for a debit item, it promises one NSF Fee in total.

Both sides agree that the key provision in the contract for purposes of the ACH insurance payment transaction attempted by Ms. Lambert is as follows:

> Navy Federal may return debits to the checking account (e.g. an ACH debit) if the amount of the debit exceeds funds available in the checking account. A fee may be assessed ... for each returned debit item.

*Id.*; *see also* Deposit Agreement at 4. Crucially, the phrase "returned debit item" appears nowhere else in the Deposit Agreement, other than the *singular* place it is quoted above; nor is the phrase "debit item" used anywhere else in the Deposit Agreement; and neither are defined. Using basic principles of contract construction and grammar, it is clear that the words "returned debit" are adjectives qualifying the key term and noun: "item." Set aside those adjectives and the promise is for one NSF Fee per "item"—which is the same promise NFCU made for "each refused check."

NFCU argues that the key fee assessment provision quoted above "is plain and informs members such as Ms. Lambert that 'each' time NFCU 'returns' a 'debit' or 'debit item' for insufficient funds, an NSF fee may be assessed, without regard to whether the debit is a re-presentment." Mot. at 16. In other words, according to NFCU, the key phrase means that it will assess an NSF Fee *each time a debit is attempted*. But the provision says no such thing; it doesn't say an NSF Fee will be assessed for each "debit" or "debit attempt." It says an NSF may be assessed for each *item*. On NFCU's reading, a "returned debit item" actually means "each returned debit." But that would make the term "item" superfluous. "Item" cannot be read out of the contract

so easily; its inclusion in this key provision by NFCU means that the key phrase—"returned debit item"—cannot simply mean each "debit" or "attempted debit," as NFCU urges.

And yet the *entirety* of NFCU's Motion rests on ignoring the term "item" in this key fee assessment provision of the contract. And yet the *entirety* of NFCU's Motion rests on ignoring the term "item" in this key fee assessment provision of the contract. For example, NFCU argues:

> Ms. Lambert does not and cannot allege facts plausibly suggesting that anything other than this exact scenario occurred in her case: Navy Federal assessed an NSF fee for each ACH debit requested (by Mutual of Omaha) and returned for insufficient funds.
> [...]
> Ms. Lambert does not (and cannot) dispute that these were two separate debit requests, each of which Navy Federal returned, rendering each a 'returned debit item.'[7]
> [...]
> Navy Federal unambiguously disclosed it assesses a fee for 'each returned debit item,' meaning 'each' payment request 'returned' for insufficient funds, without regard to the end-purpose for the request.

Mot. at 1, 7, 20. Each of these statements is wrong because the Deposit Agreement does *not* say a fee will be assessed for each debit attempt. Deposit Agreement at 4. The Deposit Agreement does *not* say a fee will be assessed for each debit attempt. *Id*. at 4. It says "a fee" will be assessed for each *item*. NFCU could have written a contract authorizing it to assess a fee for each debit merely attempted on the account, but it plainly did not. The extant contract says a fee will be assessed for each debit *item*. NFCU ignores that key term; this Court should not.[8]

---

[7] NFCU argues that it is the practice of ACH network to reprocess ACH debits up to three times. But this argument is irrelevant to whether NFCU has the right to assess duplicative fees on the same item or transaction..

[8] NFCU references in passing a contract provision that states: "An ACH debit might be made as a result of an authorization you gave a third party to automatically transfer funds from your account to pay your monthly insurance premium." This provision does not help NFCU. A debit is the result of an authorization. A debit means to remove funds. When a transaction fails, there is obviously no debit. There is only a rejection. All this provision says is the unsurprising premise that funds may be removed from an account as a result of an authorization to a third party.

While the term "item" is undefined in the contract, that is because its meaning is clear and it is routinely used in banking contexts to refer to all iterations of, or attempts at executing, a payment or deposit on an account. An "item" does not become a new "item" simply by being reprocessed in the same exact amount a day or two later.[9] Reading the term "item" in the opposite way, as NFCU does—as a sub-part of a given banking event— is highly unusual and counterintuitive. It is also at odds with all other uses of the term "item" in the Deposit Agreement.

Indeed, there are thirteen references to the term "item" in the Deposit Agreement, and each indicate "item" refers to all iterations, attempts, and interim steps to execute and finalize a credit or a debit on an account. None of the uses of "item" in the Deposit Agreement give any indication that an item can morph into a new "item" while it is waiting to be cleared or deposited on an account. Indeed, one reference to an "item" in the Deposit Agreement expressly bars that possibility:

> The Available Balance includes pending transactions that have been authorized but may not yet have been processed (posted), such as debit card POS transactions, online transfers, ATM transactions, or pending deposits, but does not include **items** such as scheduled Bill Pay transactions, deposits with holds on them, and **checks that you have written but that have not yet cleared your account**.

Deposit Agreement at 5 (emphasis added).[10] This provision makes clear that "item" includes

---

[9] That is why, for example, the other banks referenced above warn that **"[b]ecause we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item**" or that **"MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**." Compl., ¶ 48. Such warnings would be nonsensical if these banks believed each resubmission of the same item was a new "item."

[10] The other twelve references to "item" are as follows:

- Navy Federal posts **items** presented on your account in the following order: all money coming in (credits, deposits, etc.); ATM withdrawals; debit card transactions, also called Point of Sale (POS); Automated Clearing House (ACH) debits; and checks written. When more than one transaction is processed from a group of transactions, the **items** will be posted in the order of lowest to highest amount within that group of transactions.

"scheduled…transactions" that has not yet been paid and checks that "have not yet cleared" after having been written—directly analogous to Ms. Lambert's ACH item that was authorized, returned and was still waiting to be "cleared" when it was reprocessed by NFCU.  In sum, no reference to the term "item" in the entire Deposit Agreement has a meaning like the one NFCU now urges this Court to adopt:  that an "item" can duplicate itself after each payment or deposit attempt and become a new "item."  The term "item," instead, reasonably means all iterations of a given payment attempt.  Since the contract promises one NSF Fee for each "returned debit item," NFCU breaches the contract when it charges two or more NSF Fees per item. Thus, the contract provisions together bar NFCU from assessing multiple NSF Fees on the same item.

---

- All non-cash share purchases or payments made to the checking account will be credited subject to final payment of the deposited **item**(s).
- A fee may be assessed in the amount shown on Navy Federal's current Schedule of Fees and Charges for each returned debit **item**.
- Your account may become overdrawn in excess of the $500 limit due to fees. Up to $50 in fees may be added to the limit. The $500 limit includes the amount of overdrawn **items**, OOPS fees, and any other transactions that result in overdrawing your account, such as returned deposits and other fees described in our Schedule of Fees and Charges.
- When more than one transaction from a group is processed on the same day, the **items** will be processed in the order of lowest to highest amount within that group of transactions.
- If the account balance, including new credits/deposits, is greater than or equal to the total of new debits/expenditures after all **items** have posted after the end of a business day (Eastern Time), there will be no overdraft fees assessed. If the account balance is less than the total of new debits/expenditures after all **items** have posted on a business day, you will be charged up to three overdraft fees[.]
- [Y]ou can withdraw the funds in cash and we will use the funds to pay checks or other **items**.
- Additionally, we may place a longer hold, and credit will not be received on non-U.S. **items** until the collection process is completed.
- Funds from the following deposits are available on (or before) the first Business Day after the day we are considered to have received your deposit: […] Federal Reserve Bank checks, Federal Home Loan Bank checks, and postal money orders, if these **items** are payable to you.
- Available funds may be withdrawn in cash or used to pay checks or other **items**.

At the very least, such provisions are ambiguous, because NFCU's strained readings of the contract can, at most, only create an ambiguity which cannot resolved on this Motion.  A bank's account contract that—like the one here--"contain[s] no provision" defining a key term in dispute, or that requires searching for "contractual hints" scattered throughout the documents is open to two "reasonable . . . interpretations." *Ramirez v. Baxter Credit Union*, 2017 WL1064991, at *5 (N.D. Cal. March 21, 2017).  Put another way, so long as the consumer "offer[s] a plausible interpretation" of how the bank agreed to assess bank fees, dismissal before discovery and factual development is inappropriate. *Gunter,* 2016 WL3457009, at *3.  Helpfully, there is a well-developed body of case law evaluating contractual ambiguity in bank fee cases.  Those cases routinely reject arguments like the ones NFCU makes here.

In the directly analogous *Morris et al. v. Bank of America, N.A.*, *supra*, plaintiffs lodged claims identical to the claims in the instant matter.  The court applied precedent from other banking cases and denied the motion to dismiss:

> Plaintiffs base their breach of contract claim on both express breach and breach of the implied covenant of good faith and fair dealing. *See, e.g., In re HSBC Bank*, 1 F. Supp. 3d 34, 54 (E.D.N.Y. 2014) (allowing claim to proceed despite HSBC's argument that it had contractual authority to post debit transactions from high to low); *Gutierrez v. Wells Fargo*, 622 F. Supp. 2d 946, 954 (N.D. Cal. 2009) (allowing claim to proceed despite Wells Fargo's argument that it had contractual authority to post items to checking account in any order the bank chose); *White v. Wachovia Bank, N.A.*, 563 F. Supp. 2d 1358, 1363 (N.D. Ga. 2008) (declining to dismiss plaintiff's breach of the implied covenant of good faith and fair dealing at the motion to dismiss stage when plaintiff alleged that Wachovia "breached the contract provisions [of its Deposit Agreement] de facto even if it maintained performance de jure" in manipulating transactions to maximize overdraft fees); *Hunting Aircraft, Inc. v. Peachtree City Airport Auth.*, 281 Ga. App. 450, 453–54 (2006) ("[W]here the manner of performance is left more or less to the discretion of one of the parties to the contract, he is bound to the exercise of good faith.")…Applying these precedents to the facts alleged here, Plaintiffs have sufficiently alleged a breach of contract claim under both theories. For those reasons, the undersigned respectfully recommends that Defendant's Motion to Dismiss Plaintiffs' breach of contract claim be denied.

*Id.* at \*4-5 (citation omitted). And, under similar circumstances,  the court in *Lloyd*, 2018 WL 1757609, at \*7, also denied a motion to dismiss:

> The Court cannot say that the Account Agreements clearly foreclose either interpretation. Moreover, the provision in which "to cover" appears contains another ambiguity ... In the face of contractual ambiguities, Plaintiffs offer a reasonable interpretation...in the context of other provisions in the Account Agreements, which would foreclose overdraft fees on the debit card transactions at issue here. (citations omitted)

(emphasis added). Analytically, Ms. Lambert's claims here are no different than in *Lloyd*, where a phrase that controlled whether fees were assessed or not—was disputed. In short, ambiguities in descriptions of banks' fee assessment methods contained in account contracts support consumer claims for recovery of excessive fees, at least at the motion to dismiss stage. *See also Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848 (E.D. Mich. 2016); *Gunter v. United Fed. Credit Union*, 2016 WL 3457009, at \*2-3 (D. Nev. June 22, 2016); *Wodja v. Wash. State Emps. Credit Union*, No. C15-5693 BHS, 2016 WL 3218832, at \*2-3 (W.D. Wa. June 9, 2016).

Here, Ms. Lambert offers at the very least a plausible contract construction for the disputed terms in the Account Agreements.  Thus, the Court must deny NFCU's Motion.

### C.    NFCU Breached the Implied Covenant of Good Faith and Fair Dealing.

The implied covenant of good faith and fair dealing is present in all contracts.  *SunTrust Mortg., Inc. v. Mortgages Unlimited, Inc.*, No. 3:11CV861-HEH, 2012 WL 1942056, at \*3 (E.D. Va. May 29, 2012).  Multiple federal courts have recognized that contractual provisions providing a financial institution with discretion over bank fees provide a basis for a breach of the implied covenant. *See, e.g., In re HSBC Bank*, 1 F. Supp. 3d at 54 (permitting claim to proceed despite HSBC's argument that it had contractual authority to post debit transactions from high to low); *Gutierrez*, 622 F. Supp. 2d at 954 (permitting claim to proceed despite Wells Fargo's argument

that it had contractual authority to post items to checking account in any order the bank chose).[11]

Here, NFCU abused its discretion in multiple ways.

First, NFCU abused its discretion by interpreting the terms "item" or "returned debit item" in a strained and unreasonable manner that allowed it to assess more fees on Ms. Lambert and the class members than it should have. By unilaterally deciding that each attempt to reprocess the same transaction is a new "item" incurring a new "fee," NFCU interpreted the Account Agreements in an unfair and abusive manner.

Second, even though the Account Agreements suggest that under some circumstances an NSF Fee is discretionary, in practice, NFCU always assessed a new NSF Fee each time it reprocessed a transaction. While the Deposit Agreement states that an NSF Fee "will" be charged for a "refused check," it only states that an NSF Fee "may" be charged for a "returned debit item":

> Navy Federal is authorized to refuse checks that exceed funds available in the checking account. **A fee will be assessed** in the amount shown on Navy Federal's current Schedule of Fees and Charges **for each refused check**.
>
> […]
>
> Navy Federal may return debits to the checking account (e.g., an ACH payment) if the amount of the debit exceeds funds available in the checking account. **A fee may be assessed** in the amount shown on Navy Federal's current Schedule of Fees and Charges **for each returned debit item**.

Compl. ¶ 33; Compl., Ex. A (hereinafter "Deposit Agreement") at 4. The difference between "will" (for checks) and "may" (for returned debit items) suggests that NFCU reserves for itself discretion

---

[11]*See also Swift v. BancorpSouth,* Inc. (*In re Checking Account Overdraft Litig.*), No. 1:09-MD-02036-JLK, 2013 U.S. Dist. LEXIS 154432, at *39 (S.D. Fla. Oct. 24, 2013) (denying summary judgment against good faith and fair dealing claim where contract afforded bank discretion which it was alleged to have exercised in bad faith); *White v. Wachovia Bank, N.A.*, 563 F. Supp. 2d 1358, 1364 (N.D. Ga. 2008) ("Court cannot find as a matter of law that the Deposit Agreement's statement that Wachovia 'may' post items 'in any order' expressly gives Wachovia the right to manipulate transactions, delay posting indefinitely, and maximize overdraft fees")

as to whether or not to charge NSF Fees on "returned debit items." Such a reservation of discretion would make sense: since a check cannot in general be reprocessed automatically, NFCU stated clearly that it would charge a fee on each refused check. But where an ACH payment is returned, then reprocessed (which again cannot occur with a check), NFCU provided itself discretion and only stated it "may" assess a fee.  It abused that discretion when it always and as a matter of policy charged duplicative fees on the same returned debit items that had already incurred a fee.[12]

NFCU argues Ms. Lambert's allegations are insufficient to establish a breach of the covenant of good faith and fair dealing because Virginia requires a defendant to act "dishonestly" to sustain an implied covenant claim, rather than merely in "bad faith." *See* Mot. at 21. That is not the law. Rather, under Virginia law, "although the duty of good faith does not prevent a party from exercising its explicit contractual *rights*, a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party." *Virginia Vermiculite, Ltd. v. W.R. Grace & Co. Connecticut*, 156 F.3d 535, 542 (4th Cir. 1998) (emphasis in original); *see also SunTrust Mortg.,* 2012 WL 1942056, at *3 ("This duty of good faith and fair dealing prohibits a party from acting arbitrarily, unreasonably, and in bad faith."). Even the case law cited by NFCU

---

[12] Indeed, courts have found that the contract term "may" is a lie when a contracting party knows an event will take place. In a case involving the manipulation of debit card transaction posting order, a bank used the phrase "may" to describe a posting order it had already adopted. As one court presiding over bank fee litigation held:

> While [the contract] "[w]e *may choose* to pay Items in the order of highest dollar amount to lowest dollar amount[,]" it is undisputed that Wells Fargo was then *actually* posting cash withdrawals, debit-card, check, and ACH transactions from highest-to-lowest dollar amount. The phrasing "[w]e may choose" suggested to customers that the bank would either exercise discretion or that it had not yet chosen to go to a high-to-low scheme. In fact, the bank knew good and well that it was already imposing and would continue to impose high-to-low bookkeeping—the worst possible system from the customer's perspective.

*Gutierrez v. Wells Fargo* Bank*, N.A.*, 730 F. Supp. 2d 1080, 1113 (N.D. Cal. 2010), *aff'd in part, rev'd in part and remanded sub nom. Gutierrez,* 704 F.3d 729 (emphasis added).

acknowledges an implied covenant claim may arise "where a party has discretion in performance" and that party "act[s] arbitrarily or unfairly." *See Stoney Glen, LLC v. S. Bank & Tr. Co.,* 944 F. Supp. 2d 460, 466 (E.D. Va. 2013) (declining to dismiss plaintiff's claim for a breach of the implied covenant of good faith and fair dealing).

Here, NFCU has abused its discretion.  Ms. Lambert has therefore stated an implied covenant claim.  *See Lloyd*, 2018 WL 1757609, at *11.[13]

### D.   Ms. Lambert States a Claim Under the North Carolina Unfair and Deceptive Trade Practices Act.

#### 1.   The UDTPA Claim Should Not Be Dismissed Based on the Choice of Law Provision.

NFCU asserts that a choice of law provision included in the Account Agreements bars Ms. Lambert's claims under the North Carolina UDTPA. But NFCU is wrong for the following reasons: (1) NFCU has not established the choice of law provision applies to Ms. Lambert's UDTPA claims, and (2) the choice of law provision is contrary to a fundamental policy of the state of North Carolina.

First, NFCU has not established that the choice of law provision applies to Ms. Lambert's UDTPA claims. Because Virginia is the forum state, Virginia's choice of law rules govern. *LTD Mgmt. Co. v. Holiday Hosp. Franchising, Inc.*, No. 2:07cv530, 2008 WL 7281926, at *10 (E.D.Va.

---

[13] Ms. Lambert's allegations differ from the cases NFCU references. Indeed, entirely different from the abuse of contractual discretion in this case, the plaintiffs in *De Vera v. Bank of America, N.A.*, No. 2:12cv17, 2012 WL 2400627, at *3 (E.D. Va. June 25, 2012) sought to rewrite a home loan contract to add a duty for the defendant to facilitate a loan modification. Likewise, in *Charles E. Brauer Co. v. Nations Bank of Va., N.A.*, 251 Va. 28, 35, 466 S.E.2d 382, 386 (1996), the court held that the exercise of an explicit contractual *right* by bank against debtor was not bounded by good faith. *See Virginia Vermiculite,* 156 F.3d at 542 (distinguishing *Brauer*). Here, unlike either of the cases cited in its Motion, NFCU has abused its contractual *discretion*--not merely exercised a contractual right.

Mar. 11, 2008). In Virginia, contractual choice of law clauses are interpreted narrowly. For example, in *LTD Mgmt. Co., LLC*, the court concluded that a choice-of-law clause with nearly identical wording did not extend to the plaintiff's tort claims. The clause in question provided that "[The Agreement] shall be governed and construed under, and in accordance with the laws and decisions (except any conflicts of law provisions) of the State of Georgia." 2008 U.S. Dist. LEXIS 112024, at *20-21. This Court found that provision, "is narrow, and therefore does not encompass contract-related tort claims such as the Plaintiffs' claim for fraud. Therefore, Georgia law governs the Plaintiffs' contract claims whereas Virginia law governs the Plaintiffs' tort claim[.]" *Id*. at *21. Even *Freedman*, which NFCU relies on, makes clear, "a choice-of-law provision that, by its terms, applies only to the parties' contract or agreement must not be construed to govern the entirety of the parties' relationship and any claim that may arise from that relationship[.]" *Freedman*, 325 F. Supp. 2d 638, 653 (E.D. Va. 2004).

If not clearly settled by the contract, "Virginia's choice of law rule in tort actions is *lex loci delicti*, 'meaning the law of the place of the wrong governs all matters related to the basis of the right of action'[.]" *Dreher v. Budget Rent-A-Car Sys., Inc*., 272 Va. 390, 395 (2006) (citations omitted). The place of the wrong is the place where the last event necessary to make an act liable for an alleged tort took place. *Quillen v. International Playtex, Inc*., 789 F.2d 1041, 1044 (4th Cir. 1986) (citations omitted). The UDTPA claim here is a tort claim for the purpose of this analysis. *See Metro Mail Servs. v. Pitney Bowes*, No. 1:16-cv-1416, 2017 U.S. Dist. LEXIS 49840, at *13-16 (E.D. Va. Mar. 31, 2017) (O'Grady, J.) (holding that an unfair trade practices claim was governed by Virginia's choice of law rules for torts, notwithstanding the presence of a contractual

choice-of-law provision).[14] *See also Feeley v. Total Realty Mgmt*., 660 F. Supp. 2d 700, 714 (E.D. Va. 2009) (finding with respect to unfair and deceptive trade practices laws for Virginia, North Carolina, and South Carolina "the place of the injury is each plaintiff's state of residence for the purposes of claims of unfair and deceptive trade practices" because the financial injury took place there); *Insteel Indus. v. Costanza Contracting Co*., 276 F. Supp. 2d 479, 488-489 (E.D. Va. 2003) (holding that North Carolina's UDTPA claim applied where plaintiff was injured in North Carolina). Here, Ms. Lambert's account was maintained in North Carolina and she was injured in North Carolina, making that state's UDTPA applicable.

Finally, applying the choice of law clause in the manner NFCU proposes would deprive Ms. Lambert of her ability to seek relief under her state's UDTPA and is therefore contrary to public policy. In Virginia, courts decline to enforce contractual choice of law provisions when their application "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state." *Projects Mgmt. Co. v. DynCorp Int'l, LLC*, No. 1:13-cv-331, 2014 U.S. Dist. LEXIS 41411, at *14 (E.D. Va. Mar. 26, 2014) (quoting Restatement (Second) of Conflict of Laws § 187(2) (1971)); *Malpractice Resch., Inc. v. Norman*, 24 Va. Cir. 118, 120 (Va, Cir. Ct. 1991) (same). North Carolina's UDTPA represents a fundamental policy of the state of North Carolina. *Dealers Supply Co. v. Cheil Indus*., 348 F. Supp. 2d 579, 586 (M.D.N.C. 2004) ("North Carolina's UDTPA "is a consumer protection statute with a strong underlying public policy justification") (collecting cases). Further, North Carolina has a materially greater interest in protecting *its consumers* than Virginia does. *See Malpractice Research, Inc.* 24

---

[14] Additionally, as NFCU acknowledges in its other arguments concerning UDTPA, like the Connecticut law in *Metro Mail*, UDTPA is a separate and independent cause of action from breach of contract as a mere breach of contract does not state a claim. Further, UDTPA has separate and distinct remedies from a breach of contract claim, including treble damages

Va. Cir. at 120 (declining to apply Virginia choice of law clause because application of the choice of law clause would be contrary to the public policy of the state of Michigan). And there is a fundamental conflict between the two state's laws: North Carolina's UDTPA, unlike Virginia's consumer protection act (Va. Code Ann. §§ 59.1-196, *et seq.*) is enforceable against banks and credit unions. Accordingly, enforcing the choice of law provision with respect to Plaintiff's UDTPA claim would allow NFCU to evade a fundamental policy of the state of North Carolina. The Court should decline to permit NFCU to do so.

### 2. Ms. Lambert States a Valid Claim Under the UDTPA.

North Carolina's UDTPA requires allegations regarding Defendant's commission of an "unfair or deceptive act or practice." N.C. Gen. Stat. §§ 75-1.1(a). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injuries to consumers," and a 'practice is deceptive if it has the capacity or tendency to deceive." *Bumpers v. Cmty. Bank of No. Va.*, 747 S.E.2d 220, 228 (N.C. 2013) (citations omitted). "[I]n assessing whether particular conduct violates the UDTPA, either unfairness or deception can bring conduct within the purview of the statute; an act need not be both unfair and deceptive." *South Atlantic Ltd. P'Ship of Tenn v. Riese*, 284 F.3d 518, 535 (4th Cir. 2002) (citing *Rucker v. Huffman*, 392 S.E.2d 419, 421 (N.C. Ct. App. 1990)). Ms. Lambert's UDTPA claim is based on both "unfair" and "deceptive" conduct and states a claim for each. In a nearly identical case recently decided in federal district court in North Carolina, the court concluded that nearly identical factual allegations stated a claim under the NCUDTPA: "Plaintiffs have alleged facts that would permit, but not require, a reasonable jury to conclude that Defendant did not act in good faith in performing its contractual duties." *Morris*, 2019 U.S. Dist. LEXIS 56652, at *9-10. *Morris* noted that the defendant's arguments, just as here, "are more

- 26 -

appropriately considered at summary judgment and following completion of discovery." *Id.* The Court here should follow the *Morris* court and reach the same conclusion.

But to the extent the Court may be inclined to agree with NFCU, the Court should still not dismiss Ms. Lambert's UDTPA claim at this stage. Instead, courts have recognized that "a determination of what constitutes an unfair or deceptive trade practice is a question of law, such determination necessarily involves a very detailed factual inquiry that is specific to the case at hand." *South Atl. Ltd. P'ship of Tenn.*, 284 F.3d at 535. "It is, therefore, a difficult proposition to undertake such a fact-specific inquiry in the context of a Rule 12(b)(6) motion, where the Court is addressing mere allegations rather than the facts about which evidence has been presented." *Varnell, Struck & Assocs. v. Lowe's Cos.*, No. 5:06cv068, 2008 U.S. Dist. LEXIS 32032, at *25-26 (W.D.N.C. Apr. 11, 2008).

> a.    **Ms. Lambert Alleges Far More Than a Mere Breach of Contract.**

Contrary to the Motion, the Complaint specifically alleges the exact nature and circumstances of Defendant's "unfair or deceptive" practices that extend beyond a mere breach of contract, and thus pleads "substantially aggravating circumstances" necessary to bring an UDTPA claim.   By stating that Ms. Lambert's claims are no more than a breach of contract, NFCU misconstrues Ms. Lambert's allegations. *See* Mot. at 28. Paragraphs 27 to 50 of the Complaint lay out, in great detail, how the practices were unfair and deceptive, and that NFCU knew what it was doing. The Complaint also makes clear that the inequitable division of power between NFCU and Ms. Lambert exacerbated NFCU's conduct.

To recover on a UDTPA claim deriving from a contractual obligation, the plaintiff "must show substantial aggravating circumstances attending the breach to recover." *Johnson v. Colonial Life & Acc. Ins. Co.*, 173 N.C.App. 365, 370 (2005). Substantially aggravating circumstances may

be found where a court finds a defendant's "conduct to be immoral, unethical, oppressive, unscrupulous, substantially injurious to consumers," or, *alternatively*, when the conduct amounts to an inequitable assertion of power or position. *Hanes v. Darar*, 2012 WL 707110 (N.C. App. Mar. 6, 2012) (citing *McInerney v. Pinehurst Area Realty, Inc.*, 162 N.C App. 285, 289, 590 S.E.2d 313, 316-17 (2004)). *See also Faucette v. 6303 Carmel Rd., LLC*, 242 N.C. App. 267, 276 (2015) (conduct that abuses position of power constitutes an unfair act or practice). Here, NFCU knew of its actual NSF Fee policy at the time it entered into its contracts with Ms. Lambert and the putative class, and when it misrepresented its NSF Fee policy. By assessing surprise multiple fees, NFCU disproportionately injures its poorest customers. Thus, the Complaint alleges that NFCU's conduct was unethical. The Complaint also alleges that in its one sided-adhesion contract, NFCU stood in a position of power over its customers, including Ms. Lambert and the putative class, and it abused its position by assessing duplicative NSF Fees. Thus, the Complaint alleges "substantial aggravating circumstances" well beyond a mere breach of contract.

Further, the authority NFCU cites is unavailing. NFCU relies on *Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 337 (4th Cir. 1998), and *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000). First, at least one other court has distinguished *Gray* by recognizing that where, as here, a breach of contract and a violation of UDTPA are intertwined, a plaintiff may still state a claim where, as here, aggravating circumstances were pled. *Biltmore Ave. Condo. Ass'n v. Hanover Am. Ins. Co.*, No. 1:15-cv-43-MR-DLH, 2016 U.S. Dist. LEXIS 19101, at *1-3 (W.D.N.C. Feb. 17, 2016) (denying motion for reconsideration of order denying motion to dismiss); *see also Biltmore Ave. Condo. Ass'n v. Hanover Am. Ins. Co.,* No. 1:15-cv-43-MR-DLH, 2016 U.S. Dist. LEXIS 12198, at *5-8 (W.D.N.C. Feb. 2, 2016) (prior order denying motion to dismiss). And, Judge Payne similarly distinguished *Broussard* in a case, like this one,

where the facts giving rise to the plaintiff's claims were tortious in nature and presented distinct elements from an ordinary contract dispute. *Insteel Indus.*, 276 F. Supp. 2d at 488.[15]

In sum, that there is commonality between the breach of contract claim and UDTPA claim does not mean that the UDTPA claim should be dismissed, particularly at this stage. *New Hickory Pizza, Inc. v. TIG Ins. Co.*, No. 5:16-cv-00164-RLV-DSC, 2017 U.S. Dist. LEXIS 142091, at *35-37 (W.D.N.C. Aug. 31, 2017) (denying motion to dismiss UDTPA claim). Likewise, in *Martin v. Bimbo Foods Bakeries Distribution, Inc.*, the court rejected the defendant's argument "that plaintiff's allegations amount to nothing more than a standard breach of contract action," because there, as here, "plaintiff is claiming that not only did defendant [act] contrary to [the contract's] terms but also [that] defendant acted unfairly and deceptively," No. 5:14-CV-17-BR, 2014 WL 3487618, at *4 (E.D.N.C. July 11, 2014). *See also, e.g.*, *Deerborne Cottages, LLC v. First Bank*, No. 1:11cv178, 2012 U.S. Dist. LEXIS 70288, at *16-17 (W.D.N.C. Apr. 9, 2012) (finding UDTPA claim not based on breach of contract but misrepresentations). The same applies here, as the Complaint is explicit, and detailed, in pleading why NFCU practice is not only a breach of contract, but an abusive and deceptive practice. Compl. at ¶¶ 27-50. A plausible aggravating circumstance alleged in the Complaint is the charging of fees to its most vulnerable customers taking advantage of the opportunity to assess the additional fees even though it knows there are insufficient funds in the account when it reprocesses the transaction. Thus, "[t]aking the allegations as true, and allowing the Plaintiff the benefit of all reasonable and plausible inferences from those allegations, Plaintiff has alleged substantial aggravating circumstances…." *Varnell, Struck & Assocs.*, 2008 U.S. Dist. LEXIS 32032, at *26.

**b.** **NFCU Is Wrong That the Contract Allows for Its Misconduct**

---

[15] Plus, *Broussard* and *Gray* were both decided after trial, on a full factual record.

NFCU's other argument is that the UDTPA claim fails because the breach of contract claim fails. (Mot at 27-8.) The reasons NFCU is incorrect regarding the breach of contract claim are addressed in Section IV.B *supra*, and apply with equal force here. Further, NFCU's exact argument that it somehow cured its unfair and deceptive practices by the language included in its contract has been addressed and squarely rejected by a federal court in the context of a Section 75-1.1 claim regarding bank fees. *See In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1326 (finding that claim regarding high-to-low posting in overdraft case stated an unfair practices claim under laws of states including North Carolina).

A defendant cannot eliminate liability for its unfair and deceptive practices simply by ensuring those practices are baked into its one-sided contract of adhesion. If the law were otherwise, quintessential deceptive acts and practices targeted by UDTPA—such as false representations and bait-and-switch tactics—could be made lawful through even further deception: inconspicuous or ambiguous "disclosures" buried in the fine print. Here, NFCU refuses to acknowledge that its chosen words misrepresent the NSF Fee policy that Ms. Lambert challenges. She has plausibly alleged that NFCU's challenged practices are inconsistent with the terms of the parties' agreement. The Motion should be denied.

## V.    CONCLUSION

For the foregoing reasons, Ms. Lambert requests that NFCU's Motion be denied in its entirety.

Dated: April 15, 2019.                          Respectfully submitted,

                                               ___/s/     Kristi     C.     Kelly_____
                                               Kristi C. Kelly, Esq. VSB #72791
                                               Andrew J. Guzzo, Esq. VSB #82170
                                               Casey S. Nash, Esq., VSB #84261

- 30 -

KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Fax: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com

Jeffrey D. Kaliel (pro hac vice pending)
Sophia G. Gold (pro hac vice pending)
KALIEL PLLC
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C. 20009
(202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com

Hassan A. Zavareei (pro hac vice pending)
Andrea Gold (pro hac vice pending)
Katherine M. Aizpuru (pro hac vice pending)
TYCKO & ZAVAREEI LLP
1828 L Street, NW, Suite 1000
Washington, DC 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
hzavareei@tzlegal.com
agold@tzlegal.com

Jeff Ostrow (pro hac vice)
Jonathan M. Streisfeld (pro hac vice)
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
One W. Las Olas Blvd.
Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
ostrow@kolawyers.com
streisfeld@kolawyers.com
Attorneys for Plaintiff and the Putative
Classes

- 31 -

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on the 15th day of April 2019, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system which will send a notification of such filing (NEF) to all counsel of record.

<div align="right">

_____/s/_____

Kristi Cahoon Kelly (VSB# 72791)
KELLY GUZZO, PLC
3925 Chain Bridge Rd, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
*Counsel for Plaintiff*

</div>

- 32 -

[Tr. pp.1−40]

1

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | EASTERN DISTRICT OF VIRGINIA |
| 2 | ALEXANDRIA DIVISION |

```
 3  ------------------------------x
                                 :
 4  RUBY LAMBERT,                 : Civil Action No.
                                 :
 5                 Plaintiff, : 1:19-CV-103
                                 :
 6            versus           :
                                 :
 7  NAVY FEDERAL CREDIT UNION,    :
                                 :
 8                 Defendant. : May 24, 2019
    ------------------------------x
 9
                The above-entitled Motions Hearing was heard by
10  the Honorable T.S. Ellis, III, United States District Judge.

11                         A P P E A R A N C E S

12  FOR THE PLAINTIFF:            CASEY SHANNON NASH, ESQ.
                                  ANDREW JOSEPH GUZZO, ESQ.
13                                KRISTI KELLY, ESQ.
                                  Kelly Guzzo PLC
14                                3925 Chain Bridge Road
                                  Suite 202
15                                Fairfax, VA 22030

16                                JEFFREY D. KALIEL, ESQ. (Pro hac)
                                  Kaliel PLLC
17                                1875 Connecticut Avenue NW
                                  10th Floor
18                                Washington, DC 20009

19  FOR THE DEFENDANT:           DON BRADFORD HARDIN, Jr., ESQ.
                                  Davis Wright Tremaine LLP
20                                1919 Pennsylvania Ave NW
                                  Suite 800
21                                Washington, DC 20006

22                                FREDERICK BURNSIDE, ESQ.
                                  Davis Wright Tremaine LLP
23                                920 Fifth Ave, Suite 3300
                                  Seattle, WA 98101-1610
24
    ALSO PRESENT:                 BRITTANI IVEY, ESQ.
25                                NFCU general counsel
```

2

```
1    OFFICIAL COURT REPORTER:      MS. TONIA M. HARRIS, RPR
                                   United States District Court
2                                  Eastern District of Virginia
                                   401 Courthouse Square, Ninth Floor
3                                  Alexandria, VA 22314

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

**P R O C E E D I N G S**

(Court proceedings commenced at 10:04 a.m.)

THE DEPUTY CLERK:  The Court calls case 1:19-CV-103.
Ruby Lambert versus Navy Federal Credit Union for a motion
hearing.

May I have the appearances, please.  First, for the
plaintiff.

MR. KALIEL:  Good morning, Your Honor.  Casey Nash
on behalf of the plaintiff, Ruby Lambert.  With the Court's
permission, my colleague, Jeffery Kaliel will be arguing the
motion on behalf of the plaintiff, Mr. Kaliel's motion for pro
hac vice admission is pending before the Court, but has not
yet been granted.

THE COURT:  All right.  Well, I'm happy to have you
both here this morning and that I'll -- I'm not sure whether I
haven't seen the pro hac vice application come through.

THE DEPUTY CLERK:  It was granted in April.

THE COURT:  It has been granted.

All right.  So welcome to you both and certainly
you're welcome to argue this morning.  All right.  Thank you.

MS. NASH:  Thank you, Your Honor.

MR. HARDIN:  Good morning, Your Honor.  Bradford
Hardin on behalf of Navy Federal Credit Union.  With me this
morning at counsel table are Fred Burnside.  Fred is admitted
pro hac vice and, with the Court's permission, will be arguing

—Lambert v. NFCU—

4

1    our motion this morning.  I'm also joined by Brittani Ivey,

2    associate general counsel at Navy Federal Credit Union.

3            THE COURT:  All right.  Good morning to both of you.

4            MR. HARDIN:  Thank you, sir.

5            THE COURT:  All right.  I've had the opportunity to

6    read the pleadings and look at the law and I appreciate the

7    fine briefing on the case.  And let me give you my initial

8    thoughts and you can maybe perhaps tailor that to your

9    argument.  I'm not going to preclude you from making any

10   arguments and I'm interested in your responses.

11           On the choice of law provision, you know in looking

12   at the language in the contracts -- and I guess there's two

13   different documents that were produced by Navy Federal Credit

14   Union and the one authorized user for Navy Federal online

15   banking application consent -- it identifies the governing

16   laws.  This agreement shall be governed and construed in

17   accordance with the laws of the Commonwealth of Virginia.

18           And then in the schedule of these charges -- well,

19   in the second document, which is important disclosures.

20   Again, the reference to the governing laws at Navy Federal,

21   accounts are maintained and governed in accordance with the

22   federal law and the laws of the Commonwealth of Virginia as

23   amended.  I didn't see a non-waiver of any provisions of the

24   governing laws and so I think that in the -- the Virginia law

25   should apply in, I think that Judge Ellis has written on

—Lambert v. NFCU—

5

1   multiple occasions about conflicts of laws and, I guess, cited

2   was the *Run Them Sweet* case, but there's also the *Lloyd v.*

3   *Navy Federal Credit Union* out of California, which discusses

4   choice of law when you have a contract action and then also

5   tort action.  So those are my initial thoughts about the

6   choice of law.

7          As to whether preemption applies, the -- the case

8   has been, you know -- the parties have different focuses on

9   the preemption issue and as I am distilling the important

10  points that plaintiff is making, he's -- it's not a fraud or a

11  bad faith case, but it's a case of contract interpretation.

12  And I think that cases cited such as *In Re: TD Bank* and the

13  South Carolina case of *King v. Carolina First Bank*, you know,

14  speak to whether contract interpretations are preempted or

15  not.  And certainly the, you know, the language in the

16  documents, the debit item, versus debit and the contrast with

17  different parts of the -- other parts of the contract

18  concerning the language used in charges for each check have

19  been highlighted.

20         So I'm interested in your thoughts on whether in

21  fact this is a contract interpretation case, which would take

22  it outside of the preemption doctrine.  And if so -- and it is

23  a contract issue what -- where would we go from here?  Is it a

24  matter of law that is ripe for the Court to decide or is

25  discovery necessary to determine what it means in this

Lambert v. NFCU

6

1   contract, and what would that look like?

2          So, it's your motion to dismiss.

3          MR. BURNSIDE:  Thank you, Your Honor.

4          THE COURT:  And I'm not going to limit you to

5   talking about those issues.  If you want to convince me that

6   there's something else that I completely missed, I'm happy to

7   hear that argument.

8          MR. BURNSIDE:  Good morning, Your Honor.  May it

9   please the Court.

10          Fred Burnside here representing Navy Federal.  This

11   case turns on whether plaintiff had two returned debit items

12   for insufficient funds causing two NSF fees and she did have

13   two returned debit items.

14          Mutual of Omaha presented a ACH debit on

15   Ms. Lambert's behalf on October 16th and then two days later

16   on the 18th.  She concedes she had insufficient funds on both

17   occasions and admits Navy Federal returned each debit item as

18   a result.

19          THE COURT:  So is there any issue of fact as to

20   whether Mutual of Omaha was allowed to present the debit on

21   two occasions and who -- whose agreement was that and was Navy

22   Federal Credit Union even involved in the decision by Mutual

23   of Omaha to submit the debit the second time?

24          MR. BURNSIDE:  There is not a factual issue there,

25   Your Honor.  And I'd cite to reference -- plaintiffs

Lambert v. NFCU

7

1    acknowledged at page 15 of their opposition brief that the key

2    provision in the contract for purposes of the ACH insurance

3    payment transaction attempted were as follows:  Acknowledging

4    that it's an ACH means, by definition, she has authorized

5    somebody else to go ahead and pull the funds out.  And so

6    that's an agreement between Ms. Lambert and Mutual of Omaha,

7    not an agreement with Navy Federal.  Navy Federal does not

8    control how many times Mutual of Omaha makes those payment

9    attempts.

10           In fact, the disclosure say you can sign up for an

11   ACH process, but if you've got a problem with it we have to

12   process it.  You need to contact your third party authorized

13   agent.

14           THE COURT:  There could be three, it could be four,

15   it could be one, whatever agreement was made, you will follow

16   that?

17           MR. BURNSIDE:  My understanding is that the rules

18   that govern the parties to the ACH process, as administered by

19   the Federal Reserve, the natural rules, for lack of better

20   term, allow up to three re-presentments for electronic debits

21   and two for checks, applies to the Federal Reserves other

22   guidance.

23           So what I want to do is focus my time here on the

24   language of disclosures, because I think once you understand

25   what the contract allows and what the allegations are, the

─────Lambert v. NFCU─────

8

1    plaintiffs claim fall apart.  I don't think I'm going to

2    address the UDTPA, because I think we've decided -- at least

3    Your Honor has decided, I'm not going to try to convince you

4    otherwise -- that Virginia law applies.

5            Finally, if time permits, I would like to discuss,

6    in particular some of the preemption issues Your Honor has

7    raised.  But I want to talk about the facts very briefly.

8            Navy Federal Credit Union is a not-for-profit

9    member-owned credit union and one of those members is Ruby

10   Lambert.  Navy Federal's disclosures allow it to charge a NSF

11   fee for each returned debit item.  Here, Ms. Lambert agreed to

12   let Mutual of Omaha do just that.

13           The first presentment we know occurred on the 16th,

14   the second on the 18th, and she concedes she had insufficient

15   funds on both days.  The core of the contract claim fails

16   because Navy Federal received a debit item presentment from

17   Mutual of Omaha on two different days, had insufficient funds

18   on both days, and those got two NSF fees.  That Ms. Lambert

19   understood her insurance payment with Mutual of Omaha to be

20   one transaction, it doesn't change the dispositive question

21   whether more than one payment was presented.

22           So what does plaintiff argue in response?  They

23   argue that they should first -- the Court should first

24   subtract terms, then they invite the Court to add terms.

25   First, they ask the Court to set aside key words in the

—Lambert v. NFCU—

9

1    agreement including the operative word "return."  Remember,

2    the triggering event here is not the submission of a debit

3    item, it's the return of a debit item because that is what

4    triggers a NSF fee, when it's returned for insufficient funds.

5           And we know from the cases we've cited *Squire v.*

6    *Virginia Housing* and the *Delmarva Power* case, the Court, you

7    know, is not supposed to render any word meaningless and is

8    supposed to give contracts -- interpret contracts as a whole

9    without emphasis to specific isolated terms.

10          THE COURT:  So in the case of the checks, the

11   contracts states, "A fee will be assessed in the amount shown

12   on Navy Federal's current schedule of fees and charges for

13   each refused check."  And then with regard to debits it says,

14   under Section A, "A fee may be assessed in the amount shown on

15   Navy's current schedule of fees and charges for each returned

16   debit item."

17          What significance is there to using the different

18   words in the -- in those provisions?

19          MR. BURNSIDE:  Substantively, I think what it boils

20   down to is this:  I mean a check is refused, that is, we're

21   not going to take the check and send back.  An electronic

22   transaction simply is returned via that same electronic

23   transmission method by the ACH network.

24          THE COURT:  So meaning you cannot accept a debit,

25   it's an electronic --

10

1          MR. BURNSIDE:  Right.

2          THE COURT:  -- filing that comes in and is accepted

3    by a computer.

4          MR. BURNSIDE:  Right.

5          THE COURT:  And so it's accepted but it can be

6    rejected?

7          MR. BURNSIDE:  Right.  And under the natural rules

8    in the agreement, Navy Federal has to take that and it has to

9    try to process it on behalf of the third party.

10          So Ms. Lambert is really asking the Court to delete

11    the word "return," the verb, from that sentence.  She's also

12    seeking to add new words to disclosures.  She argues the

13    disclosures permit only a single NSF fee and that's not what

14    the agreements say.  They say, "A NSF fee for each returned

15    debit item."

16          She likewise argues that items should mean all

17    erases of a payment attempt.  That also is trying to rewrite

18    the disclosures.  We're entitled to charge a fee for each

19    returned debit item, not each new returned debit item.  It

20    doesn't matter, as they made a point, whether or not this is

21    for the same underlying transaction.  The point is were there

22    multiple presentments made, not what is the payment for.

23          It will be different, for example, and they will

24    have a case, if on the 16th Navy Federal had charged two NSF

25    fees for that one presentment.  But we didn't do that.  That's

11

1    not our case.

2         THE COURT:  Well, will it be clear or less clear if

3    you had eliminated the word "item" and just used the language

4    "for each returned debit?"

5         MR. BURNSIDE:  You know, Your Honor, I went through

6    and counted and there's 20 instances in the disclosures where

7    the term "item" is used.  And in context, the term becomes

8    helpful to understand.  And in reviewing plaintiff's briefing

9    on this, at pages 7 to 8, they cite to the Federal Reserve

10   Board's official commentary to these -- the TISA regulations

11   at issue here.  And so I started looking at that and the

12   appendices there too.  And there's an Appendix B there too

13   that applies.  And I'm going to preface this by saying these

14   Appendix B explains that Section 269(b) of the TISA provides

15   that credit unions that use these clauses and forms will be in

16   compliance with TISA's disclosure requirements.

17        And so what is it that they actually say?  The model

18   clause that's offered in this document has a note at the end.

19   It says, "Fees and charges may be disclosed in the account

20   disclosure or separately in the rate and fee schedule.  We do

21   both."

22        It then goes onto to say, "In either event, the

23   disclosure should also specify when the fee will be assessed

24   by using phrases such as "per item."

25        And so, what's happened here is we have the Federal

—Lambert v. NFCU—

12

1   Reserve saying this is the disclosure you should use and

2   plaintiff saying, "I want to use state law and say you

3   shouldn't be complying with federal law."  And that gets into

4   the preemption argument a little bit, but also gets into the

5   language of item.

6           And I think "item," in this context, makes more

7   sense because really you got the ACH batch transaction.  It

8   all comes in.  And they're just line items.  It's the

9   itemization of each debit that comes in.  That's why the term

10  makes sense.  In the immediately preceding sentence, to the

11  one that plaintiff's counsel focuses on, reads that:  Navy

12  Federal may return debits to the checking account, e.g. an ACH

13  payment, in the amount of -- if the amount of the debit

14  exceeds funds available.

15          It then goes on to say, basically, if there's a

16  return that -- if there's a return of that debit item, there's

17  going to be a NSF fee.  Read together, those two sentences

18  explain if you don't have sufficient funds in your account,

19  there's going to be a NSF fee for that returned debit item.

20          I'm not sure if that answered Your Honor's question

21  entirely.

22          THE COURT:  Yes.

23          MR. BURNSIDE:  So that's why I think that the

24  contract claim, you know, fails.  In addition, you know

25  plaintiff's offer up their own definition, which we actually

Lambert v. NFCU

13

1   don't disagree with for "item."

2          They argue, at complaint paragraphs 34 and 39, the

3   debit item is an instruction for payment.  And that's what we

4   have.  Two instructions for payment.  One on the 16th and one

5   on the 18th.  She conflates her instruction to Mutual of Omaha

6   to obtain payment for her premium, which Mutual of Omaha has

7   multiple instructions for payment and debit item resentments.

8          Thus, there's two NSF fees, because there are two

9   presentments.  And this doesn't mean, as plaintiffs argued in

10  their opposition brief, that Navy Federal can charge a fee for

11  each attempted debit item.

12         What it means is Navy Federal can charge a fee for

13  each returned debit item.  And that's exactly what happened

14  here.  And so I think the language supports us.  I think,

15  certainly the Federal Reserves commentary helps us.  I think

16  the breach of contract claim fails for that reason.

17         They also touch on the duty of good faith and fair

18  dealing as a support for the contract claim, which I also want

19  to touch on.  The gist of plaintiff's claims that Navy Federal

20  exercised its discretion of bad faith when it charged two NSF

21  fees in connection with one insurance premium.  But here, the

22  objective facts show there were two debit items presented on

23  two different days which permits two NSF fees.

24         The moment each debit item was returned, Navy

25  Federal had the accrued right to impose a NSF fee.  And the

Lambert v. NFCU

14

1   *Stoney Glen* case, I think, goes into great deal on this point.

2   It walks through all the case law on accrued rights versus

3   discretion.  And so, as to some degree, every contract right

4   has discretion in it.  What it explains is, instead of

5   "discretion," it uses the term "flip a coin."  It says, "A

6   party can flip a coin to determine whether to exercise an

7   accrued right, but it can't flip a coin to determine if a

8   right accrued."

9          In all the cases plaintiff cite, the overdraft fee

10  cases, the high-to-low cases, in every instance, it was the

11  defendant had the discretion to create the event that caused

12  the fee.  That's not what happened here.  We have no control

13  over how many times Mutual of Omaha submits an ACH debit and

14  we have no control over whether Ms. Lambert has insufficient

15  funds.  It might be different if they allege that we held on

16  to the payment until she had insufficient funds -- that would

17  be analogous -- but that's not what we have here.

18         It was an accrued right the moment each one was

19  returned because Navy Federal exercised an accrued contract

20  right, there's no breach of the duty of good faith and fair

21  dealing.

22         Obviously, I agree with Your Honor on the choice of

23  law issues.  We think Virginia law applies.  I'm trying to --

24  my notes here on the preemption issue.  To some degree we

25  agreed with plaintiffs.  We agree that if their claim is you

——Lambert v. NFCU——

15

1  made an affirmative misrepresentation, you said X and you did

2  Y, that claim is not preempted.  That's not what they're

3  really alleging here.

4       She brings claims based on the lack of disclosures

5  that she would prefer.  She's not arguing that Navy Federal's

6  statement that would charge a NSF fee for each returned debit

7  item is untrue.  She's arguing that you should interpret

8  "item" to mean something -- you should interpret "item" and

9  "isolation" and omit the other words.  And that's different.

10      What she's asking for, and as the complaint shows at

11 paragraphs 20, 37, 40, 44, 50, 75, and 46 through 49, it's all

12 about admissions, it's all about the failure to disclose.  And

13 that's why I think the case is -- the claims are preempted by

14 federal law.  And I think the *Whittington* case does a nice job

15 of distilling the difference between the nature of the

16 contract claim that is preempted and the nature that isn't

17 preempted.  There the Court held that state law claims of any

18 strike that try to force additional disclosures or require

19 them to be made in a particular manner or dictate the fees a

20 credit union can charge, are preemptive.

21      Now, what plaintiffs point out is in *Whittington*

22 there was a contract claim that survived.  But that was a case

23 based on affirmative misrepresentation that leaking certain

24 accounts would save the plaintiff money and it wouldn't.

25 That's an affirmative misrepresentation.  There's no similar

Lambert v. NFCU

16

1   allegation here.

2        They also cite *Murr v. Capital One* for the same

3   concept.  There the defendant represented the particular

4   program would save the customer money, when in fact it

5   wouldn't save the customer money.  She doesn't argue Navy

6   Federal's statement that would charge a NSF fee for each

7   returned debit items is untrue, she just disagrees with how

8   it's applied.

9        Plaintiff's using -- trying to use state law claims

10  to require additional disclosures, frankly, disclosures that

11  would be contrary to the guidance from the Federal Reserve

12  Board.  She's asking the Court to declare, and this is in her

13  prayer for relief, that Navy Federals fee practices are

14  wrongful, unfair, and unconscionable.  And that's exactly the

15  kind of relief that is preempted.  She's attempting to

16  regulate Navy Federals disclosures, which violates the Truth

17  and Savings Act and barring Navy Federal from charging a NSF

18  fee for each returned debit item that's represented, which it

19  violates the SCUA.

20       As a result, her claims are preempted and we think

21  the Court should dismiss on that alternative basis if not

22  otherwise.

23       So in conclusion, Your Honor, again, the case turns

24  on whether or not there were two debit items that were

25  presented and returned, and there were.  As a result, we think

Lambert v. NFCU

17

1  the claim fails.  And this two amendment and whether or not

2  the Court should allow additional discovery on that, I think

3  the answer is no.  And probably not surprising to Your Honor.

4          The reason for that is, the language of these

5  disclosures isn't going to change in discovery.  What happened

6  in her transaction isn't going to change in discovery.  And

7  those are the two fundamental factual issues that dovetail

8  show that there is no amendment that could cure this because

9  plaintiff haven't sought leave to amend in connection with the

10  motion to dismiss.

11          For those reasons we think Your Honor should grant

12  the motion to dismiss with prejudice.

13          THE COURT:  All right.  Thank you.  Go ahead.

14          MS. KALIEL:  Thank you, Your Honor.

15          We know consumers are using electronic payments to

16  conduct a growing number of small dollar transactions.  Gym

17  memberships, Netflix payments, insurance, and utility

18  payments, even micro PayPal one-time transfers.

19          The practice that this lawsuit concerns Your Honor,

20  is the tiny subset of rules of electronic payments in some

21  checks.  And it concerns Navy Federal account holders who

22  maintain chronically low balances.  Chronically low account

23  balances.  And so one hypothetical, Your Honor, Navy Federal

24  account holder sets up her Netflix payment to be automatically

25  deducted from her checking account every month.  I think it's

———Lambert v. NFCU———

18

1   $11.95 now.

2          On the day that payment is processed, there are

3   insufficient funds in the account.  Navy Federal rejects the

4   payment and charges a $29 NSF fee.  So far so good.  Three or

5   four days later, the same transaction, same merchant, same

6   amount, same purpose is processed again by Navy Federal.  If

7   there's still insufficient funds, it is again rejected,

8   another NSF fee of $29.  Same thing happens again three or

9   four days later.  If there are still insufficient funds,

10  another NSF fee, and another rejection.  And so now the $11.95

11  Netflix payment has all of a sudden caused nearly $90 in fees.

12  Three separate returned item fees or NSF fees.

13         Our complaint concerns the second two or the second

14  one.  Every one after the first one.  It's a practice that

15  homeless people -- Your Honor, it is a devastating occurrence

16  to have $90 in NSF fees for low-income consumers trying to

17  make a one-time payment to Netflix in the amount of $11.95.

18         In the case of Navy Federal account holders, many of

19  whom -- most of whom are former or current military.  These

20  are the E1s and the E2s making 18 grand a year who are getting

21  hit with these fees.  $90 for a single Netflix payment.  It's

22  a very, very difficult practice for people to cope with.  It's

23  a practice that some banks in the country do not use at all

24  because it is so cumulative.  JPMorgan Chase doesn't do it.  A

25  few banks that do do it, charge multiple NSF fees on the same

19

1  item, expressly disclose it in flashing red lights, warn their

2  account holders:  Look out, the same item can incur multiple

3  NSF fees.  Be careful.  Watch out.

4          Navy Federal did none of this.  It's why it's a

5  surprise and it's a shock to folks like plaintiff Lambert and

6  other reasonable consumers that they can get nearly $90 in

7  fees on a single payment.  And that's because the Navy Federal

8  disclosures, we believe reasonably read, promised a single $29

9  NSF fee on a ACH payment.

10         And the argument that Navy Federal is advancing

11 before this Court depends on one -- we think one central

12 conceit and that is an item can sort of morph or replicate or

13 divide itself into new items simply because it's reprocessed

14 after an initial rejection.  That's a strange concept.  That

15 is not a concept or an understanding, I think, any reasonable

16 consumer has.  This sort of -- it's like mitosis from high

17 school biology, cell mitosis.  You split into a different item

18 that has all the exact same features so you can charge another

19 fee on it.

20         We think it's -- it's not plausible.  We think the

21 contract here, reasonably read, promises a single $29 fee on a

22 payment.

23         If I could, Your Honor, I've gone through the

24 trouble of printing out a couple of boards.

25         THE COURT:  Sure.

─Lambert v. NFCU─

20

1        MR. KALIEL:  That have, I think --  if I may

2  approach?

3        THE COURT:  Yes.

4        MS. KALIEL:  Have, I think, the very few relevant

5  provisions in the -- in the disclosures.

6        So Your Honor from the deposit agreement, what Navy

7  Federal calls the important disclosures, we think two key

8  promises here.  The first promise is -- the first paragraph on

9  the board, which is that fees and charges that may be assessed

10  are disclosed on Navy Federal's current schedule of fees and

11  charges.  So we have an affirmative and independent promise by

12  Navy Federal that it will disclose in the separate document

13  all fees that Navy charged on an account.  This is a promise

14  that it chose to make on its own.  We'll talk about that in a

15  little bit.

16        Second important promise in the important

17  disclosures, with respect to plaintiff Lambert's electronic

18  payments, is the last paragraph here.  Which we need to parse

19  closely.  We've already heard Navy Federal discuss it.  I'd

20  like to discuss it in detail.  Says, "Navy Federal may return

21  debits to the checking account, --

22        For example, an ACH payment.

23        "If the amount of the debit exceeds funds available

24  in the checking account, a fee may be assessed in the amount

25  shown of Navy Federal's current schedule of fees and charges

1   for each returned debit item."

2         So that's it.  That's all we got in the deposit

3   agreement that's on point here.

4         The third paragraph on the board makes an express

5   promise.  A fee...

6         Singular for each returned debit item.

7         Well, what in heck, Your Honor, is a "returned debit

8   item."  "Returned debit item" is not defined.  "Debit item" is

9   not defined and "item" is not defined.  So what does it mean?

10   We think the most reasonable reading of this contract is that

11   "item" refers to the payment attempt by the consumer, the

12   order from the consumer to pay Netflix.  The consumer merchant

13   transaction.

14         Now, Navy Federal thinks "item" refers to the back

15   office dealings between Navy Federal and Netflix, but that's

16   invisible to the consumer.  That's invisible to plaintiff

17   Lambert.  "Item," reasonably read, means the payment she tried

18   to make to Netflix for $11.95.  That payment could only be

19   made once Your Honor.  The parenthetical, the e.g. ACH

20   payment, is a sign, is a signal to Ms. Lambert that it means

21   what she's trying to accomplish, which is a single payment to

22   Netflix.

23         There is no way for her to know what is happening in

24   the back office between Netflix and Navy Federal.  In a

25   reasonable consumers mind, like plaintiff Lambert, "payment"

—Lambert v. NFCU—

22

1  or "ACH payment" as in that parenthetical, must refer to her

2  singular intention to make a payment to Netflix.  That payment

3  can only happen once.

4  THE COURT:  Well, she's a -- entered into a contract

5  with Mutual, which allows Mutual to try and collect the funds

6  twice, right?  So she's on notice that Mutual is going to try

7  and collect from Navy Federal credit union on a second

8  occasion if the first occasion fails.

9  So where does that fit in?

10  MS. KALIEL:  Well, that's exactly -- we're not

11  disputing that, Your Honor.  There is nothing in our complaint

12  that would fault Navy Federal for merely reprocessing two

13  times, three times, four times, however many times it's going

14  to do it.  The question is:  What did it say about fee

15  assessment?

16  Reprocessing is not our case.  It's fine.  They can

17  do it all they want.  Did they tell consumers or did they not

18  tell consumers, in the contract reasonably read, that they

19  were going to charge a fee each time?  We think that is not

20  clear from this board, from the words on this board.

21  Now, the next point I want to make about this third

22  paragraph on the board the first sentence pretty clearly says

23  what Navy Federal may do.  Right?  Navy Federal may return

24  debits really whenever it wants.  Navy Federal can return

25  debits when there are insufficient funds to do so.  As we just

—Lambert v. NFCU—

23

1   talked about, Your Honor, there's nothing wrong with that.

2   They can do that all day and all night.

3          But the key sentence is the second sentence, "for

4   purposes of fee assessment."  The fee assessment sentence ties

5   fee assessment to an entirely different thing.  "A fee may be

6   assessed in the amount shown for each returned debit item."

7   This is not a fee each time we, Navy Federal, do something

8   each time we return an item.  This is a fee on the item

9   itself.  And the item itself, reasonably read, should include

10  all attempts to pay that item, in our view.

11          THE COURT:  So where is the word "each" returned

12  debit item?  Where is the ambiguity in that?

13          MS. KALIEL:  Well the ambiguity is, Your Honor, what

14  does "item" mean?

15          The first sentence uses -- it doesn't use "item" in

16  any way.

17          THE COURT:  Right.

18          MR. KALIEL:  Right?  And then all of a sudden we get

19  an additional item in the second sentence.  So it must mean

20  something else.  "Returned debit item" must mean something

21  else than just debit.  Right?  This paragraph here doesn't

22  say, We will charge you a fee each time we try to debit an

23  account.

24          THE COURT:  So if they'd left the word "item" off of

25  that second sentence, you think that would put your client on

Lambert v. NFCU

24

1   notice that each debit, regardless of whether it was involving

2   the same third party, would merit an overdraft NSF?

3          MS. KALIEL:  If they had said, Your Honor, that we

4   will charge a NSF fee each time we try and failed a debit in

5   an account, we probably would not have a case.  That's not

6   what this disclosure says.

7          They added the additional word "item" and that item

8   -- that word "item" must be given some meaning.  I haven't

9   heard, other than this new reference to some, deep in the

10  books federal regulation, I haven't heard any explanation for

11  what does "item" mean.  This term comes out of nowhere.

12         So what does "item" mean?  We're putting forth what

13  we believe to be a plausible explanation of the term "item,"

14  which shows up out of nowhere in the second and most key fee

15  assessment sentence.

16         THE COURT:  So Mr. Burnside says it appears 20

17  different times in the contract.  And frankly, I haven't

18  tracked it 20 different times through the contract, but what

19  variance, if any, do you see in the word being used by Navy

20  Federal?

21         MS. KALIEL:  So we did the same analysis as Mr.

22  Burnside and tried to find other clues, other hints about what

23  "item" means in the contract.  And most of them are anodyne,

24  it doesn't really -- we couldn't find anyway that they would

25  bare on the question before us.  But we did find one that we

Lambert v. NFCU

25

1 think is important.

2        On page 5 of the deposit agreement, there is a

3 clause that uses "item" in a very particular way that we think

4 is relevant here, because it shows that an item maintains its

5 integrity. It's the same item, even while it's waiting in the

6 back office to be paid. Even while it's in that back office

7 purgatory, it's still an item in Navy Federal's view,

8 according to this deposit agreement.

9        So it says on page 5 of the deposit agreement, "Item

10 includes, quote, scheduled bill pay transactions, deposits

11 with holds on them, and checks you have written but have not

12 yet cleared your account.'" That's at 5 of the deposit

13 agreement.

14        Written but not yet cleared your account or

15 transactions that have not yet cleared your account. Right?

16 So they're waiting to be cleared. Just like plaintiff

17 Lambert's transaction that got rejected the first time and was

18 waiting to be cleared again, they're waiting and they're still

19 the same item, Your Honor.

20        We think that use of item, at the very least, shows

21 "item" could plausibly and reasonably be understood in the way

22 that plaintiff Lambert understands it.

23        Now, Your Honor, I'd also like to point out -- you

24 know we cite in the complaint to various bank contracts that

25 expressly disclose that an item can incur many fees. And we

1   do that because it provides some useful context that the Court

2   may want to consider as it tries to determine what "item"

3   means.  And I think it points to general usage, common usage

4   of what "item" means in the industry.

5           In each of the disclosures we cite in the complaint,

6   Your Honor, these other banks they warn expressly that the

7   same item can get multiple fees.  The same item can get

8   multiple fees.  So even the banks that do this multiple fee

9   practice, like Navy Federal, even they think, Your Honor, it's

10  the same item.  It's just the same item getting reprocessed

11  and getting multiple fees.  They don't think what Navy Federal

12  thinks, which is that the item replicates and morphs and

13  undergoes mitosis to become a new item.

14          For Citizens Bank, for example, the one we cite in

15  the complaint says, "Because we may charge a service fee for a

16  NSF item, each time it's presented, same item presented many

17  times, we may charge you more than one service fee for a given

18  item."

19          If we use this same understanding of item that these

20  other banks have and that plaintiff Lambert has, Navy

21  Federal's contract, as written, says it can only charge one

22  fee for an item.

23          Again, we think that's a useful data point as the

24  Court considers what the meaning of "item" is in this

25  contract.

Lambert v. NFCU

27

1          THE COURT:  What significance is it, do you think

2   at -- it has that Navy Federal states in their disclosure that

3   they -- a fee will be assessed for each refused check; where

4   does that fit in?

5          It's on page 4.  You know, two paragraphs above the

6   statements that are on your board about each returned debit

7   item.  So on the one hand they say each check returned we're

8   going to collect a fee on.  Is that ambiguous to you or do you

9   understand that to mean that the same check can be, if

10  returned, can -- it will incur a NSF fee in each case,

11  regardless whether it's to the same third party receiver?

12         MS. KALIEL:  Well, Your Honor, so I don't know

13  enough about how check processing works to understand the back

14  office operations.  This to me, reading this for each refused

15  check clause, seems to have a finality about it.  If there's a

16  check written and it's refused, you get a fee, and it's over.

17  The event is over.  Unless say, the consumer, maybe we're

18  going to write another check, but the reference or a refused

19  check getting a single fee, when read against the returned

20  debit item getting a single item, would seem to indicate to me

21  that both are one-time events, both fees are one-time events.

22  Right?

23         Because, again, the consumer -- just as I don't

24  really know what happens with check processing, I don't think

25  the consumer really knows what is happening in the back office

28

1   with respect to ACH or electronic payments.

2           I would go, Your Honor -- one last point on the

3   other disclosures from the other banks, it does show how easy

4   it would have been for Navy Federal to disclose this practice.

5   Clearly they certainly didn't do that.  I would submit, Your

6   Honor, that reading this board in context in an industry where

7   some banks do the practice and some banks don't do the

8   practice, where some banks disclose it, and some banks don't,

9   a reasonable consumer, like plaintiff Lambert, a reasonable

10  service person who's a member of Navy Federal reading this

11  board, would have no reason to anticipate multiple NSF fees on

12  a single ACH payment.  It is a shock.  It should rightly be a

13  shock when you're reading these disclosures, because they

14  don't say it.

15          And you might say, Your Honor, what about the first

16  sentence on that board which says, Hey, don't worry we're

17  going to disclose all fees that may, even possibly could be

18  charged on an account, we're going to disclose that on a fee

19  schedule.

20          If I may, Your Honor.

21          THE COURT:  Yes, sir.

22          MR. KALIEL:  Here is what the fee schedule says.

23          (Displays to the Court.)

24          MR. KALIEL:  So that's it, Your Honor.  That's what

25  the fee schedule says.  Non-sufficient funds fee for checks

JA 113

—Lambert v. NFCU—

1   and ACH debit, $29.  Well, that doesn't help very much in my

2   view.  That doesn't say all the fees that may be assessed on

3   this account, because we know that up to $87 on a single ACH

4   debit can be -- or an ACH payment can be assessed on the

5   account.

6          Navy Federal took it upon itself to promise its

7   account holders that it would disclose all fees that even may

8   be assessed on an account in a fee schedule.  It didn't do so.

9   For this disclosure and the fee schedule to be accurate, it

10  should say, ACH debit, ACH payments can incur up to $87 in

11  fees.  Not just $29 fees.

12         We think that's a separate breach.  That $29

13  representation is inaccurate.

14         The Navy Federal argument, if you listen closely,

15  Your Honor, and if you read the briefing, they do the same

16  thing over and over again, which is that they keep saying

17  there were multiple returned debit items.  That she had

18  multiple returned debit items.  Where does the contract say

19  that each time a transaction is reprocessed, it's a new debit

20  item?  They continually ally the difference between a debit

21  and a debit item or a returned debit item.

22         Our submission to the Court is that that is far from

23  clear.  That each submission is a new item or a new returned

24  debit item.  And that while we think we have made out a case

25  for an express breach of contract that would necessitate the

—Lambert v. NFCU—

30

1    denial for the motion to dismiss, even if the Court disagrees

2    and finds that there is some validity or there is some

3    plausibility to the arguments that Navy Federal is making,

4    that would just create, we believe Your Honor, an ambiguity,

5    because we believe we have presented the Court with a

6    reasonable, plausible reading of the contract.  When there are

7    two reasonable, plausible readings of a contract, that creates

8    an ambiguity.  We think, at the very least, the contract is

9    ambiguous.  If the contract is ambiguous, there are two

10   possible results, but both of which necessitate a denial of

11   the motion.

12         The first result would be that the ambiguity is

13   construed against the drafter, Navy Federal, in which case,

14   motion denied.  The second is that the Court can decide

15   extrinsic evidence could potentially be valuable in construing

16   the ambiguity and understanding the ambiguity.  And so we

17   would go to the summary judgment process, we would go to the

18   discovery process, and see if there is valid applicable

19   extrinsic evidence that could help the Court make a final

20   determination on the meaning of this contract.

21         Both an expressed breach finding and an ambiguity

22   finding would result in a denial of the motion today.  I --

23         THE COURT:  Have you thought about what discovery

24   would look like if the Court ordered discovery?

25         MS. KALIEL:  Well, Your Honor, I think it would

Lambert v. NFCU

31

1   involve what is -- what is the banks usage of these key terms

2   in other context?  Is the bank aware of consumers

3   misunderstanding these key terms?  How often is the bank --

4   I'm sorry -- the credit union had complaints about confusion?

5   Was it aware of the misperception?  Why did it choose to use

6   key terms?  When it uses "item" internally, how does it refer

7   to it?

8         And then what actually does happen with respect to

9   check and electronic debit processing?  Which, I certainly

10  don't know as an outsider at this point.  What would we learn

11  that would bear upon the meaning of the contract about how

12  these back operations work, how the transactions are passed

13  back and forth between the merchant and Navy Federal?  Those

14  are all things that would be the topic of discovery that could

15  help the Court determine the meaning of what we believe to be

16  ambiguous, at best, contract.

17        Very briefly, Your Honor, because I've already been

18  talking for too long.  The good faith claim.  Virginia law is

19  clear that where a contract vest a party with discretion,

20  discretion of any sort, that discretion has to be used in good

21  faith.  It cannot be used unfairly or to result in unexpected

22  or result under the contract.

23        There are two ways that we think discretion was used

24  unfairly here.  One, is referring back to the terms we just

25  discussed, Your Honor.  Returned debit item or item or debit

1  item.  Defining those terms in a way to create unexpected

2  results.  Defining those terms in an unexpected way.  There is

3  no doubt that Navy Federal could have, if it chose, define

4  "items" in the way we understood "items" -- that we are

5  understanding "item" to be.  Which includes, a payment and all

6  attempts to make that payment as one item.  It chose the other

7  one.  We say it chose the other one because it directly led to

8  more fees that it could put into its bottom line.  It abused

9  discretion in defining these key terms in the contract that

10  we've just talked about.

11       The other one -- I'm sorry, Your Honor, one last

12  time.  The other discretion point is back in this deposit

13  agreement.  And you'll see that when talking about refused

14  checks that -- that middle provision there says, "We will

15  assess a fee when a check is refused or returned."  But the

16  second -- the third paragraph, when talking about returned

17  debit items, it says "we may."  And "may" is an obvious and

18  clear reservation of discretion.  The conflict or the contrast

19  between we will do something or we might or might not do it

20  depending on how we feel that day, that is a discretion point

21  we say that they abused.

22       They had a policy in place to always assess NSF

23  fees.  It wasn't "may" it was "will" and it should have said

24  that if that was going to be their policy.

25       I won't spend anytime on preemption.  We agree with

———Lambert v. NFCU———

33

1   the Court's initial observation.

2           With respect to the choice of law issue, we don't

3   dispute Virginia law applies in general.  But with respect to

4   the North Carolina UDAP claim, it may be a finding the Court

5   could make either now or down the road, but that UDAP statute

6   in North Carolina is a fundamental public policy of the state

7   and should not be a waivable choice of law provision.

8           We've briefed this but we understand the Court's

9   initial observations.  Thank you, Your Honor.

10          THE COURT:  All right.  Thank you, sir.

11          Mr. Burnside, do you want to reply?

12          MR. BURNSIDE:  Please.

13          I want to walk through some of the points that he

14  just made.  First, I want to talk about his reference to the

15  fee schedule.  The fee schedule discloses what the fee is.

16  The important disclosures explain how it results.  So blaming

17  the fee schedule for not explaining that in more detail is a

18  red herring.

19          Second, I want to talk about this argument about

20  ambiguity.  Now, he argues it's ambiguous because he wants to

21  focus on the word "item" ignoring the phrase "returned debit."

22  The 20 times it was used in the agreement is helpful.  For

23  example, as Mr. Kaliel, I'm happy to walk through some of

24  those items.  And as a side, I'll say the case we cited *Gay v.*

25  *Peoples Savings Bank* from North Carolina, was a case involving

Lambert v. NFCU

34

1    a high-to-low overdraft fee case.  And there, the plaintiff

2    again tried to argue:  Well, "item" is ambiguous and therefore

3    we should win.  And the Court rejected that saying, Although

4    the contract does not expressly define "item" to include

5    electronic debit transactions, the plain meaning of the term

6    is easily discerned by the other parts of the agreement.

7           And I think we have the same thing here.  And he

8    focused on page 4.  And I think there's other spots, as I

9    mentioned, that are helpful here, page 3 in the order of

10   "transactions" section, which the plaintiff cited in a

11   footnote.  It explains that Navy Federal post types of items

12   presented on the account in a certain order, then gives

13   examples of items, including an ACH debit.  That clearly

14   explains an ACH debit is a item.

15          Page 4 is the sentence we've gone over repeatedly.

16   Page 5, the use disclosures explain that if an overdraft is

17   not paid, your transaction will be declined and/or your check

18   ACH return unpaid.  Again, this is explaining the failure of

19   insufficient funds and no overdraft protection, that the ACH

20   debit presentment will be returned.

21          That's the part that he focuses on talks about

22   situations where there's a check that hasn't cleared.  We're

23   not talking about a check that hasn't cleared.  A debit item

24   was submitted.  It's been returned.  It's never coming back.

25   They can submit another one, but it's not like a check that's

—Lambert v. NFCU—
35

1   just sitting there and waiting to be clear or there's a hold

2   on an account.

3            And again, he -- it harps on the fact that this

4   hurts those with lower incomes.  But remember, under the

5   agreement, the only way someone gets to a NSF fee is, who has

6   an overdraft protection program, is if they have maxed that

7   out at $500.  And so at some point there has to be a limit.

8            In any event, that language talks about the fact

9   that ACH debit presentment is the type of item that gets

10  returned and is the subject to NSF fees for each returned

11  debit item.  There's a section on the posting order.  It

12  explains the order in which various items are posted,

13  including ACH debits.  Clearly identifying an ACH debit is a

14  type of item.

15           There, tellingly, Navy Federal says we're going to

16  post from low-to-high, not high-to-low.  Distinguishing all

17  the cases plaintiff cites about how evil it is to cite, you

18  know, to post these things high-to-low.  We do the opposite

19  because we are a not-for-profit member-owned credit union of

20  which Ruby Lambert is a member.

21           Plaintiff's opposition brief actually helps us out

22  here too.  They define "item" as a given instruction for

23  transfer or payment from an account.  We agree with that

24  definition.  They argue that it must also cover all

25  iterations, but they say nothing in the agreement that says

36

1    that that would read the word "each" out of the agreement.

2            Finally, as to ambiguity, obviously Your Honor knows

3    that disagreement doesn't make the words ambiguous and the

4    Court, to use their terms, the ordinary plain meaning.  And

5    what the cases in Virginia hold is if you don't define a term,

6    you look at the context around it, how it's used and you give

7    its ordinary term.  So there's no fatal flaw in not defining a

8    term, particularly when you have the Federal Reserve saying

9    this is a term we think you should use.

10           The fact that the contract doesn't define it doesn't

11   mean anything, because remember, the triggering event for a

12   NSF fee is the return of a debit item, not the underlying

13   purpose.

14           As far as the back office stuff, she's not required

15   to know what the back office is doing.  But she agreed to let

16   Mutual of Omaha do exactly that.  So that's somewhat

17   irrelevant.  And I heard Mr. Kaliel say the agreement doesn't

18   say a fee -- a fee each time.  But it actually does say that.

19   It says there would be a fee for each returned debit item.

20   That's exactly what it says.

21           Again, citing to other banks and what they disclose

22   is simply confirming that their claims are preempted.  They're

23   saying we want to use state law to say you have to do it like

24   this.  Well, you can't charge a fee unless you do it like this

25   and I think that is preempted.  As far as discovery goes, as I

37

1    said before, Your Honor, all the discovery in the world isn't

2    going to change what this agreement says or whether Your Honor

3    has made the determination that the term "item" -- not "item,"

4    I don't want to focus on the word "item," because it's

5    "returned debit item" is a phrase when used in context.  That

6    that phrase is ambiguous.

7           Well, all the 20 times it's used in the agreement we

8    think the context is clear.  And if Navy Federal had to define

9    every term in a contract, the contract would be 1,000 pages

10   long.  We didn't define "credit" or "union" or "overdraft" or

11   "debit" either, but she knows what those words mean.

12          So ultimately, I think, the claims -- the contract

13   language is not ambiguous.  And I think that the argument that

14   we should disclose it differently is preempted, and I think

15   that the language we've used is expressly contemplated by the

16   Federal Reserve.  So the Court should grant the motion to

17   dismiss.

18          THE COURT:  All right.  Thank you, sir.

19          All right.  One point you want to make?

20          MS. KALIEL:  Just one point I neglected to mention.

21   I can show ample precedent for the Court to deny this motion.

22   There's the *Morris v. Bank of America* in the western district

23   of North Carolina, where Judge Conrad denied the motion to

24   dismiss a contract and viewed that claim on the identical

25   period about multiple fees on the same item.  And the *Lloyd v.*

Lambert v. NFCU

38

1   *Navy Federal* decision where a court in San Diego applying

2   Virginia law, looked at the identical Navy Federal context and

3   found -- contract and found multiple ambiguities in that

4   context and said expressly we need to go to the summary

5   judgment process to figure out what this ambiguous contract

6   means.

7           Thank you, Your Honor.

8           MR. BURNSIDE:  Could I just respond to that for two

9   points, Your Honor?

10          THE COURT:  Yes.

11          MR. BURNSIDE:  I mean first *Morris* is from North

12  Carolina.  It's different disclosures and there are different

13  state law.  And there were six different contract claims at

14  issue there.  And the judge never -- the magistrate never

15  explains which one it's affirming on.  There's the theory that

16  Bank of America charged overdraft and NSF fees prematurely, no

17  allegation here.  It charged both a NSF fee and overdraft fee,

18  no allegation like that here.  It charged NSF and overdraft

19  fees on multiple accounts for trying the same transaction.

20          THE COURT:  I read the case.

21          MR. BURNSIDE:  Okay.

22          THE COURT:  He just wanted to cite a Judge Conrad

23  case so that I would be mindful of that because --

24          MR. BURNSIDE:  One other thing --

25          THE COURT:  -- we've been together for 20 years.  Go

────────────── Lambert v. NFCU ──────────────
39

1  ahead.

2          MR. BURNSIDE:  One other thing of note, Mr. Kaliel

3  recently argued a motion to dismiss also in North Carolina in

4  state court.  The *Levow-Guerra v. State Employees Credit Union*

5  citing *Morris*, making those arguments.  And the trial court

6  judge granted a motion to dismiss despite *Morris*.  So even

7  Courts in North Carolina aren't necessarily persuaded by the

8  argument that he's raising.

9          MR. KALIEL:  I didn't argue that.

10          MR. BURNSIDE:  Well, one of your colleagues did.  As

11 to *Lloyd* --

12          THE COURT:  And you've run your course when you

13 start arguing with each other instead of me.  I appreciate the

14 briefing and we'll get you out a decision shortly and we

15 appreciate you coming from the west coast.

16          How is the weather out there?  Is it any --

17          MR. BURNSIDE:  Less humid.

18          THE COURT:  We've got great weather for a change.

19 But obviously, you wouldn't track our weather, but last year

20 we had more rain that you-all did.  So it was quite a summer.

21 We're looking forward to a little different one this year.

22 Well, have a safe trip back.

23          Good to see you-all.  Thank you for your arguments.

24 Have a good weekend.

25          MR. KALIEL:  Thank you, Your Honor.

1          **(Proceedings adjourned at 10:56 a.m.)**

2                 CERTIFICATE OF REPORTER

3

4          I, Tonia Harris, an Official Court Reporter for

5    the Eastern District of Virginia, do hereby certify that I

6    reported by machine shorthand, in my official capacity, the

7    proceedings had and testimony adduced upon the Motions

8    Hearing in the case of the **RUBY LAMBERT versus NAVY FEDERAL**

9    **CREDIT UNION**, Civil Action No. 1:19-CV-103, in said court

10   on the 24th day of May, 2019.

11         I further certify that the foregoing 40 pages

12   constitute the official transcript of said proceedings, as

13   taken from my machine shorthand notes, my computer realtime

14   display, together with the backup tape recording of said

15   proceedings to the best of my ability.

16         In witness whereof, I have hereto subscribed my

17   name, this August 1, 2019.

18

19

20

21                                Tonia M. Harris, RPR

22                                Official Court Reporter

23

24

25

                                                            40

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | |
|---|---|
| RUBY LAMBERT, individually and on behalf of all others similarly situated, <br><br> *Plaintiff,* <br><br> v. <br><br> NAVY FEDERAL CREDIT UNION, <br><br> *Defendant.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Civil No. 1:19-cv-103-LO-MSN

Hon. Liam O'Grady

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant's Motion to Dismiss for Failure to State a Claim (Dkt. 19). The Motion is fully briefed, and the Court heard oral argument on May 24, 2019. For the reasons stated below, and for good cause shown, Defendant's Motion to Dismiss for Failure to State a Claim (Dkt. 19) is hereby **GRANTED**.

## I. BACKGROUND

Plaintiff Ruby Lambert alleges that Defendant Navy Federal Credit Union charges multiple nonsufficient fund fees for multiple attempts to process a single payment request in violation of contractual language implying that only a single nonsufficient fund fee would ever be charged for a payment request, no matter how many times that payment request is declined for nonsufficient funds.

Plaintiff's contract with Navy Federal states that Navy Federal "may" assess "[a] fee" "for each returned debit item." Navy Fed. Credit Union Important Disclosures (hereinafter "Important Disclosures") at 4. Plaintiff's insurer, Mutual of Omaha, attempted to automatically

deduct Plaintiff's insurance payment from her Navy Federal account (with Plaintiff's prior authorization) using an Automated Clearing House ("ACH") debit request. That request was rejected due to insufficient funds, and Plaintiff was charged a nonsufficient fund fee. Mutual of Omaha again submitted an ACH debit request for the same payment two days later. Navy Federal again rejected the request due to insufficient funds and charged Plaintiff with another nonsufficient fund fee. Plaintiff challenges Navy Federal's assessment of the second nonsufficient fund fee, as she views Mutual of Omaha's original payment request and subsequent reprocessing attempt as involving the same "debit item." Plaintiff has brought two claims against Navy Federal: (1) breach of contract and the covenant of good faith and fair dealing under Virginia law, and (2) violation of North Carolina's Unfair and Deceptive Trade Practices Act.

Defendant Navy Federal Credit Union has moved to dismiss both claims on preemption grounds and for failure to state a valid claim.

## II. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A motion to dismiss pursuant to Rule 12(b)(6) must be considered in combination with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief" so as to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While "detailed factual allegations" are not required, Rule 8 does demand that a plaintiff provide more than mere labels and conclusions stating that the plaintiff is entitled to relief. *Id.* In evaluating whether a complaint states a plausible claim to relief, "although a court must accept as true all factual allegations contained in [the] complaint,

2

such deference is not accorded to legal conclusions stated therein." *Walters v. McMahen*, 684

F.3d 435, 439 (4th Cir. 2012).

## III. ANALYSIS

### A.    Plaintiff's Claims Are Partially Preempted.

Defendant Navy Federal Credit Union argues Plaintiff's claims are preempted by the

National Credit Union Administration's ("NCUA") regulations implementing the Federal Credit

Union Act ("FCUA") and Truth in Savings Act ("TISA"). State law claims may be preempted by

Congress "either expressly through the statute or regulation's language or impliedly through its

aim and structure." *Whittington v. Mobiloil Fed. Credit Union*, 2017 WL 6988193, at *6 (E.D.

Tex. Sept. 14, 2017) (citing *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)).

The relevant implementing regulations of the FCUA and TISA are contained in 12 C.F.R.

parts 701 and 707, respectively. The FCUA's implementing regulations state:

> A Federal credit union may, consistent with this section, parts 707 and 740 of this
> subchapter, other federal law, *and its contractual obligations*, determine the types
> of fees or charges and other matters affecting the opening, maintaining and
> closing of a share, share draft or share certificate account. *State laws regulating
> such activities are not applicable to federal credit unions.*

12 C.F.R. § 701.35(c) (emphasis added). By its terms, § 701.35 "expressly provides that [federal

credit unions] are authorized to determine, *free from state regulation*, the types of *disclosures,*

*fees or charges*" for their account offerings. 49 Fed. Reg. 46552-01, 46552 (Nov. 27, 1984)

(emphasis added); *see also* 50 Fed. Reg. 4636-01, 4636 (Feb. 1, 1985) ("This final rule provides

that policies with respect to disclosures, fees or charges . . . shall be determined by [a federal

credit union's] member-elected board of directors, free from regulatory restrictions."). Similarly,

the TISA implementing regulations require federal credit unions to provide disclosures regarding

"[t]he amount of any fee that may be imposed in connection with the account . . . and the

conditions under which the fee may be imposed," 12 C.F.R. § 707.4(b)(4), and expressly

3

preempt any "[s]tate law requirements that are *inconsistent* with the requirements of the TISA and [its implementing regulations]," 12 C.F.R. § 707.1(d) (emphasis added).

Consistent with the language and purpose of these regulations, it is well established that state law claims regarding a federal credit union's failure to disclose certain fee practices or any perceived unfairness in the fee practices themselves are preempted. *See, e.g., Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 725 (9th Cir. 2012) (finding that claims alleging the defendant's practice of posting debit-card transactions in high-to-low order was unfair were preempted because they would "prevent[] or significantly interfere[] with a national bank's federally authorized power to choose a posting order"); *id.* at 726 (finding failure to disclose claim against a bank preempted because "[i]mposing liability for the bank's failure to sufficiently disclose its posting method leads to the same result as mandating specific disclosures"); *Whittington*, 2017 WL 6988193, at *9 (finding that the plaintiff's "attempts to use a state consumer law to dictate to a federal credit union what fees it may charge and how it may charge them" were preempted); *id.* at *10 ("[A]ny claims based on [Mobiloil Federal Credit Union's] alleged failure to make certain disclosures are preempted.").

On the other hand, it is equally well established that true breach of contract and affirmative misrepresentation claims are not federally preempted, even if the result of those claims may affect a federal credit union's fee disclosures. *See, e.g., Gutierrez*, 704 F.3d at 726 (finding that the plaintiff's claims "based on Wells Fargo's misleading statements about its posting method" under the fraudulent prong of California's Unfair Competition Law were not preempted because that law "does not impose disclosure requirements but merely prohibits statements that are likely to mislead the public"); *Whittington*, 2017 WL 6988193, at *10–11 (finding a claim alleging a credit union affirmatively misrepresented that it assesses overdraft

4

fees only when a customer has overdrawn his or her account not preempted); *In re TD Bank,*

*N.A.*, 150 F. Supp. 3d 593, 610 (D.S.C. 2015) ("[B]reach of contract claims *not* premised on

unfairness or bad faith theories but on genuine disputes about the terms of the contract and the

parties' compliance therewith," are not preempted because "their impact on the bank's exercise

of its powers is only *incidental*." (emphasis in original)); *Hanjy v. Arvest Bank,* 94 F. Supp. 3d

1012, 1025 (E.D. Ark. 2015) (finding that the plaintiffs' breach of contract and breach of the

implied covenant of good faith and fair dealing claims were not preempted because the plaintiffs

merely sought "to hold [the defendant bank] to the terms of its contracts"); *Murr v. Capital One*

*Bank (USA), N.A.*, 28 F. Supp. 3d 575, 583 (E.D. Va. 2014) (rejecting the argument that the

plaintiff's fraud claim was preempted by the National Banking Act because holding the

defendant liable for fraud under state law would be "tantamount to imposing greater disclosure

requirements").

Here, Plaintiff alleges that Navy Federal does not assess fees as disclosed in its contract

and that its actual fee assessment practice is unfair. To the extent Plaintiff's claims allege only

that Navy Federal has failed to comply with the express terms of the parties' contract or

affirmatively misrepresented its fee practices, Plaintiff's claims are not preempted under the

affirmative misrepresentation and true breach of contract line of cases. While federal credit

unions have the discretion to determine fee practices and disclosures free from state regulation

inconsistent with the FCUA, the TISA, and their implementing regulations, federal credit unions

must still comply with the terms of their contracts related to fee practices and not affirmatively

misrepresent those practices. To the extent Plaintiff challenges a perceived failure to disclose, the

specific language used in the disclosure, or the fairness of the fee practice itself, however, those

arguments are clearly preempted.

**B.** **The Complaint Fails to State a Claim for Breach of Contract.**

Although Plaintiff's breach of contract claim is not entirely preempted, the Court finds

that it must be dismissed for failure to state a claim because the contract unambiguously gives

Navy Federal the contractual right to impose fees in the way that it did.

Contracts must be construed as a whole without placing undue emphasis on isolated

terms, *Erie Ins. Exch. v. EPC MD 15, LLC*, 297 Va. 21, 822 S.E.2d 351, 356 (2019), or adding

additional terms, *Squire v. Va. Hous. Dev. Auth.*, 287 Va. 507, 758 S.E.2d 55, 60 (2014). When

the terms of a contract are "clear and unambiguous," courts are required to construe those terms

"according to their plain meaning." *Golding v. Floyd*, 261 Va. 190, 192, 539 S.E.2d 745, 736

(2001). "The fact that one may hypothesize opposing interpretations of the same contractual

provision does not necessarily render the contract ambiguous because . . . a contract is not

ambiguous simply because the parties to the contract disagree about the meaning of its

language." *Erie*, 822 S.E.2d at 356 (internal quotation marks omitted) (quoting *Babcock &*

*Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 179, 788 S.E.2d 237 (2016)). Instead, "conflicting

interpretations reveal an ambiguity only where they are reasonable." *Id.* at 355. "If the text of the

agreement is unambiguous, then the court is without authority to resort to extrinsic evidence,"

such as public confusion, "in interpreting its meaning." *Schneider v. Cont'l Cas. Co.*, 989 F.2d

728, 732 (4th Cir. 1993).

While Plaintiff disagrees with Navy Federal's interpretation of "[a] fee may be assessed

. . . for each returned debit item," the Court agrees with Navy Federal that the provision is

unambiguous and matches Navy Federal's practice.

Both parties agree that an "item" is a request or invitation for payment. In disclosing the

order in which transactions are posted to a member's account, the contract lists all of the

following as types of "items": "all money coming in (credits, deposits, etc.); ATM withdrawals;

6

debit card transactions, also called Point of Sale (POS); *Automated Clearing House (ACH)*
*debits*; and checks written." Important Disclosures at 3 (emphasis added). Thus, it is clear from
the contract that ACH debit requests, such as the two submitted by Plaintiff's insurer, qualify as
"debit items." The contract also warns Navy Federal Credit Union members that "[a]n ACH
debit might be made as a result of an authorization you gave a third party to automatically
transfer funds from your account to pay your monthly insurance premium, utility bills, or car
payment," *id.* at 9, as happened when Plaintiff's insurer submitted the second request for
payment.

Plaintiff argues, however, that two ACH debit requests made by the same merchant, in
the same amount, for the same purpose, are the same "debit item." In other words, Plaintiff
argues that her insurer merely resubmitted the same "debit item" when it requested payment for
the second time, rather a new debit item. In support of her interpretation, Plaintiff analogizes her
insurer's requests for payment to a "check[] that you have written but that ha[s] not yet cleared
your account," which the disclosures refer to as a single item, *id.* at 5.

Plaintiff's interpretation is unreasonable in light of the contract as a whole. When
Plaintiff was charged the initial nonsufficient funds fee, it was because her insurer's request for
payment (the "debit item") was returned. The contract specifies that "Navy Federal may *return*
debits to the checking account (e.g., an ACH payment) if the amount of the debit exceeds funds
available in the checking account" and assess "[a] fee" for the "*returned* debit item." *Id.* at 4
(emphasis added); *see also id.* at 5 ("If we do not pay an overdraft, your transaction will be
declined and/or your check/ACH will be *returned*, unpaid." (emphasis added)). Plaintiff's
insurer's first ACH debit request was not in the midst of being processed like a "check[] that you
have written but that ha[s] not yet cleared your account," but rather was rejected just as a

7

bounced check would be. Navy Federal also did not keep Plaintiff's insurer's unsuccessful first ACH request and attempt to reprocess the request on its own. It returned the request and waited for Plaintiff's insurer to submit another request for payment, which Navy Federal was then obligated to process.

If a check was rejected and a second check was submitted by the same merchant, in the same amount, for the same purpose, and the second check was also rejected, the contract clearly gives Navy Federal Credit Union the right to charge another fee. *Id.* at 4 ("A fee will be assessed . . . for each refused check."). The analogous provision for debit items therefore also gives Navy Federal the right to charge a fee for each presentment of an ACH electronic request for payment, even if the request is by the same merchant, in the same amount, and for the same purpose. [1] Thus, rather than support Plaintiff's position, the contract's check provisions support Navy Federal's interpretation of the contract and position that the contract is unambiguous. When Plaintiff's insurer "re-presented" the request for payment, it was a new ACH debit item – just as a second check would be a new check even if it was by the same merchant, in the same amount, for the same purpose – and was therefore eligible for a fee when it was returned for nonsufficient funds.

Further, the sentence in dispute must be read in conjunction with the sentence immediately before it. The first sentence states: "Navy Federal may return debits to the checking account (e.g., an ACH payment) if the amount of the debit exceeds funds available in the checking account." *Id.* at 4. The next sentence warns: "A fee may be assessed in the amount shown on Navy Federal's current Schedule of Fees and Charges for each returned debit item."

---

[1] The use of "refused" before check but "returned" before "debit item" is inconsequential. When a check is refused, it may not always be returned. For example, Navy Federal Credit Union may not mail a bounced check back to the member or payment requester. By contrast, the parties have represented that when electronic transactions, such an ACH debits, are rejected, they are returned via the same electronic transmission method, such as the ACH network.

8

*Id.* (italics removed). Taken together, these sentences clearly provide that Navy Federal may return a debit item, such as an ACH debit, if there is not enough money in the account (the first sentence), and, if there is a return, Navy Federal may charge the member a fee for that returned debit transaction (the second sentence).

Plaintiff disagrees, arguing that "returned debit *item*" in the second sentence must mean something different than "returned debit" in the first sentence. At the hearing, Plaintiff conceded that without the inclusion of "item" in the second sentence, Plaintiff would not have a claim. Yet, the Court finds that the use of "item" does not render the sentence ambiguous. As noted above, other provisions of the contract demonstrate that an "item" includes various types of transactions that would either add or subtract money from the account. The contract merely uses "debit" as an adjective to modify "item," just as "returned" is used as an adjective to modify "debit item." Thus, "debit item" clearly refers to a transaction that attempts to withdraw money from the account, such as an ACH debit request, and the inclusion of "item" in "returned debit item" does not render the contract ambiguous.

In conclusion, when the terms of the contract are read together and in context, the contract unambiguously provides that "each" time Navy Federal Credit Union "returns" a request for payment (a "debit item") for insufficient funds, a nonsufficient fund fee may be assessed without regards to whether the returned debit item was a re-presentment of a previously rejected request. As a result, Navy Federal Credit Union did not breach the contract when it assessed the second nonsufficient fund fee for Plaintiff's insurer's second ACH debit request. Because "[t]he Complaint's allegations make clear that no breach [of contract] occurred," the breach of contract claim must be dismissed for failure to state a claim. *Hanback v. DRHI, Inc.*, 94 F. Supp. 3d 753, 761 (E.D. Va. 2015).

**C.**     **The Complaint Fails to State a Claim for Breach of the Covenant of Good Faith and Fair Dealing.**

Plaintiff's breach of the covenant of good faith and fair dealing claim must also be dismissed for similar reasons.

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 51 (E.D.N.Y. 2014). The implied covenant prevents a party from exercising "contractual *discretion* in bad faith, even when such discretion is vested solely in that party," but it "does not prevent a party from exercising its explicit contractual *rights*." *Va. Vermiculite, Ltd. v. W.R. Grace & Co.–Conn.*, 156 F.3d 535, 542 (4th Cir. 1998) (emphasis in original). The relevant case law establishes that "(1) where a party has a clear contract right, even if its exercise would arguably be arbitrary, that party is only forbidden from acting dishonestly; (2) but where a party has discretion in performance, that party cannot act arbitrarily or unfairly." *Stoney Glen, LLC v. S. Bank & Trust Co.*, 944 F. Supp. 2d 460, 466 (E.D. Va. 2013) (citations omitted).

Courts have "explicitly rejected attempts to characterize the decision whether to exercise an accrued right as a matter of 'contractual discretion.'" *Id.* at 468. At the same time, however, courts have held that the implied covenant applies where the accrual of a contractual right depends on a party's exercise of contractual discretion rather than on objective facts. *Id.* at 469. In other words, "[a] party to a contract can flip a coin to decide whether to exercise an accrued right, but cannot flip a coin to determine whether a right has accrued." *Id.*

In this case, Navy Federal's right to charge a fee depended on the existence of an objective fact: whether a debit item had been returned for nonsufficient funds. Thus, although the contract stated that Navy Federal "may" rather than "will" assess a fee for each returned debit item, Navy Federal had the contractual right to assess the challenged fee and, unlike in the cases

<div align="center">10</div>

cited by Plaintiff, had not exercised any contractual discretion in bad faith to cause that right to accrue.[2] Plaintiff has also not plausibly alleged that Navy Federal exercised its contractual right to charge the fee dishonestly.

Accordingly, Plaintiffs' breach of the covenant of good faith and fair dealing claim must be dismissed because Navy Federal honestly exercised its contractual *right* to charge Plaintiff a nonsufficient fund fee for her insurer's second request for payment. *Va. Vermiculite*, 156 F.3d at 542 ("[I]t is a basic principle of contract law in Virginia, as elsewhere, that . . . the duty of good faith does not prevent a party from exercising its explicit contractual *rights* . . . ." (emphasis in original)); *Riggs Nat'l Bank of Wash., D.C. v. Linch*, 36 F.3d 370, 373 (4th Cir. 1994) ("An implied duty of good faith cannot be used to override or modify explicit contractual terms."); *Wilkins v. United States*, 2016 WL 2689042, at *4 (E.D. Va. May 9, 2016) (dismissing implied covenant claim where the defendant "had the contractual right . . . to engage in the actions alleged in the Complaint"); *Bennett v. Bank of Am., N.A.*, 2012 WL 1354546, at *11 (E.D. Va. Apr. 18, 2012) (dismissing implied covenant claim where the defendant bank exercised its contractual rights and it was not plausibly alleged that the bank "exercise[d] its contractual *discretion* in bad faith" (alteration and emphasis in original)); *Albayero v. Wells Fargo Bank, N.A.*, 2011 WL 4748341, at *6 (E.D. Va. Oct. 5, 2011) (dismissing implied covenant claim where "the actions taken by Defendants merely amounted to an exercise of their contractual rights").

---

[2] In the cases Plaintiff relies upon, the breach of implied covenant claims survived motions to dismiss because the banks exercised their contractual discretion to post debit items in any order to maximize the accrual of their right to charge overdraft fees. *See, e.g., Gutierrez*, 622 F. Supp. 2d at 954; *In re HSBC Bank*, 1 F. Supp. 3d at 51–52.

**D.      The Complaint Fails to State a Claim Under the North Carolina Unfair and Deceptive Trade Practices Act.**

Finally, Plaintiffs' North Carolina Unfair and Deceptive Trade Practices Act ("NC UDTPA") claim must be dismissed pursuant to the contract's choice-of-law provision.

The contract specifies that "Navy Federal accounts are maintained and governed in accordance with federal law and the laws of the Commonwealth of Virginia, as amended." Important Disclosures at 7. The language of this provision, which is included in a separate "Governing Laws" section, is sufficiently broad to preclude Plaintiff's NC UDTPA claim because the claim (a) concerns how Navy Federal "maintain[s]" Plaintiff's "accounts" and interprets the account agreement, and (b) asserts identical allegations to Plaintiff's breach of contract claims. *Run Them Sweet, LLC v. CPA Glob. Ltd.*, 224 F. Supp. 3d 462, 465–69 (E.D. Va. 2016) (Ellis, J.); *Freedman v. Am. Online, Inc.*, 325 F. Supp. 2d 638, 653–54 (E.D. Va. 2004) (Ellis, J.); *see also Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999) ("Where a choice of law clause in the contract is sufficiently broad to encompass contract-related tort claims," courts should apply the clause as such.).

Plaintiff has also failed to show that enforcing the choice-of-law provision in this case "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state." *Projects Mgmt. Co. v. DynCorp Int'l, LLC*, 2014 U.S. Dist. LEXIS 41411, at *13 (E.D. Va. March 26, 2014) (quoting Restatement (Second) of Conflict of Laws § 187(2) (1971)). Although North Carolina's UDTPA permits claims against credit unions while Virginia's analogue statute does not, "the enforcement of a choice-of-law provision that would apply a narrower consumer protection or deceptive trade practices statute does not amount to a violation of a fundamental public policy of another, more interested jurisdiction." *Canon U.S.A., Inc. v. Cavin's Bus. Sols., Inc.*, 208 F. Supp. 3d 494, 505 (E.D.N.Y. 2016) (dismissing NC

12

UDTPA claim pursuant to a choice-of-law provision); *see also, Run Them Sweet*, 224 F. Supp.

3d at 469 (dismissing a claim brought under California's unfair and deceptive trade practices

statute pursuant to a Virginia choice-of-law provision because "there is no indication" that doing

so "violates California public policy"). North Carolina's UDTPA also does not have an anti-

waiver provision that would indicate dismissing a NC UDTPA claim pursuant to a choice-of-law

provision would violate North Carolina's policy. *G.P.P., Inc. v. Guardian Prot. Prods., Inc.*,

2015 WL 3992878, at *18 (E.D. Cal. June 30, 2015) (dismissing a NC UDTPA claim pursuant to

a choice-of-law provision because the parties did not "identify a choice-of-law exclusion or

waiver provision in the statute"); *see also Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co.*,

386 F.3d 581, 608–09 (4th Cir. 2004) (noting that a fundamental policy analysis generally

focuses on whether there is an anti-waiver provision in the statute or other statutory language

suggesting the legislature intended the statute to embody fundamental policy, and finding that a

choice-of-law provision barred a state law claim brought under a statute that had neither). To the

contrary, the North Carolina Supreme Court has held that parties *can* waive their rights under

North Carolina's UDTPA. *See Ussery v. Branch Banking & Trust Co.*, 368 N.C. 325, 777 S.E.2d

272, 281 (2015); *United Labs., Inc. v. Kuykendall*, 335 N.C. 183, 437 S.E.2d 374, 381 n.6

(1993). Thus, dismissing Plaintiff's NC UDPTA claim pursuant to the choice-of-law provision

would not violate North Carolina's fundamental policy.

Accordingly, Plaintiff's North Carolina Unfair and Deceptive Trade Practices Act claim

will be dismissed pursuant to the contract's choice-of-law provision.[3]

---

[3] In *Lloyd v. Navy Federal Credit Union*, the United States District Court for the Southern District of California
found the Virginia choice-of-law provision at issue unenforceable as to the plaintiff's California consumer
protection statutory claims because enforcing the provision would violate California's public policy. 2018 WL
1757609, at *5–6 (S.D. Cal. Apr. 12, 2018). The holding in *Lloyd* was based on (a) California's fundamental public
policy in favor of class actions, which the California statutes permit but the Virginia statutes do not, and (b) the
express anti-waiver provision in one of the California consumer protection statutes at issue, which stated that
waivers are unenforceable as contrary to public policy. *Id.* at *5. Because NC's UDTPA does not have an anti-

## IV. CONCLUSION

For the reasons stated above, and for good cause shown, Defendant's Motion to Dismiss for Failure to State a Claim (Dkt. 19) is hereby **GRANTED**. Finding that amendment would be futile, Plaintiff's Complaint is hereby **DISMISSED WITH PREJUDICE**.

It is **SO ORDERED.**

August/4, 2019                                  _____
Alexandria, Virginia                            Liam O'Grady
                                                United States District Judge

---

waiver provision or any statement that the ability to bring suits against a credit union is a fundamental policy of the state, *Lloyd* does not apply to this case.

14

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

|  |  |
|---|---|
| RUBY LAMBERT, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. 1:19-cv-00103-LO-MSN |
| v. | Hon. Liam O'Grady |
| NAVY FEDERAL CREDIT UNION, | |
| Defendant. | |

### PLAINTIFF'S NOTICE OF APPEAL

Notice is hereby given that Plaintiff-Appellant Ruby Lambert hereby appeals to the United States Court of Appeals for the Fourth Circuit from the Memorandum Opinion and Order, dismissing the Complaint with prejudice, signed and entered by District Judge Liam O'Grady on August 14, 2019.  [ECF No. 37.]

Respectfully submitted,

Date:   September 11, 2019

*/s/ Kristi C. Kelly*
Kristi C. Kelly, VSB No. 72791
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Fax: (703) 591-0167
Email: kkelly@kellyguzzo.com

Jeffrey D. Kaliel (pro hac vice)
Sophia G. Gold (pro hac vice)
KALIEL PLLC
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C. 20009
(202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com

Hassan A. Zavareei (pro hac vice)
Andrea Gold (pro hac vice)
Katherine M. Aizpuru (pro hac vice)
TYCKO & ZAVAREEI LLP
1828 L Street, NW, Suite 1000
Washington, DC 20036
Telephone: (202) 973-0900

Jeff Ostrow (pro hac vice)
Jonathan M. Streisfeld (pro hac vice)
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
One W. Las Olas Blvd.
Suite 500
Fort Lauderdale, FL 33301

- 1 -

Facsimile: (202) 973-0950
hzavareei@tzlegal.com
agold@tzlegal.com
kaizpuru@tzlegal.com

Telephone: (954) 525-4100
Facsimile: (954) 525-4300
ostrow@kolawyers.com
streisfeld@kolawyers.com

*Attorneys for Plaintiff and the Putative Classes*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 11th day of September, 2019, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

/s/ *Kristi C. Kelly*

Kristi C. Kelly, VSB No. 72791
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Fax: (703) 591-0167
Email: kkelly@kellyguzzo.com
*Counsel for Plaintiff*

- 3 -

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2019, I electronically filed the foregoing Joint Appendix with the United States Court of Appeals for the Fourth Circuit using the Court's CM/ECF system. All participants in Case No. 19-1993 are registered CM/ECF users and will be served by the appellate CM/ECF system. Participants in the cases who are registered CM/ECF users have been served by email as follows:

Frederick B. Burnside
*fredburnside@dwt.com*

Jonathan Marc Streisfeld
*streisfeld@kolawyers.com*

Rebecca Jean Francis
*rebeccafrancis@dwt.com*

Matthew W.H. Wessler
*matt@guptawessler.com*

Andrea Rifka Gold
*agold@tzlegal.com*

Hassan A. Zavareei
*hzavareei@tzlegal.com*

Don Bradford Hardin Jr.
*bradfordhardin@dwt.com*

I certify under penalty of perjury that the above is true and correct.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler